1    **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO**

2
- - - - - - - - - - - - - - - - - - x
3                                    :
UNITED STATES OF AMERICA,           : Case No. CR 12-155-S-BLW
4                                    :
                   Plaintiff,       :  **JURY TRIAL**
5                                    :
          vs.                       :
6                                    :
JESUS GUADALUPE SANCHEZ, a/k/a JOSE :
7 SALAZAR, a/k/a "CHE," JIM ALLEN    :
LOVELAND, and, MICHAEL DENNIS MORRIS, :
8                                    :
                   Defendants.      :
9                                    :
- - - - - - - - - - - - - - - - - - x
10

11

12

13

14

15    REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17    before B. Lynn Winmill, Chief District Judge

18    Volume 5

19    January 18, 2013

20
      Pages 1215 to 1323
21

22

23                **Tamara I. Hohenleitner**
          Idaho Certified Shorthand Reporter No. 619
24              Registered Professional Reporter
                 Certified Realtime Reporter
25            Federal Certified Realtime Reporter

             United States Courts, District of Idaho
       550 West Fort Street, Boise, Idaho  83724  (208) 334-1500

1                        A P P E A R A N C E S

2

3       FOR UNITED STATES OF AMERICA

4               Lynne W. Lamprecht
                US ATTORNEY'S OFFICE
5               Washington Group Plaza IV
                800 Park Blvd., Ste. 600
6               Boise, ID 83712-9903
                Tel:  (208) 334-1211
7               Fax:  (208) 334-9375
                Email:  Lynne.lamprecht2@usdoj.gov
8

9       FOR DEFENDANT JESUS GUADALUPE SANCHEZ
10
                Jeffrey P. Heineman
11              HEINEMAN LAW OFFICE
                1501 Tyrell Lane
12              Boise, ID 83706
                Tel: (208) 830-6124
13              Fax: (208) 947-9009
                Email: Jeff@heinemanlaw.com
14

15      FOR DEFENDANT MICHAEL DENNIS MORRIS

16              Joseph W. Borton
                BORTON-LAKEY LAW OFFICES
17              141 E. Carlton Avenue
                Meridian, ID 83642
18              Tel: (208) 908-4415
                Fax: (208) 493-4610
19              Email: Joe@borton-lakey.com

20

21      FOR DEFENDANT JIM ALLEN LOVELAND

                Christian Berglund
22              BERGLUND LAW, PLLC
                500 W. Bannock Street
23              Boise, ID 83702
                Tel: (208) 342-7600
24              Fax: (208) 392-1395
                Email: Chris@berglundlaw.com
25

---

**United States Courts, District of Idaho**

1217

<u>I N D E X</u>

| 1 | Date | Proceeding | Volume-Page |
|---|------|-----------|-------------|

2  01/14/13  Jury Trial Day 1......................... V1 - 159

3            Preliminary jury instructions........... V1 - 177
             Opening statement by the Government..... V1 - 196
4            Opening statement by Defendant Morris... V1 - 228
             Opening statement by Defendant Loveland.. V1 - 242
5            Opening statement by Defendant Sanchez... V1 - 245

6  01/15/13  Jury Trial Day 2......................... V2 - 317

7  01/16/13  Jury Trial Day 3......................... V3 - 639

8  01/17/13  Jury Trial Day 4......................... V4 - 916

9  01/18/13  Jury Trial Day 5......................... V5 - 1215
             Rule 29 motion by Defendants............ V5 - 1298
10           Jury instruction conference............. V5 - 1315

11 01/22/13  Jury Trial Day 6......................... V6 - 1324
             Further jury instruction conference..... V6 - 1334
12           Final jury instructions by The Court.... V6 - 1341
             Closing argument by the Government...... V6 - 1364
13           Closing argument by Defendant Loveland.. V6 - 1422
             Closing argument by Defendant Morris.... V6 - 1443
14           Closing argument by Defendant Sanchez... V6 - 1468
             Rebuttal argument by the Government..... V6 - 1481
15           Final jury instructions by The Court.... V6 - 1495
             Jury verdict............................ V6 - 1505

16

17                <u>U N I T E D   S T A T E S   W I T N E S S E S</u>

18                                              **VOLUME-PAGE**

19 **FABIAN BELTRAN**
        Direct Examination by Ms. Lamprecht..............V1 - 249
20      Continued Direct Examination by Ms. Lamprecht....V2 - 328
        Voir Dire Examination by Mr. Borton.............V2 - 338
21      Continued Direct Examination by Ms. Lamprecht....V2 - 340
        Cross-Examination by Mr. Heineman...............V2 - 364
22      Cross-Examination by Mr. Borton.................V2 - 377
        Cross-Examination by Ms. Berglund...............V2 - 383
23      Redirect Examination by Ms. Lamprecht...........V2 - 388
        Recross-Examination by Mr. Heineman.............V2 - 394
24      Recross-Examination by Mr. Borton...............V2 - 396
        Recross-Examination by Ms. Berglund.............V2 - 400
25      Further Redirect Examination by Ms. Lamprecht....V2 - 402

1218

# I N D E X

1

### U N I T E D   S T A T E S   W I T N E S S E S

2
                                                    VOLUME-PAGE
3   ROBERT BOONE
        Direct Examination by Ms. Lamprecht..............V4 - 1131
4       Cross-Examination by Mr. Borton..................V4 - 1146
        Redirect Examination by Ms. Lamprecht...........V4 - 1147
5
    PATRIC CAMPBELL
6       Direct Examination by Ms. Lamprecht..............V4 - 928
        Cross-Examination by Mr. Borton..................V4 - 952
7       Redirect Examination by Ms. Lamprecht...........V4 - 959

8   AMY CAVAZOS
        Direct Examination by Ms. Lamprecht..............V4 - 1025
9       Cross-Examination by Mr. Borton..................V4 - 1047
        Cross-Examination by Mr. Heineman................V4 - 1049
10      Redirect Examination by Ms. Lamprecht...........V4 - 1052
        Recross-Examination by Mr. Borton................V4 - 1053
11
    JAMES CHRISTENSEN
12      Direct Examination by Ms. Lamprecht..............V4 - 1058
        Cross-Examination by Mr. Heineman................V4 - 1082
13
    RACHEL L. COBLENTZ
14      Direct Examination by Ms. Lamprecht..............V4 - 961
        Cross-Examination by Mr. Borton..................V4 - 1000
15      Redirect Examination by Ms. Lamprecht...........V4 - 1009
        Cross-Examination by Mr. Heineman................V4 - 1012
16      Recross-Examination by Mr. Borton................V4 - 1014
        Further Redirect Examination by Ms. Lamprecht....V4 - 1016
17      Further Recross-Examination by Mr. Heineman......V4 - 1020
        Further Redirect Examination by Ms. Lamprecht....V4 - 1023
18
    KRISTOPHER CRAIG HENSLEY
19      Direct Examination by Ms. Lamprecht..............V3 - 766
        Cross-Examination by Mr. Borton..................V3 - 812
20      Cross-Examination by Ms. Berglund................V3 - 824
        Redirect Examination by Ms. Lamprecht...........V3 - 824
21      Recross-Examination by Mr. Borton................V3 - 827
        Further Redirect Examination by Ms. Lamprecht....V3 - 832
22
    AMBER HITES
23      Direct Examination by Ms. Lamprecht..............V3 - 868
        Cross-Examination by Mr. Borton..................V3 - 904
24      Redirect Examination by Ms. Lamprecht...........V3 - 907
        Cross-Examination by Mr. Heineman................V3 - 908
25      Further Redirect Examination by Ms. Lamprecht....V3 - 911

1219

## <u>I N D E X</u>

1

U N I T E D   S T A T E S   W I T N E S S E S

2
                                                                         VOLUME-PAGE

3  **JUSTIN KLITCH**
     Direct Examination by Ms. Lamprecht..............V3 - 852

4
**JONATHAN L. LAURENSON**

5       Direct Examination by Ms. Lamprecht..............V3 - 838

6  **MARIO MARTINEZ**
     Direct Examination by Ms. Lamprecht..............V2 - 578

7       Cross-Examination by Ms. Berglund...............V2 - 598
     Cross-Examination by Mr. Heineman...............V2 - 598

8       Redirect Examination by Ms. Lamprecht...........V2 - 604

9  **DAVID R. NETH**
     Direct Examination by Ms. Lamprecht..............V2 - 406

10
**VICTOR RUIZ**

11      Direct Examination by Ms. Lamprecht..............V2 - 485
     Cross-Examination by Mr. Borton................V2 - 556

12      Cross-Examination by Ms. Berglund...............V2 - 561
     Cross-Examination by Mr. Heineman...............V2 - 566

13      Redirect Examination by Ms. Lamprecht...........V2 - 570
     Recross-Examination by Mr. Borton...............V2 - 575

14      Recross-Examination by Mr. Heineman.............V2 - 575

15 **DAVID C. SINCERBEAUX**
     Direct Examination by Ms. Lamprecht..............V5 - 1256

16      Cross-Examination by Mr. Borton................V5 - 1282
     Cross-Examination by Mr. Heineman...............V5 - 1286

17      Redirect Examination by Ms. Lamprecht...........V5 - 1293

18 **JESS STENNETT**
     Direct Examination by Ms. Lamprecht..............V4 - 1148

19      Continued Direct Examination by Ms. Lamprecht....V5 - 1238
     Cross-Examination by Ms. Berglund...............V5 - 1242

20      Cross-Examination by Mr. Heineman...............V5 - 1251
     Redirect Examination by Ms. Lamprecht...........V5 - 1253

21      Recross-Examination by Ms. Berglund.............V5 - 1253

22 **JOHNNY TAMBUNGA**
     Direct Examination by Ms. Lamprecht..............V2 - 412

23      Cross-Examination by Ms. Berglund...............V2 - 461
     Cross-Examination by Mr. Heineman...............V2 - 465

24      Cross-Examination by Mr. Borton................V2 - 473
     Redirect Examination by Ms. Lamprecht...........V2 - 479

25      Recross-Examination by Ms. Berglund.............V2 - 483

# I N D E X

1

## U N I T E D   S T A T E S   W I T N E S S E S

2

VOLUME-PAGE

3  **BENJAMINE LAWRENCE VERTNER**
      Direct Examination by Ms. Lamprecht.............V2 - 607
4      Continued Direct Examination by Ms. Lamprecht....V3 - 649
      Cross-Examination by Mr. Borton..................V3 - 715
5      Cross-Examination by Mr. Heineman................V3 - 745
      Cross-Examination by Ms. Berglund................V3 - 750
6      Redirect Examination by Ms. Lamprecht............V3 - 751
      Recross-Examination by Mr. Heineman..............V3 - 758
7      Further Redirect Examination by Ms. Lamprecht....V3 - 760

8  **KENNETH WHITE**
      Direct Examination by Ms. Lamprecht.............V3 - 762

9

   **GENE WUNSCH**
10      Direct Examination by Ms. Lamprecht.............V4 - 1084
      Cross-Examination by Mr. Heineman...............V4 - 1129

11

12

## U N I T E D   S T A T E S   E X H I B I T S

13

14  **ADMITTED**                                         VOLUME-PAGE

15  **2**      Photo of Trailer #10, Clifford's Trailer
              Park.......................................V1 - 262
16  **3**      Clifford's Trailer Park Payment Log.........V2 - 430
    **4**      Photo of Johnny Tambunga....................V1 - 267
17  **5**      Photo of Fabian Beltran.....................V2 - 434
    **6**      Photo of Victor Ruiz........................V1 - 308
18  **7**      Jim Loveland Business Card - Piloting
              Service....................................V4 - 1188
19  **8**      Jim Loveland Business Card - Disaster
              Recovery...................................V4 - 1189
20  **9A**     Phone calls between Jim Loveland and Che
              Primo a/k/a Sanchez - Summary Chart -
21            March 2012- May 2012.......................V1 - 196
    **9B**     Phone calls between Jim Loveland and
22            Beltran - Summary Chart - February 2012 -
              May 2012...................................V1 - 196
23  **9C**     Phone calls between Jim Loveland and
              Tambunga - Summary Chart Dec. 2011-
24            January 2012...............................V1 - 196
    **9D**     Loveland Phone Tolls Diagram...............V1 - 196
25  **9E**     902(11) Certification of T-Mobile Records
              by Joshua Spencer..........................V1 - 196

1221

<u>I N D E X</u>

1                        <u>U N I T E D   S T A T E S   E X H I B I T S</u>

2   **ADMITTED**                                              **VOLUME-PAGE**

3   **10**      Photo of Jim Loveland's House............... V1 - 274
    **11**      Photo of Mario Martinez..................... V1 - 278
4   **12**      Photo of Dawson Lee Moore................... V1 - 280
    **13**      Photo of Dawson Lee Moore's House........... V1 - 281
5   **14**      Beltran's T-Mobile Samsung Phone............ V1 - 305
    **14A**     Phone Contacts from Ex. 14 - Fabian
6           Beltran's T-Mobile Samsung Phone............ V1 - 305
    **15**      Beltran's Blackberry Phone.................. V1 - 295
7   **15A**     Contact List from Ex.15 Fabian Beltran's
            BlackBerry Phone............................ V1 - 297
8   **15B**     Phone calls between Jim Loveland and
            Primo Che a/k/a Sanchez - Summary Chart -
9           Feb. 2012................................... V4 - 1199
    **17**      Llama .380 pistol........................... V4 - 1066
10  **18**      Photo of Llama .380 pistol under couch in
            Trailer..................................... V1 - 288
11  **21**      .22 Derringer pistol with gold grip S.N.
            241111...................................... V4 - 1091
12  **22**      Photo of two Derringer pistols.............. V1 - 290
    **23**      .22 Derringer pistol with red grip S.N.
13          491605...................................... V4 - 1092
    **24**      30, .22 Hornady Bullets..................... V4 - 1095
14  **24A**     Photo of .22 bullets from back bedroom...... V4 - 1096
    **25**      ATF Form 4473 Transaction Record of Ex.
15          16 (.380  pistol) and Ex. 19 (.22
            Derringer) to Jesus Guadalupe Sanchez....... V1 - 196
16  **25A**     902(11) Certification of Records from
            Bargain Gun and Pawn by John Cox............ V1 - 196
17  **26**      ATF Report of Multiple Sale of Pistols to
            Sanchez..................................... V1 - 196
18  **27**      Photo of Red Ford F11 pickup truck.......... V2 - 348
    **28**      Photo of Money in steering wheel of Ex.
19          26 (Ford F11 pickup truck).................. V2 - 350
    **29**      Certificate of Title for Red Ford F11
20          pickup truck................................ V2 - 411
    **30A**     JZ Auto Sales Retail Vehicle purchase
21          Contract for Sanchez - Lincoln Navigator.... V4 - 1102
    **30B**     Report of Sale and Application for
22          Certification of Title for Lincoln
            Navigator by Sanchez........................ V4 - 1103
23  **30C**     Receipt for $500 payment for Lincoln
            Navigator................................... V4 - 1106
24  **31A**     Wells Fargo Bank Consumer Account
            Application for Jesus G. Sanchez - Acc't
25          No. X5483 3 pp.............................. V1 - 196

1222

<u>I N D E X</u>

1

<u>U N I T E D   S T A T E S   E X H I B I T S</u>

2

**ADMITTED**                                                    **VOLUME-PAGE**

3

  **31B**    Sanchez's Wells Fargo Statement for Acc't
4          X5483 Oct. - Nov. 2011......................V1 - 196
  **31C**    Sanchez's Wells Fargo Statement for Acc't
5          X5483 Nov. - Dec. 2011......................V1 - 196
  **31D**    Sanchez's Wells Fargo Statement for Acc't
6          X5483 Dec. 2011 - Jan. 2012.................V1 - 196
  **31E**    Sanchez's Wells Fargo Statement for Acc't
7          X5483 Jan. 2012-Feb. 2012...................V1 - 196
  **31F**    Sanchez's Wells Fargo Statement for Acc't
8          X5483 Feb. 2012 - Mar. 2012.................V1 - 196
  **31G**    Sanchez's Wells Fargo Statement for Acc't
9          X5483 Mar. 2012 - Apr. 2012.................V1 - 196
  **31H**    Sanchez's Wells Fargo Statement for Acc't
10         X5483 Apr. 2012 - May 2012..................V1 - 196
  **31I**    Sanchez Wells Fargo Statement for Acc't
11         X5483 May 2012 - June 2012..................V1 - 196
  **31J**    902(11) Certification of Records from
12         Wells Fargo by Sherry Tiniakoff.............V1 - 196
  **32A**    Wells ExpressSend Service Global
13         Remittance Service Agreement - Wells
           Fargo Acc't X5483 Jesus G. Sanchez,
14         12/21/2011 - 2 pp...........................V4 - 1107
  **32B**    Wells Fargo Receipt - $1600 Deposit to
15         Acc't X5483 -12/21/2011 at 1:11 p.m.........V4 - 1111
  **32C**    Wells Fargo Express Send Remittance
16         Transfer Record - Acc't X5483 -
           12/21/2011 at 1:12:43 p.m. $1500 to
17         Elizabeth Hernandez Vega....................V4 - 1113
  **32D**    Wells Fargo Bank Transaction Record $1500
18         withdrawal from Acc't X5483 at 1:15 p.m.....V4 - 1115
  **33A**    Wells Fargo ExpressSend Transfer Record
19         Acc't No. X5364 Jesus G. Sanchez $1,000
           to Elizabeth Hernandez Vega on 1/23/12......V4 - 1079
20 **33B**  Wells Fargo Receipt for $1000 sent to
           Elizabeth Hernandez Vega on 1/23/12 Acc't
21         No. X5364...................................V4 - 1081
  **34A**    Western Union Money Transfer - $400
22         Maria de Jesus Beltran Delgado by Jesus
           G. Sanchez..................................V4 - 1120
23 **34B**  Western Union Customer Receipt for $400
           Money Transfer to Beltran Delgado by
24         Jesus Sanchez at Ridley's on 02-02-2012.....V4 - 1122
  **34C**    Ridley's Receipt for Western Union Money
25         Transfer on Feb. 2, 2012....................V4 - 1123

<u>I N D E X</u>

1                      <u>U N I T E D   S T A T E S   E X H I B I T S</u>

2  **ADMITTED**                                                      **VOLUME-PAGE**

3  **35A**   Western Union Money Transfer - $1000 to
          Jesus Roberto Salazar-Perez by Johnny
4          Tambunga.....................................V2 - 449
   **35B**   Western Union Customer Receipt for $1000
5          Money Transfer to Salazar Perez by Johnny
          Tambunga at Ridley's on 02-23-2012..V2 - 450
6  **35C**   Ridley's Receipt for Western Union Money
          Transfer on Feb 23, 2012....................V2 - 452
7  **36A**   Western Union Customer Receipt for $1000
          Money Transfer by Rachel Coblentz to
8          Jesus Sanchez on April 8, 2012.............V4 - 973
   **37**    Photo of Ben Vertner.........................V1 - 270
9  **38**    Photo of Amber Hites.........................V1 - 272
   **39**    Photo of K.C. Hensley........................V2 - 635
10 **40**    Photo of Patric Campbell.....................V3 - 671
   **41**    Photo of Rachel Coblentz.....................V2 - 546
11 **41A**   Photo of Rachel's Apartment Building........V3 - 662
   **42**    Photo of Amy Cavazos.........................V2 - 343
12 **43**    Photo of Amy Cavazos's House................V2 - 614
   **44**    Photo of Jonathan Chapman....................V2 - 636
13 **45**    Photo of Jacob Clevenger.....................V2 - 618
   **46**    Silver Tube removed from Olson on 5/15......V3 - 687
14 **47**    Methamphetamine from silver tube............V3 - 866
   **48**    Methamphetamine from K.C. Hensley's Car.....V3 - 849
15 **49**    Methamphetamine from Cavazos's house on
          5/15.......................................V4 - 1159
16 **50**    Vertner U/C call to Morris on 5/16..........V3 - 696
   **51**    Photo of Morris' house in Ontario...........V2 - 340
17 **52**    Methamphetamine from U/C purchase on 5/16...V4 - 1170
   **53**    Methamphetamine from Trailer # 10..........V4 - 1176
18 **54**    Black Lunch Bag..............................V2 - 358
   **55**    Photo of black lunch bag under kitchen
19          sink.......................................V1 - 264
   **56**    Photo of money and meth in black lunch
20          bag........................................V2 - 353
   **57**    Photo of Money and large bag of meth........V2 - 355
21 **58**    Photo of Money and smaller bag of meth......V4 - 1074
   **60**    Silver digital scale from black bag under
22          kitchen sink...............................V2 - 357
   **61**    Photo of silver digital scale...............V1 - 266
23 **62**    Photo of gym shoe with Money................V2 - 555
   **63**    Plea Agreement for Johnny Tambunga.........V2 - 459
24 **64**    Plea Agreement for Fabian Beltran..........V2 - 361
   **65**    Plea Agreement for Victor Ruiz.............V2 - 488
25 **66**    Plea Agreement for Mario Martinez..........V2 - 582
   **67**    Plea Agreement for Benjamine Vertner.......V2 - 611

1224

# I N D E X

U N I T E D   S T A T E S   E X H I B I T S

**ADMITTED**                                                          **VOLUME-PAGE**

**68**    Plea Agreement for Amber Hites.............. V3 - 902
**69**    Plea Agreement for K.C. Hensley............. V3 - 775
**70**    Plea agreement of Patric Campbell........... V4 - 950
**71**    Plea Agreement for Rachel Coblentz.......... V4 - 997
**72**    Plea Agreement for Amy Cavazos.............. V4 - 1046
**73**    Phone Call Vertner/Sanchez 5/22/12.......... V3 - 711
**74A**   Video Clip from Exhibit 74.................. V4 - 1139
**74B**   Video Clip from Exhibit 74.................. V4 - 1143
**74C**   Video Clip from Exhibit 74.................. V4 - 1143
**74D**   Video Clip from Exhibit 74.................. V4 - 1143

1225

1 P R O C E E D I N G S
2 January 18, 2013
3 (Jury absent.)
4 THE CLERK:  The court will now hear Criminal
5 Case 12-155-S-BLW, United States of America versus
6 Jesus Guadalupe Sanchez, Michael Dennis Morris,
7 Jim Allen Loveland, for day five of jury trial.
8 THE COURT:  Good morning, Counsel.
9 I had a chance to reflect on this last
10 night and, in addition, reviewed the government's
11 brief on the matter.  I didn't see anything from
12 anyone else.
13 But upon reflection and reading -- and
14 I will also admit, although perhaps I shouldn't,
15 that this was kind of a novel request.  I had not
16 really considered the issue before.  But as I
17 reviewed the language of Rule 801(d)(2), it
18 strikes me that the purpose of that last
19 paragraph, which reads, "The statement must be
20 considered but does not by itself establish the
21 declarant's authority under (C); the existence or
22 scope of the relationship under (D); or the
23 existence of the conspiracy or participation in it
24 under (E)," I think what that paragraph is telling
25 the court is that the court is required to make

1226

1 preliminary findings of fact by a preponderance of
2 the evidence in (C), (D), and (E), and that in
3 making that preliminary determination -- and in
4 this case what that determination is that there
5 was, in fact, a conspiracy, and that the defendant
6 and the person making the statement were members
7 of the conspiracy -- that in making that
8 determination, you can consider the statement
9 itself, but that the statement does not -- is not
10 sufficient by itself to establish the existence of
11 that conspiracy.
12 As counsel is well aware, the court is
13 required to make a finding by a preponderance of
14 the evidence that there is a conspiracy as a
15 condition precedent to the evidence coming in.  Of
16 course, the way it normally is done is that the
17 court admits the evidence on the assumption that
18 the government will establish, at least by a
19 preponderance of the evidence, the existence of
20 the conspiracy and, of course, if the government
21 fails to do so, then the rule, the consequence is
22 that the case is dismissed at the close of the
23 government's case anyway.  So that's the way it's
24 normally done.
25 So my take on that is that that

1227

1 language is only relevant to the court's
2 determination by a preponderance of the evidence
3 that there is a conspiracy or that -- rather, that
4 there was a conspiracy and that both the declarant
5 and the defendant against whom the statement is
6 offered were members of that conspiracy.
7 If I were to give any limiting
8 instruction, it would require that I give a full
9 explanation of that to the jury, and I'm fairly
10 confident that the defendants do not want the
11 court to instruct the jury that the court has made
12 a finding by a preponderance of the evidence that
13 the conspiracy existed and that the defendants
14 were members of that conspiracy.  So I just -- I
15 don't know that I can give that requested
16 instruction.
17 Now, I'm going to hear your arguments,
18 if you wish, but I have not had the request made
19 before.
20 I will certainly give Mr. Borton an "A"
21 for effort, and I think a very creative approach
22 on behalf of his client, but at this point I'm not
23 persuaded that it really does -- that that
24 language goes to anything except the court's
25 determination of the existence of the conspiracy.

1228

1 So with that, Mr. Borton, it was your
2 request.  Do you want to address the court?  And
3 if you have some authority, I'm all ears.  If you
4 have any authority where that's been done or
5 requested, you can turn me around in a heartbeat
6 on the issue, because, as I said, it is novel.  I
7 have not had that request made in the past, at
8 least not to my memory.
9 MR. BORTON:  Thank you, Your Honor.
10 I, quite frankly, wish I did.  I know
11 Ms. Lamprecht probably searched as well, and there
12 isn't direct authority of any item or request like
13 this being appealed and the decision being made.
14 I don't think that lack of authority
15 negates the potential validity of the request.
16 Any time there is a somewhat novel, but
17 appropriate, request for a jury instruction, you
18 know, we try and focus on ensuring that the jury
19 gets a full and complete instruction on its
20 obligations, rights and duties.
21 While novel, I do think -- and the
22 reason for the request, when I look at (d)(2), is
23 I was trying to capture who the recipient of the
24 message is.  And when it's making reference to
25 "the contents of the statement are not alone

1229

1 sufficient to establish a conspiracy," that
2 component doesn't seem particularly relevant to a
3 judge's preadmission determination on whether or
4 not the statement should come in.
5         It appears as though it's almost a
6 component of the -- I think it was Jury
7 Instruction No. 6, the preproof instruction, that
8 made reference to, "The court may provide limiting
9 instructions if and when appropriate." I think
10 that existing model instruction invites this type
11 of modification or additional direction to the
12 jury.
13        Because I think both parties would,
14 quite frankly, agree that those statements, when
15 received, are received with that understanding, I
16 mean, the (d)(2) restriction that those statements
17 don't alone -- those statements alone aren't
18 sufficient, you've got to bring other -- other
19 evidence, that the jury should also be made aware
20 of that same restriction.
21        So I don't have any case law that
22 supports it. I just think the language within
23 (d)(2) and the general desire to provide the jury
24 complete and accurate instruction of the
25 parameters of their obligation make it

1230

1 appropriate.
2         THE COURT: All right.
3         MR. BORTON: Thank you.
4         THE COURT: Thank you.
5         Ms. Berglund, do you wish to add
6 anything to the arguments?
7         MS. BERGLUND: No, Your Honor.
8         THE COURT: All right.
9         And likewise, Mr. Heineman?
10        MR. HEINEMAN: No, Your Honor.
11        THE COURT: Ms. Lamprecht, your response.
12        MS. LAMPRECHT: Well, as counsel candidly
13 stated, he has no authority --
14        THE COURT: Would you step to the lectern --
15        MS. LAMPRECHT: I'm sorry.
16        THE COURT: -- so you stay closer to the
17 microphone?
18        MS. LAMPRECHT: Certainly.
19        Thank you. I sound loud to myself, so
20 thanks.
21        As counsel has stated, there is no
22 authority for his request but, in fact, under
23 United States vs. Bourjaily, it's a federal rule
24 of evidence, and the instructions are, as the
25 court has noted, for the court to determine.

1231

1         The law is that once the court
2 determines that those coconspirators' statements
3 meet the evidentiary threshold, they come in and
4 the jury can consider them for almost any purpose,
5 which is why there are no Ninth Circuit model
6 instructions that state what Mr. Borton wants to
7 advise the jury.
8         And I would just say that it's simply
9 not the law, what he is asking you to instruct.
10 And so -- Rule 104.8, that's clearly your decision
11 and your decision alone, if there is an objection
12 as to whether there is enough evidence for those
13 statements to come in.
14        So our position is simply that the
15 court should give the regular Ninth Circuit jury
16 instructions in this case, and after -- there have
17 been, by the way, no objections to coconspirator
18 statements now for the entire trial.
19        THE COURT: Well, I think there were hearsay
20 objections, but I overruled them under
21 801(d)(2)(E). I pointedly never refer to the
22 exception as being the coconspirator's statement,
23 because I don't want the jury thinking that I have
24 made some determination.
25        And that's the very issue I'm concerned

1232

1 with here. The court is required to make a
2 preliminary determination that the conspiracy does
3 exist and that both the declarant and the person
4 against whom it is offered were members of that
5 conspiracy, and make that finding by a
6 preponderance of the evidence.
7         But I never want the jury to know that
8 I have made that determination. If I had to have
9 a discussion, we do it at sidebar, but that's why
10 I refer to it as 801(d)(2)(E), so that counsel
11 knows what I'm referring to without my having to
12 mention the coconspirator's exception to the
13 hearsay rule.
14        MS. LAMPRECHT: And basically, that's all we
15 have. Mr. Borton has not provided the court with
16 an instruction that he likes. He has no case law
17 to support such an instruction, as far as I know.
18 So we would just request that the court deny his
19 request for such an instruction, because it's
20 simply not the law and it's not the jury's
21 obligation to make that determination.
22        THE COURT: All right. Well, it is the
23 jury's obligation to determine beyond a reasonable
24 doubt whether a conspiracy existed.
25        MS. LAMPRECHT: It is.

1233

1    THE COURT: Ms. Lamprecht, go ahead. I'm
2 just announcing my ruling. I'm not engaging in
3 a -- unless you want to. I guess we can chat.
4    MS. LAMPRECHT: I'm sorry, Your Honor. I
5 didn't know if you were still --
6    THE COURT: All right.
7    However -- and the court will provide
8 substantive instructions on what the jury must
9 consider and can consider in determining whether
10 that conspiracy exists.
11    It strikes me that if this last
12 paragraph of Rule 801(d)(2) was intended to have
13 some substantive effect upon the jury's
14 determination, that we would see a series of
15 instructions or see some modifications of the
16 existing conspiracy instructions that would make
17 that clear.
18    It seems to me, after reviewing all of
19 Rule 801, that that last paragraph was not
20 intended to create a new substantive requirement
21 that the jury must determine, but was simply a
22 guide to the trial court that in making the
23 preliminary determination that a conspiracy
24 existed and, again, that the defendant and the
25 declarant were members of that conspiracy, that

1234

1 the court can consider the declarant's -- well, in
2 fact, just I think the way to look at it is
3 precisely the way the language is stated: "The
4 statement must be considered but does not by
5 itself establish the existence of the conspiracy
6 or participation in it."
7    And I think that that is clearly
8 directed at the judge who has to make that
9 determination, not the jury.
10    And I think I would have much more of a
11 concern if there had been any discussion in front
12 of the jury about the court's obligation to make
13 that decision. But where we have, I think,
14 successfully not mentioned that to the jury, there
15 is really no need for us, I think, to give any
16 cautionary instruction.
17    I would note, as I did earlier, that
18 early on when I first started handling conspiracy
19 cases, there was an occasion where defense counsel
20 would ask me not to admit the evidence, the
21 hearsay statements, until I had actually made a
22 determination on the record that the government
23 had proven the existence of the conspiracy by a
24 preponderance of the evidence.
25    And I initially was somewhat taken with

1235

1 that idea until I realized it would create a
2 nightmare and delay a trial almost interminably,
3 because we would have to hear the evidence almost
4 outside the presence of the jury, allow me to make
5 a determination, and then present the same
6 evidence again to the jury.
7    I think Rule 611 gives the court a
8 great deal of leeway and allows me to essentially
9 conditionally admit the evidence. And it works
10 nicely, because if I determine that the government
11 can't prove by a preponderance of the evidence the
12 existence of the conspiracy, I would, like night
13 follows day, make a like determination at the
14 close of the government's case that they have not
15 established enough evidence to submit the issue to
16 the jury and I would grant a Rule 29 motion at the
17 close of the government's case. And so my
18 practice has been to just essentially merge those
19 factors in together and to treat that all at the
20 end of the trial.
21    So I will deny the request. We won't
22 give that instruction to the jury.
23    When we return, I think we'll have
24 Officer Stennett back on the stand. The
25 government is going to take just a couple of

1236

1 minutes, and then we'll go into cross-examination.
2    All right. Let's just take --
3    MR. BORTON: Your Honor --
4    THE COURT: Yes, Mr. Borton.
5    MR. BORTON: Can I bring up one point on the
6 novel question?
7    THE COURT: Yes.
8    MR. BORTON: The last item, again, which
9 causes the unique approach is the sentence that,
10 "The contents of the statement shall be
11 considered, but" -- and what intrigues me is:
12 Shall be considered by whom? Is that sentence
13 making reference to shall be considered by the
14 judge in its determination, or shall be considered
15 by the jury but --
16    THE COURT: Well, I think it's considered by
17 the judge. Because once the evidence is in, there
18 is no limitation on the reasons or the purpose for
19 which the jury can consider the evidence. And I
20 think that limitation is a caution to the court to
21 not rely solely upon the statements itself to
22 establish the existence of the conspiracy. You
23 can consider it, but it can't be -- it's not
24 sufficient by itself to establish the existence of
25 the conspiracy.

1237

1 So I understand, and it's a -- it's an
2 area that I think could profit from a little
3 clarification. Simply inserting language there
4 saying that the court can consider it would, I
5 think, solve the problem.
6 I may even make a note of that and make
7 a request that the evidence committee review that
8 and consider that for modification at some point
9 in the future. It's a new issue that I hadn't
10 thought of, and I compliment you for taking a good
11 run at it. But at the end of the day I have to
12 find that it's not required and would, in fact, do
13 mischief rather than solve a problem.
14 We'll be in recess. We'll bring the
15 jury in just momentarily; step down, and bring the
16 jury in.
17 (Recess.)
18 (Jury present.)
19 THE COURT: For the record, I'll note the
20 jury is present.
21 Officer Stennett, if you'll retake the
22 witness stand. I'll remind you, you are still
23 under oath.
24 Ms. Lamprecht, you may resume
25 your -- actually, I'm allowing Ms. Lamprecht, I

1238

1 think, to reopen her direct examination to cover
2 just a couple of items.
3 Go ahead, Ms. Lamprecht.
4 MS. LAMPRECHT: Thank you, Your Honor.
5 JESS STENNETT,
6 having been previously duly sworn to tell the
7 whole truth, testified as follows:
8 CONTINUED DIRECT EXAMINATION
9 BY MS. LAMPRECHT:
10 Q. I would like you to look at
11 Government's Exhibit 25 and -- well, let's -- 25
12 and 26. I'm going to also ask you to compare
13 those exhibits with Exhibits 17 and 21.
14 And I think, let's go to the second
15 page of Exhibit 25.
16 Let's go to Exhibit 26, I apologize.
17 Does Exhibit 26 show the serial numbers of the
18 guns that were purchased by Jesus Guadalupe?
19 A. They do.
20 Q. Okay. Let's start with Government's
21 Exhibit 17. What is Government's Exhibit 17?
22 A. It is the Llama .380 pistol recovered
23 from the trailer.
24 Q. How do you know that gun is a Llama?
25 A. The marks on the gun itself.

1239

1 Q. Could you hold that up and show the
2 jury?
3 A. (Witness complied.) They're going to
4 be along the slide of the weapon.
5 Q. What is the serial number on Exhibit 26
6 for the Llama gun, the .380 pistol?
7 A. It's on here. I've just got to locate
8 it. It would probably be best to open up this
9 packaging, because I can't really see through the
10 clear -- if I could do that.
11 Q. Do you need something to open the
12 packaging with?
13 THE COURT: We'll need to reseal it once
14 you've examined it. Is that for security reasons
15 or --
16 THE WITNESS: No, we don't need to. It's
17 inoperable.
18 THE COURT: There are some scissors,
19 Ms. Gearhart.
20 THE WITNESS: Thank you.
21 BY MS. LAMPRECHT:
22 Q. Did you render that gun inoperable?
23 A. It has a thing through it, so it's
24 fine.
25 Yeah, I can read it.

1240

1 Q. But that's something that you did; is
2 that correct?
3 A. Yes.
4 Q. Did you do that to all the guns in this
5 case?
6 A. Yes. It's per our policy.
7 The serial number is 7- -- it's not
8 very easy to read -- 798469, I believe.
9 Q. Okay.
10 A. Or 468.
11 Q. 468. Is that the serial number that's
12 the same on Exhibit 26?
13 A. Yes.
14 Q. And could you show the jury where
15 you're looking, in case they want to look for
16 themselves?
17 A. It's right here above the trigger.
18 It's not very easy to read, but it is there.
19 Q. Now, with respect to Government's
20 Exhibit 21, do you have that in front of you?
21 A. Yeah.
22 Do you want me to just put this one
23 away?
24 Q. Yes, please.
25 A. And the serial number on this is easier

**1241**

1 to read: 241111.
2     Q. What is the kind of gun you are holding
3 in your hand?
4     A. It is the Derringer, Davis Industries,
5 .22 caliber.
6     Q. In your experience, do guns ever have
7 the same serial number?
8     A. No.
9     Q. Like fingerprints?
10     A. Yes.
11     Q. Now, would you describe the layout of
12 the trailer?
13     What is the first room that you go into
14 when you walk in the door of that Trailer No. 10?
15     A. There was a built-on front porch and
16 then you go into a living room area.
17     Q. And what is in the middle of the
18 trailer?
19     A. The bathroom.
20     Q. And then the back bedroom where the
21 Derringers were found, is that on the other side
22 of the bathroom?
23     A. It is.
24     Q. And, finally, there was some question
25 that arose about doing a background check,

**1242**

1 perhaps, on people in Mexico. Do you or any other
2 U.S. law enforcement -- well, do you have the
3 ability to run a background on anyone in Mexico?
4     A. I do not.
5     Q. Do you know if any law enforcement
6 agency in the area does?
7     A. Not that I know of, no.
8     MS. LAMPRECHT: That's all I have,
9 Your Honor.
10     THE COURT: All right. Cross, Ms. Berglund.
11     CROSS-EXAMINATION
12 BY MS. BERGLUND:
13     Q. Good morning, Detective Stennett.
14     A. Good morning.
15     Q. Did you have an opportunity to look at
16 Johnny Tambunga's phone?
17     A. Yes, I did.
18     Q. Okay. And did he have any contact
19 numbers for Jim Loveland in there?
20     A. I do not recall.
21     Q. You don't recall.
22     Did you have a chance to -- well, I'm
23 sorry. We looked at Exhibit No. 14A. That was
24 the Samsung. And Jim Loveland's number was not in
25 that Samsung, correct?

**1243**

1     A. In the phone itself? No, it was not.
2     Q. Okay. And in the BlackBerry, there
3 were 26 saved entries, 26 saved names?
4     A. Yeah. I'm not sure exactly how many
5 there were.
6     Q. Let me show it to you. So the last one
7 there is number -- excuse me. The last one there
8 is No. 26?
9     A. Yes, that's correct.
10     Q. That's the one that says "Jime"?
11     A. Yes.
12     Q. Did you have an opportunity to review
13 any of the other contents of this phone in terms
14 of outgoing, incoming, missed phone calls?
15     A. Yes.
16     Q. Did you note whether or not Mr.
17 Loveland's number consistently came up with the
18 assigned name Jime?
19     A. Are you speaking -- can you clarify
20 which phone we're talking about?
21     Are we looking at tolls in general or a
22 specific phone itself?
23     Q. Mr. Beltran's phone.
24     A. Which one?
25     Q. Let me take a look. You ran a report

**1244**

1 on both of them? Did you get the contents of both
2 phones?
3     A. I did.
4     Q. Okay. And so on his BlackBerry, did
5 you get a list of information that would show all
6 the missed calls, incoming calls?
7     A. The BlackBerry's phone had a limited
8 amount of information because the SIM card was
9 taken and placed in the other phone; therefore, it
10 had a very limited amount of data that was stored
11 in it.
12     Q. Did it have data back to around the end
13 of April?
14     A. I don't recall.
15     Q. Would you recall if you saw that?
16     A. Maybe, yes.
17     MS. BERGLUND: Your Honor, I would like to
18 show the witness a copy of the report. It's
19 pretty voluminous. So could someone hand the
20 witness --
21     THE COURT: Mr. Severson, could you hand
22 that to the witness?
23     MS. LAMPRECHT: Your Honor, may I have an
24 opportunity to look at that well?
25     THE COURT: You don't have a copy of that?

**United States Courts, District of Idaho**

1245

1  MS. LAMPRECHT: Yes. I'm not sure what that
2  is.
3  THE COURT: Well, confer with Ms. Berglund.
4  MS. LAMPRECHT: I did, and she does not have
5  an extra --
6  MS. BERGLUND: I had a copy of it. Oh, I do
7  have it.
8  MS. LAMPRECHT: There it is. Thank you.
9  Okay.
10  BY MS. BERGLUND:
11  Q.  And was this for the Samsung telephone?
12  A.  I don't know which one this is.
13  It's -- I'm only -- I see a bunch of numbers in a
14  report, but I don't have an indication of which
15  phone this actually came from.
16  Q.  So you ran reports on both phones?
17  A.  Yes.
18  Q.  Okay.  And were there calls recorded on
19  this phone dating back to the 27th?
20  A.  Again, I'm not sure what phone we're
21  speaking about in particularly [sic].
22  Q.  Okay.  Let me ask you this:  By
23  3:26 p.m. on the 16th of May, was Mr. Beltran in
24  custody?
25  A.  On the 26th of May?  Yes, he would have

1246

1  been, absolutely.
2  Q.  I'm sorry, the 16th of May?
3  A.  He was in custody, yes.
4  Q.  He was in custody by then.
5  And so do you recall how many of the
6  phone calls after the period of time he was in
7  custody -- when you looked at the phone toll
8  records between him and Mr. Loveland, do you
9  recall how many of those 40 phone calls would have
10  taken place after Mr. Beltran was in custody?
11  A.  Without looking at the sheet --
12  THE COURT:  If you want to put the sheets on
13  the evidence presenter, I have turned off the jury
14  monitor.
15  MS. BERGLUND:  I believe this was admitted
16  as Government's Exhibit 9B.
17  THE COURT:  Nine B.  Ms. Lamprecht, I assume
18  you agree that is 9B, the same?
19  MS. LAMPRECHT:  That's it.
20  BY MS. BERGLUND:
21  Q.  And so in looking at that, can you tell
22  me approximately how many of those calls took
23  place after 3:00 p.m. on the 16th?
24  A.  Approximately -- I'm going to just try
25  to count down as best as I can.  Can you scroll up

1247

1  to the top just a little bit, to see if it's in
2  Mountain Time or -- it's not on there, is it?
3  Sometimes the phone records are going
4  to be in varying different times.  But if we just
5  went to the 16th itself and go by what is marked
6  as -- your question was at 3:30, how many calls
7  are after?
8  Q.  Yes.
9  A.  So we would go down to where it says
10  1620 hours.  One, two, three, four, five, six,
11  seven, eight, nine, ten, eleven, twelve, thirteen,
12  fourteen, fifteen, sixteen, seventeen, eighteen.
13  Looks like about nineteen calls.
14  Q.  Okay.  And then looking at this phone
15  call on the 17th, where it says "In" --
16  A.  Yes.
17  Q.  -- would that have been a call from Mr.
18  Beltran's cell phone to Mr. Loveland?
19  A.  It looks like the duration is zero
20  hours, zero minutes on there, so I'm not sure
21  exactly what that means, whether it was -- yeah.
22  It says "In."
23  Q.  But the phone was in the custody of the
24  police at that time?
25  A.  It was.

1248

1  Q.  Okay.  And there were no phone calls
2  between Mr. Loveland and anyone associated in this
3  case until the 27th of December?
4  A.  Looking at his phone tolls themselves,
5  I -- I don't recall exactly the date when the
6  other phone calls were being made to Mr. Sanchez
7  and to Mr. Tambunga.
8  Q.  If you were to see those exhibits --
9  A.  Yes, I would.  It would be much easier.
10  Q.  Okay.  Well, we have this one already,
11  Mr. Beltran.  And what is the first date that you
12  see a phone call on there?
13  A.  It looks 2/21 of 2012.
14  Q.  And for Mr. Tambunga?
15  A.  12/27 of 2011.
16  Q.  And for Mr. Sanchez?
17  A.  2/15 of 2012.
18  Q.  And, again, Mr. Sanchez's other number?
19  A.  3/31 of 2012.
20  Q.  So none of those -- none of those calls
21  took place before the 27th of December?
22  A.  That's correct.
23  Q.  And you got phone records going back to
24  September for Mr. Loveland?
25  A.  Yes.

1249

1    Q.  Okay.  And let's take a look one more
2  time at Mr. Beltran, from 9B.  Do you see any
3  phone calls for the month of April?
4    A.  It looks like there is a gap between
5  3/31 and 5/5.
6    Q.  Okay.  And, again, looking at 9A, the
7  final set of calls between Mr. Loveland and
8  Mr. Sanchez, do you see any after the 9th of May?
9    A.  No, not on this chart, no.
10    Q.  Okay.  You arrested Mr. Loveland in
11 August; correct?
12    A.  I believe so, yes.
13    Q.  And at that time you didn't find him in
14 possession of any methamphetamine; correct?
15    A.  No, I did not.
16    Q.  He didn't have unusual amounts of cash
17 on him?
18    A.  He had quite a bit of cash; not an
19 unusual amount.
20    Q.  Not an unusual amount?
21    A.  It was a couple -- it was over $100,
22 which would be unusual for me because I don't have
23 that in my pocket.
24    Q.  Okay.  But we're not talking about
25 $24,000, like you found at the trailer?

1250

1    A.  No.
2    Q.  You didn't find him in possession
3  of -- we have heard about MSM, a cutting agent.
4  He didn't have anything like that?
5    A.  No.
6    Q.  Did he have any baggies?
7    A.  No.
8    Q.  Scales?
9    A.  No.
10    Q.  Okay.  My final question:  I just want
11 to go back to when you interviewed Victor Ruiz on
12 July 31st.  Did he tell you that they first went
13 to Jim's and then went to dinner?
14    A.  I couldn't recall.  If you want
15 to show -- I can --
16    Q.  Okay.
17    A.  -- that would be perfect.
18    MS. BERGLUND:  Your Honor, can I just put
19 one thing on the screen without --
20    THE COURT:  Yes.  Just for the record, I
21 have turned the jury monitor off.
22    THE WITNESS:  Yes, I recall.
23 BY MS. BERGLUND:
24    Q.  Did he tell you that they went to Mr.
25 Loveland's house before they ate dinner?

1251

1    A.  Yes.
2    Q.  Okay.  And when you interviewed Johnny
3  Tambunga, his third interview on August 13th, do
4  you recall if he told you he was distributing
5  methamphetamine for $1,400 an ounce?
6    A.  I believe so, yes.
7    MS. BERGLUND:  Okay.  No further questions.
8    THE COURT:  Mr. Borton.
9    MR. BORTON:  No questions, Your Honor.
10    THE COURT:  All right.  Mr. Heineman.
11    CROSS-EXAMINATION
12 BY MR. HEINEMAN:
13    Q.  Really just one question,
14 Detective -- well, I'm sorry.  It always turns out
15 to be two or three.  We're attorneys.  We talk too
16 much, I know.
17    With those phone records that you just
18 reviewed, there were several durations -- well,
19 not several.  There were a lot of durations that
20 were just one minute.
21    A.  Correct.
22    Q.  That's it.
23    You also had ones that were 39 seconds,
24 43 seconds.
25    Do you have a -- I guess, do you have

1252

1  knowledge of what a duration of one minute would
2  mean?
3    Because I guess I can't tend to believe
4  that people talk perfectly for one minute and they
5  stop talking.
6    Do you have an idea what that means
7  when you see one minute on the sheets?
8    A.  I do not understand your question.
9    MR. HEINEMAN:  Allow me, Your Honor.
10    THE COURT:  Yes.
11 BY MR. HEINEMAN:
12    Q.  Go back to Government's Exhibit 9B.  Do
13 you see that on the screen, sir?
14    A.  Yes.  The durations, yes.
15    Q.  Yes.  Do you have knowledge of when you
16 see just one minute and not a specific amount of
17 seconds, does that have any specific meaning that
18 you're aware of?
19    I mean --
20    A.  It just means the call lasted a minute
21 to two minutes or it's the duration of the call.
22    Q.  Okay.  So they don't break it down into
23 exact time after a minute; is that what you're
24 saying?
25    A.  No.  They don't have exact.

1253

1      MR. HEINEMAN:  Thank you.
2         No further questions, Your Honor.
3      THE COURT:  Ms. Lamprecht.
4          REDIRECT EXAMINATION
5 BY MS. LAMPRECHT:
6      Q.  When you searched the trailer, do you
7 remember how many cell phones you found that were
8 operable or inoperable?
9      A.  I believe there was additional cell
10 phones found inside of the trailer.  However,
11 those cell phones were not -- they were passcode
12 locked and unable to be looked at.  Their contents
13 were essentially unable to be recovered.
14      Q.  So if there was a call between Jim
15 Loveland's phone and one of those cell phones, we
16 would not have a record of it; is that correct?
17      A.  Correct.
18      MS. LAMPRECHT:  No further questions,
19 Your Honor.
20      THE COURT:  Any further questions?
21 Ms. Berglund.
22         RECROSS-EXAMINATION
23 BY MS. BERGLUND:
24      Q.  Did you find any evidence of other
25 telephone numbers that had been used by the

1254

1 defendants in this case?
2      A.  Yes.
3      Q.  And did you review those numbers
4 against cell phone records of Mr. Loveland?
5      A.  Could you repeat the question?  I'm
6 sorry.
7      Q.  Well, did you ever compare those
8 numbers to any numbers you found on Mr. -
9      A.  I think I -- I think I misspoke.  I
10 reviewed lots of numbers, is what I was -- but I
11 think you were talking in context of only numbers
12 taken out of the trailer itself.
13      Q.  Yes.  Did you find evidence that they
14 had been using other cell phones numbers?
15      A.  Cell phones, but we could not recover
16 the contents of those phones because they were
17 passcode locked.
18      Q.  Did it appear that when Mr. Beltran
19 transferred from the BlackBerry to the Samsung,
20 that he kept the same telephone number?
21      A.  It changed.
22      Q.  It changed?
23      MS. BERGLUND:  Okay.  Thank you.
24      THE COURT:  Mr. Borton.
25      MR. BORTON:  None, Your Honor.

1255

1      THE COURT:  Mr. Heineman.
2      MR. HEINEMAN:  None, Your Honor.
3      THE COURT:  You may step down.
4         The government may call its -- well,
5 let's let Officer Detective Stennett --
6      MS. LAMPRECHT:  Detective Stennett, would
7 you leave those up -- we need certain exhibits
8 left up there.
9         The next witness will be the forensic
10 chemist David Sincerbeaux.  I would like to leave
11 the drug exhibits up there to save time.
12      THE COURT:  Would you announce the name of
13 the next --
14      MS. LAMPRECHT:  The next witness is David
15 Sincerbeaux.
16      THE COURT:  Mr. Sincerbeaux, would you
17 please step before Ms. Gearhart, be sworn as a
18 witness, and then follow her directions from
19 there.
20        DAVID C. SINCERBEAUX,
21 having been first duly sworn to tell the whole
22 truth, testified as follows:
23      THE CLERK:  Please state your complete name
24 and spell your name for the record.
25      THE WITNESS:  My name is David Charles

1256

1 Sincerbeaux, spelled S-I-N-C-E-R-B-E-A-U-X.
2      THE COURT:  You may inquire of the witness.
3      MS. LAMPRECHT:  Thank you, Your Honor.
4          DIRECT EXAMINATION
5 BY MS. LAMPRECHT:
6      Q.  Mr. Sincerbeaux, how are you employed?
7      A.  I work for the Idaho State Police
8 Forensic Laboratory, stationed up in Coeur
9 d'Alene.
10      Q.  How long have you worked for the
11 forensic laboratory?
12      A.  It's just about 16 years.
13      Q.  What is your position with that
14 laboratory?
15      A.  I am the discipline leader for
16 controlled substances.
17      Q.  And as the discipline leader, what do
18 you do?
19      A.  Primarily, I analyze evidence for the
20 presence of controlled substances.
21      Q.  Now, what educational training have you
22 had for this particular position?
23      A.  I have been -- or I have a bachelor's
24 of science degree in chemistry and have been an
25 analytical chemist since 1985.

1257

1    Q.  Where did you work before you went to
2    the Idaho State Forensic Laboratory?
3        A.  I worked in a couple of environmental
4    laboratories down in California.
5        Q.  Now, are you a member of any
6    professional associations?
7        A.  I belong to a group, the short name is
8    CLIC.  It stands for the Clandestine Laboratory
9    Investigating Chemists Association, and it's
10   basically a group of people that basically
11   specialize in like meth labs and making MDMA and
12   basically keep up on all of the latest trends.
13       Q.  Any others?
14       A.  That's it.
15       Q.  Okay.  And have you had any specialized
16   training with respect to your position with Idaho
17   State Police?
18       A.  I've had training in actually analyzing
19   controlled substances when I started with the
20   Idaho State Police.  And then through CLIC I
21   attend seminars about every three years or so and
22   basically just get whatever is the new trends.
23       Q.  You said that you -- well, I -- what is
24   a -- are you a forensic scientist 3?
25       A.  Yes.

1258

1    Q.  What is that?
2        A.  That is -- the way that we have it
3    worked out, a forensic scientist 1 is somebody who
4    is basically in training, somebody who has been
5    about a year.  A forensic scientist 2 is what we
6    have just as a bench chemist.
7            A forensic scientist 3 is a technical
8    leader.  In addition to analyzing evidence for
9    controlled substances, I also write basically the
10   SOPs and do quality control work, just to make
11   sure that everybody else around the state is doing
12   what they're supposed to be doing.
13       Q.  Would you just tell us what an SOP is,
14   for the record?
15       A.  Standard operating procedure.
16       Q.  And as a disciplinary leader, do you
17   also supervise other laboratory chemists?
18       A.  I don't directly supervise them.  I
19   just make sure that they are doing things
20   technically.  Since we have three laboratories, we
21   want to make sure that everybody is doing
22   everything the same way in all three of the
23   laboratories.
24       Q.  Okay.  Based on your experience and
25   training, is it fair to say that you're familiar

1259

1    with the controlled substance methamphetamine?
2        A.  Yes, I am.
3        Q.  Have you had any specialized training
4    regarding methamphetamine quantification?
5        A.  Not really specialized.  When I was an
6    environmental chemist, everything we did was
7    quantitated.  The principles are the same whether
8    you are looking at a pesticide or whether you're
9    looking at methamphetamine.
10       Q.  What does "quantitated" or
11   "quantification" mean in your -- in your
12   laboratory?
13       A.  For what we do is, for methamphetamine,
14   we will determine the purity.  Normally it will
15   come in as a crystal and we just basically find
16   out how much of those crystals are actually
17   methamphetamine.
18       Q.  So as part of your job, do you
19   chemically analyze substances to determine whether
20   or not they contain methamphetamine in the first
21   place?
22       A.  Yes, I do.
23       Q.  Okay.  And how often have you done that
24   in your career?
25       A.  On average, I will do about 40 cases,

1260

1    40 to 50 cases a month that contain
2    methamphetamine, and I have been doing that for
3    15, almost 16 years.
4        Q.  And did you determine whether the
5    substances submitted to you in this case were, in
6    fact, methamphetamine?
7        A.  Yes, I did.
8        Q.  What process did you use to determine
9    whether -- well, first of all, what process do you
10   normally use to determine whether a substance
11   contains methamphetamine?
12       A.  For the purpose of federal court, we do
13   it a little bit different than we do it for state.
14   Generally, we need two positive tests to indicate
15   the presence of methamphetamine or any other
16   controlled substance.
17           And the way that we do it for federal
18   court is that we will run it twice on our
19   instrument, and we have to have a positive result
20   from both of those tests.
21       Q.  What instrument do you use to run the
22   suspected substance?
23       A.  The instrument we use is a gas
24   chromatograph/mass spectrometer, commonly referred
25   to as a GC/MS.

1261

1     Q. Are these procedures recognized as
2 reliable and generally accepted within the
3 forensic scientist community?
4     A. Yes, they are.
5     Q. And did you do those procedures in this
6 case?
7     A. Yes, I did.
8     Q. Now, in addition to determining whether
9 the substance contains methamphetamine, you said
10 you quantitated them. Did you -- "quantitate," is
11 that the word?
12     A. Yes.
13     Q. Did you quantitate the examples that
14 were submitted to you in this case?
15     A. Yes, I did.
16     Q. Okay. And what do you do when you
17 quantify the amount of purity of methamphetamine
18 that's been submitted to you?
19     A. It's a fairly involved procedure. The
20 first thing that I do is, when I receive the
21 evidence and make sure that everything has been
22 sealed and hasn't been tampered with before I have
23 seen it, or at least evidently, I will open it up.
24     I will visually mark down what it looks
25 like, whether it's crystals, powder, whatever the

1262

1 case may be. I will then take a weight of the
2 sample. We do not weigh any of the packaging
3 unless for some reason it is requested, and that's
4 exceptionally rare.
5     Once I have taken the gross weight, I
6 will take the sample. I will grind it up into the
7 finest powder that I can. What we're trying to do
8 for that is trying to homogenize just to make sure
9 that if there is crystals of cut in there and
10 crystals of methamphetamine, that they are all
11 intermixed, because we are going to be taking a
12 small subsample of that and we want to make sure
13 it's as homogenous as possible.
14     Once we have done that, I will take
15 a -- take two aliquots of it, basically two small
16 scoops, put it into two different vials, dilute it
17 up with a solvent that basically dissolves it.
18     I will then run both of those extracts
19 on my GC/MS. The GC/MS has been calibrated with
20 known methamphetamine standards at different
21 concentrations. I will compare the response that
22 comes off of the unknown to the known curve, and
23 there is a calculation that is done and it will
24 tell you the purity of the methamphetamine.
25     Q. Okay. So is that a procedure that is

1263

1 also recognized as reliable and generally accepted
2 within the forensic community?
3     A. Not everybody does quantitation
4 results. It's actually pretty much only for
5 federal court, and it is the way that basically
6 everyone does it. Some people use different
7 instruments. The GC/MS is what we have and is
8 what we use.
9     Q. How often have you quantified
10 substances which contain methamphetamine?
11     A. I usually do them about once a quarter.
12 It's a kind of a specialty test. We have to set
13 up our instrument to look for quantification
14 results. I do them about, like I said, about once
15 a quarter, usually about ten cases, and I have
16 been doing that for just about five years now.
17     Q. Now, you talked about when you receive
18 evidence in your laboratory. Would you explain
19 how your laboratory receives evidence and then how
20 you get it once the laboratory receives it?
21     A. Yes. Our laboratory will receive
22 evidence either in person, either an officer or a
23 agency will bring it in. More commonly,
24 especially for quantification cases, is that it
25 will be shipped up to us, usually by FedEx or

1264

1 overnight mail.
2     Once we receive it, it is logged into
3 our evidence tracking system. It is given -- each
4 piece of evidence is given a bar code that's put
5 on the evidence.
6     It is then put into a secure vault that
7 only our forensic evidence specialists will have
8 access to. I'm not allowed to go into the vault.
9     When I am ready to do my analysis, I
10 will check it out from them. They give it to me.
11 I work it back on my bench.
12     If for any reason I have it overnight
13 or any preparation, I have a locker that only I
14 have access to.
15     When I'm done with the case, I will
16 seal it up. I will sign it, make sure that
17 everything looks okay, and then I will return it
18 to them, to our evidence specialists.
19     They will type up the report. I will
20 sign it, review, and then when we're finally
21 finished we'll send everything back to the agency
22 that submitted it.
23     Q. Now, you received five samples, I
24 guess, or methamphetamine exhibits in this case
25 that you were asked to analyze. Would it be

1265

1 easier to go through them individually or talk
2 about them all at once, with respect to each step
3 that you took?
4     A.  They were done all at the same time and
5 were run as a batch, so it doesn't really matter.
6 Whatever is easiest for you.
7     Q.  Okay.  Well, let's try it this way and
8 see how it works.  I'm talking about Exhibits 47,
9 48 -- well, 47, which is your Exhibit C2 --
10     MS. LAMPRECHT:  And may the agent give the
11 exhibits to the witness, Your Honor?
12 BY MS. LAMPRECHT:
13     Q.  The exhibits, I believe, in front of
14 you are Government's Exhibit 57, which is your
15 Exhibit C2; Government's Exhibit 48, which is your
16 Exhibit C11; Government's Exhibit 49, which is
17 your Exhibit C7; Government's Exhibit 52, which is
18 your Exhibit C8; and Government's Exhibit 53,
19 which is your Exhibit C9.
20     A.  Okay.
21     Q.  When you received these exhibits, you
22 said the first thing you did was to check the
23 seal.  Did you do that with Exhibits 47, 48, 49,
24 52, and 53?
25     A.  Yes, I did.

1266

1     Q.  And as to Exhibit 57 -- 47, what was
2 the condition of the seal when you received it?
3     A.  It was intact.
4     Q.  Government's Exhibit 58, what was the
5 condition of the seal?  That's C11.
6     A.  It was intact.
7     Q.  Government's Exhibit 49, which is your
8 C7.
9     A.  It was also intact.
10     Q.  Government's Exhibit 52, which is your
11 C8.
12     A.  It was intact.
13     Q.  And Government's Exhibit 53, which is
14 your C9.
15     A.  It was also intact.
16     Q.  What is the importance of having the
17 seal intact when you receive it?
18     A.  The main thing is you want to ensure
19 that it is not leaking, for health and safety
20 reasons; but also, if anything was coming out,
21 that means stuff could also be put in.  And we
22 just want to make sure that there is no evidence
23 that anything has been tampered with.
24     Q.  Now, did you weigh Exhibits 47, 48, 49,
25 52, and 53, to determine how much they weighed?

1267

1     A.  Yes, I did.
2     Q.  How much did Exhibit 47 weigh, which is
3 your C2?
4     A.  That one, there was two plastic bags
5 that were leaking.  They were -- basically, the
6 contents were intermixed.  So I ran that
7 particular one as a composite, basically put them
8 all together as one piece of evidence, and the
9 total of that was 6.61 grams.
10     Q.  And did you weigh that with or without
11 those bags?
12     A.  Without the bags.
13     Q.  And even though the two plastic bags
14 inside the exhibit were leaking, was the seal on
15 the -- that you received on Exhibit 47, also C2,
16 intact?
17     A.  Yes, it was.
18     Q.  So there wouldn't be any outside
19 contamination; just between the two exhibits
20 inside?
21     A.  That is correct.
22     Q.  What was the weight of the substance in
23 Government's Exhibit 48, which is your C11?
24     A.  My C11, the crystals weighed 41.51
25 grams.

1268

1     Q.  And Government's Exhibit 49, which is
2 your Exhibit C7?
3     A.  That one weighed 28.98 grams.
4     Q.  Government's Exhibit 52, which is your
5 C8?
6     A.  That one weighed 55.36 grams.
7     Q.  And Government's Exhibit 53?
8     A.  Is 72.7 grams.
9     Q.  And all of these were without
10 packaging; is that correct?
11     A.  That is correct.
12     Q.  Now, after you weighed these
13 substances, did you make a determination as to
14 whether they were methamphetamine?
15     A.  Yes, I did.
16     Q.  Or at least a mixture and substance
17 containing methamphetamine?
18     A.  That is correct.
19     Q.  And you did this individually with each
20 one of these exhibits?
21     A.  Yes, I did.
22     Q.  And what was your determination as to
23 Government's Exhibit 47?
24     A.  That it contained methamphetamine.
25     Q.  Forty-eight?

1269

1    **A.** That it contained methamphetamine.
2    **Q.** Forty-nine?
3    **A.** Methamphetamine.
4    **Q.** Fifty-two?
5    **A.** Contained methamphetamine.
6    **Q.** And 53?
7    **A.** Also contained methamphetamine.
8    **Q.** And when you made that determination,
9    did you follow the processes that you talked about
10   before that are accepted and recognized in the
11   scientific community?
12   **A.** Yes, I did.
13   **Q.** With each one of them?
14   **A.** Yes, I did.
15   **Q.** Once you determined that these
16   were -- that there was methamphetamine in
17   these -- in these exhibits, what did you do?
18   **A.** The process of determining whether they
19   contain methamphetamine and doing the purity is
20   the same -- same test. It's just a function of
21   calculation. Once I determined that they had
22   methamphetamine in them, I then did the
23   calculation to determine the purity.
24   **Q.** Okay. Did you homogenize all of these
25   samples before you made the determination as to

1270

1    whether they contained meth?
2    **A.** Yes, I did.
3    **Q.** What did they look like before you
4    homogenized them?
5    **A.** I have in my notes described them as
6    crystals, anywhere from large ones to small ones.
7    It doesn't really matter.
8    **Q.** And when you homogenize it, how do you
9    change the appearance?
10   **A.** If you look at the evidence, if it's
11   less than 10 grams, I will basically take all of
12   the substance and grind it up into a fine powder.
13   I will then take a small amount of that, generally
14   about a gram, gram-and-a-half, and put that in a
15   glass vial, and it would -- would be a very fine
16   powder.
17   The ones that are more than 10 grams, I
18   will take -- I will do a rough grind on it. I
19   will then take subsamples of that and grind it
20   into a fine powder, and again there will be a vial
21   in there that I have the fine powder, which is
22   what I will actually measure for both the
23   determination of whether or not it contained
24   methamphetamine and the purity.
25   **Q.** What is the purpose of homogenizing the

1271

1    methamphetamine that you get like this?
2    **A.** Kind of like I mentioned, is that to
3    make sure that if there are different crystals in
4    there, that since I am taking a small subsample,
5    about 40 milligrams, which is not a heck of a lot,
6    that I want to make sure that all of the stuff
7    that gets on my little Special that I weigh
8    everything out on, that it is as mixed up as
9    possible so that there is not one large crystal of
10   methamphetamine with a bunch of nonmeth or vice
11   versa.
12   **Q.** So in other words, if there is cut in
13   there, you homogenize that right in with the
14   methamphetamine to determine the purity, to help
15   you -- and then you can determine how much of it
16   is cut and how much of it is meth?
17   **A.** That is correct.
18   **Q.** Okay. How many samples do you take
19   after you homogenize?
20   **A.** I take two -- normally, I will take
21   two. What our procedures are, is that -- and the
22   reason why I take two, I check to see what the
23   purity is on each of those samples from each
24   exhibit.
25   And the reason we do that is if the

1272

1    answers are too far apart, then I know it wasn't
2    homogenized as well as it should be, and I'll go
3    back and homogenize it some more. If they are
4    relatively close together, then I know that it was
5    homogenized and then I will take, when I do my
6    calculation, I will take the lowest number and,
7    you know, give the final answer.
8    **Q.** Is it fair to say that you always err
9    on the low side?
10   **A.** Yes.
11   **Q.** Okay. Did you take samples with
12   respect to Government's Exhibits 47, 48, 49, 52,
13   and 53?
14   **A.** Yes, I did.
15   **Q.** Are those samples -- did you put those
16   samples that you took inside of the exhibit?
17   **A.** Yes. They will be in the glass vials.
18   **Q.** Could you hold one of those exhibits up
19   and just show the jury where your samples would be
20   when they look at that exhibit?
21   **A.** (Witness complied.) This is No. 47.
22   These were the two original plastic bags. This is
23   the leftover. Since it's 6 grams, it's more than
24   I put into the vial. The powder that I ground up,
25   the finest was in the vial, and that's what I took

1273

1 the samples from.

2     Q. And once you have those two samples,
3 what do you to determine how much actual
4 methamphetamine is in that whole package?

5     A. I will take the -- again, I will do the
6 extraction of them, will run them on the GC/MS.
7 It will give me a printout that tells me primarily
8 how many micrograms per milliliter, basically the
9 concentration of the solution, of how much
10 methamphetamine.

11     I will then do a calculation. I will
12 take the lowest of those two calculations, and it
13 comes out as a percent, and I will do -- multiply
14 that percentage times the original weight
15 that -- of all of the crystals, and then that will
16 give me the amount of actual methamphetamine.

17     Q. So it is the GC/MS, the gas
18 spectrometer [sic] that -- and the -- what is the
19 MS?

20     A. Mass spectrometer.

21     Q. Mass spectrometer, and the gas
22 chroma- -- what is it?

23     A. Gas chromatograph.

24     Q. Thank you.

25     What -- what is it that that shows you?

1274

1     A. What it basically shows me is the
2 response that -- I'll go into it in a little bit
3 more detail.

4     On the mass spectrometer part, which is
5 the actual detector of the instrument, it will
6 take the organic compound that comes off of the GC
7 part and basically blows it to bits, hits it with
8 a bunch of electrons and fragments it.

9     When we do a quantitation and also an
10 identification, we will take some of those ions,
11 we tell them which ones we want to look at -- and
12 it is reproducible -- that we'll say, count up all
13 the numbers that have a 58 ion and a -- in this
14 particular case, a 148 and a 77. It will count
15 all those ions up and it will give a response, an
16 electronic response.

17     And at that point, what we'll do is, on
18 the unknown, that is compared to known standard
19 curves, which is, we'll have one that's like at 10
20 percent, one at 20 percent, 40 percent, 60
21 percent, 80 and 100. And, obviously, the more you
22 have, the bigger the response is.

23     It's plotted out on a linear curve, if
24 you remember your algebra from way back. You will
25 have a straight line. Depending on what your

1275

1 response is, it will hit somewhere on that line
2 and it will tell you how much actually -- how much
3 methamphetamine that response correlates to, and
4 that's what I'm looking for.

5     Q. And then you measure the percent -- you
6 take the percent of methamphetamine in the small
7 sample that you did and you multiply that times
8 the total amount of the exhibit?

9     A. That is correct.

10     Q. The weight of the exhibit?

11     A. That is correct.

12     Q. Okay. Did you follow that
13 procedure -- well, let me ask you one more
14 question.

15     With respect to the ions, are the ions
16 that you just identified, are those the ones that
17 show that the substance is methamphetamine?

18     A. Yes, they are.

19     Q. Now, did you follow that procedure with
20 respect to each of these five exhibits?

21     A. Yes, I did.

22     Q. Okay. With respect to Exhibit 41,
23 which is your Exhibit C- -- I'm
24 sorry -- Exhibit 47, which is your Exhibit C2,
25 what was the -- how pure was that 6.61 grams of

1276

1 methamphetamine?

2     A. On that particular one, I don't have it
3 right off the top of my head. The --

4     Q. You didn't quantify C2?

5     A. I quantitated it. And the notes for
6 that particular item -- it was submitted as a
7 different case number, and I didn't bring those
8 notes with me, so I can't give you the purity of
9 that particular one. But the original weight was
10 6.61 grams. The weight of actual methamphetamine
11 was 6.22.

12     So it's probably -- if someone had a
13 calculator it would be easier, but I would say
14 roughly about 90 percent or greater.

15     Q. And do you use an error factor when you
16 make those calculations?

17     A. Yes, I do.

18     Q. And what is the error factor that you
19 use? Would you explain that?

20     A. It is plus or minus 7 percent. And
21 that was derived from a validation study we did
22 five years ago when we were setting up doing
23 quantitative analysis. It involves doing a bunch
24 of replicates and finding out what our precision
25 and our accuracy is. We report out to a 95

1277

1 percent confidence level, which happens to be two
2 standard deviations, and it comes out as
3 7 percent.
4      Q. And so, that would be 6.22 plus or
5 minus how many grams in this case?
6      A. .44 grams.
7      Q. And that's a half a gram, a little less
8 than a half a gram?
9      A. Correct.
10     Q. Okay.
11        Now, with respect to Exhibit 48, which
12 is your C11, were you able to determine the purity
13 using the methods that you've talked about?
14     A. Yes, I did.
15     Q. How much of Exhibit 48 was actual
16 methamphetamine, by your calculations?
17     A. On that calculation, on -- that was
18 my -- which one are we talking about again? I'm
19 sorry.
20     Q. Your C11, I believe.
21     A. C11. Okay.
22     Q. Our Exhibit 48 -- is your C11 marked as
23 Exhibit 48, I hope?
24     A. Yes, it is.
25     Q. Okay. Good.

1278

1      A. That particular one had 40.57 grams of
2 methamphetamine.
3      Q. And that's actual methamphetamine?
4      A. That is correct.
5      Q. Out of how many grams?
6      A. Out of 41.51.
7      Q. And so, how many grams of that 40.57 is
8 there plus or minus factor to?
9      A. Is 2.84.
10     Q. So does that mean that the lowest
11 amount would be 37-plus grams of actual
12 methamphetamine, but the highest amount would be
13 maybe 44?
14     A. The highest amount would be actually
15 more than the actual weight of the original
16 sample. It would be -- yeah, 43 and change.
17     Q. Okay. But that's just -- that's just
18 the error factor. That isn't actual; is that
19 correct?
20        It's just because you used the 7
21 percent?
22     A. I'm going to correct you slightly.
23     Q. Yes, please.
24     A. We don't like to call it an error
25 factor.

1279

1      Q. Oh.
2      A. That leaves a wrong impression.
3        It's the uncertainty of measurement.
4 Any time you measure anything, there is certain
5 amount that's always a plus or a minus, and it's
6 just about how close to the actual number is your
7 reported number.
8      Q. So I guess if you use the uncertainty
9 factor with each of these, and you take that
10 uncertainty factor out, which you've just
11 discussed, then you get the absolute lowest amount
12 of pure methamphetamine; is that correct?
13     A. That is correct.
14     Q. Although it could be more; is that also
15 correct?
16     A. That is correct.
17     Q. Okay. Going to Exhibit 49, which is
18 your Exhibit, I believe, C7.
19     A. Okay.
20     Q. Did you determine the purity of the
21 methamphetamine in Government's Exhibit 49?
22     A. Yes, I did.
23     Q. And what was the purity of the
24 methamphetamine?
25     A. The amount of methamphetamine I had was

1280

1 28.45 grams, plus or minus 1.99.
2      Q. With respect to Exhibit 52, which is
3 your Exhibit C8 -- I'm sorry.
4      A. I'm just checking.
5        That one is -- came out as 53.79 grams,
6 plus or minus 3.77.
7      Q. And your Exhibit 53, which is -- your
8 Exhibit C9, which is our Exhibit 53.
9      A. That one came out as 71.52 grams, plus
10 or minus 5.01 grams.
11     Q. Thank you.
12     MS. LAMPRECHT: Your Honor, at this time I
13 would like to move -- Government's Exhibits, they
14 are in evidence. I don't know if you want to show
15 them to the jury at this time, or just let them go
16 back into the jury room.
17     THE COURT: What are you -- I don't know
18 what you're referring to.
19     MS. LAMPRECHT: Government's Exhibits 47,
20 48, 49, 52 and 53.
21     THE COURT: I think they have already been
22 admitted.
23     MS. LAMPRECHT: They have been admitted. I
24 just wondered if you want to show them to the jury
25 at this time or just let them look at it back in

1281

1 the jury room.
2         THE COURT: Are you requesting that they
3 be --
4         MS. LAMPRECHT: Could we just hold them up
5 one at a time and show them and tell them the
6 amounts again?
7 BY MS. LAMPRECHT:
8     Q. Exhibit 47, which is your Exhibit C2?
9     A. That's this particular one here, and it
10 was 6.22 grams, plus or minus .44.
11     Q. Exhibit 48, which is your Exhibit C11.
12     A. That one is this one right here, and it
13 came out as 40.57, plus or minus 2.84.
14     Q. And those are grams, right?
15     A. That is in grams.
16     Q. Exhibit 49.
17     A. And that one is -- C7 is 28.45, plus or
18 minus 1.99.
19     Q. Exhibit 52, which is your C8.
20     A. And this one is 53.79, plus or minus
21 3.77.
22     Q. And all these are grams; correct?
23     A. That is correct.
24     Q. Okay. And finally, Exhibit 53 which is
25 your C9.

1282

1     A. And this one right here is 71.52 -- so
2 you can see the vial -- plus or minus 5.01.
3     Q. How many grams are there in an ounce?
4     A. 28.35.
5     Q. How many ounces are there are in a
6 pound?
7     A. I don't deal with pounds. Sixteen, I
8 believe.
9         MS. LAMPRECHT: I have no further questions.
10 Thank you very much.
11     THE COURT: Cross-examination.
12     MS. BERGLUND: None, Your Honor.
13     THE COURT: Mr. Borton.
14     MR. BORTON: Just briefly, Your Honor.
15     THE COURT: Yes.
16         CROSS-EXAMINATION
17 BY MR. BORTON:
18     Q. My first question is to ask you to
19 pronounce your last name, so I don't do it wrong.
20     A. It is Sincerbeaux.
21     Q. Sincerbeaux. Thank you.
22         Mr. Sincerbeaux, you do 40 to 50 cases
23 a month. That sounds pretty busy. I take it it's
24 a busy practice of yours?
25     A. Yes. And that's -- that's just for the

1283

1 methamphetamine and solid dosage drugs. We also,
2 on average, will do another 50 cases of marijuana.
3     Q. Okay. Can you share with us, with
4 regards to those five exhibits, who is the -- who
5 is the individual that handled it just prior to
6 you?
7     A. I can check with that, and -- I'm
8 checking to see if they're all the same first.
9     Q. Sure.
10     A. They were all one of our evidence
11 technicians. Her name is Lynn Higdon.
12     Q. And do you know who handled those five
13 exhibits before -- is it Lynn Higgon?
14     A. Higdon.
15     Q. Who handled it before Lynn?
16     A. They came in -- again checking to make
17 sure it's all the same -- they came in from
18 overnight on FedEx.
19     Q. Okay. Do you know who personally
20 handled those five exhibits before Lynn Higdon?
21     A. No, I do not.
22     Q. Are you able to tell from your -- your
23 role in the case, I presume, is as a chemist doing
24 the chemical analysis, from what you testified to;
25 correct?

1284

1     A. That is correct.
2     Q. All right. Would it be fair to say
3 that the actual source of what you study is not
4 within the realm of what you're tasked to do,
5 meaning any particular case, one case versus
6 another case?
7         Is that fair to say?
8     A. Yeah. It doesn't matter to me where it
9 comes from.
10     Q. And it sounds like the items come to
11 your department from FedEx, regardless of
12 what -- from a variety of cases.
13     A. That is correct.
14     Q. Do you have -- do you know whether or
15 not Lynn Higdon opened any of those exhibits,
16 touched them, did anything with them and then
17 resealed them?
18     A. It would not appear that way. When I
19 received them they looked like they had the
20 original seals from the agency.
21     Q. Do you know either way, though, for
22 sure?
23     A. It did not appear that anyone had
24 opened them, other than when it was sealed
25 originally.

1285

1     Q. And you don't know who the individual
2 was who handled them with regards to the FedEx
3 shipping?
4     A. No, I do not.
5     Q. Okay. Would it be fair to say that
6 with regards to Exhibits 47, 48, 49, 52, 53,
7 you -- your personal knowledge doesn't know
8 whether they're associated with this case or not?
9     A. Just from the identification of our bar
10 code and our case number on it, that's my only
11 reference point.
12     Q. Okay. But that -- that, in and of
13 itself, doesn't tell you whether it's from this
14 case, another case; that's someone else's
15 determination?
16     A. As the evidence comes in, there will be
17 a sticker or a -- depending on the evidence
18 envelope, if it has one, will have information on
19 it as to who the suspect is.
20     You know, I will note that and I will
21 check it, and when I'm getting ready to sign our
22 report, I check it to make sure that our
23 submission form matches what my evidence says and,
24 you know, just trying to make sure that I am
25 reporting out on the particular case. But I go by

1286

1 our case number more than anything else.
2     Q. And if there was any change, switch,
3 mistake, bag leak, et cetera, that occurred at the
4 FedEx stage or before, you and your department
5 would have no idea about it; correct?
6     A. That is correct.
7     MR. BORTON: Thank you.
8     Thank you, Your Honor.
9     THE COURT: Mr. Heineman.
10     CROSS-EXAMINATION
11 BY MR. HEINEMAN:
12     Q. With each one of the packages you
13 received, am I clear to say that you test a part
14 of each one of the samples that you receive?
15     Is that correct?
16     A. That is correct.
17     Q. Okay. And for my clarification -- and
18 maybe I'm the idiot here -- but what does
19 "homogenize" mean from the standpoint of your job?
20     A. What I'm doing with a homogenizing is
21 just making sure it is as -- the sample that I
22 test is as uniform as possible.
23     Q. Okay. And so you take a -- well, for
24 example, I think you were talking about the 6.1
25 gram sample. So you took approximately how much

1287

1 of that?
2     A. I used, in total, just about .08 grams.
3     Q. Okay. And that was what you ground up
4 into a fine powder; correct?
5     A. That is correct.
6     Q. And did you -- and correct me if I'm
7 wrong. To help test its purity, was it the
8 spectrum meter that did that part?
9     A. Mass spectrometer.
10     Q. Mass spectrometer. Okay. Is the mass
11 spectrometer used on the entire sample or just
12 that one particular piece?
13     A. Just on the one particular piece.
14     Q. Okay. And, again, the reason why you
15 homogenize it is, with that one particular piece,
16 to make sure if there is any cut and any meth are
17 kind of mixed together, so you can accurately
18 determine its purity level?
19     A. That is correct.
20     Q. Okay. But the reason why you said that
21 is because if you had a piece and you, you know,
22 just tested one part of, it could be primarily
23 cut. So you took two samples; correct?
24     A. That is correct.
25     Q. Okay. But for the most part, based on

1288

1 your testing, if you had a larger sample but you
2 only took two little pieces of it, you wouldn't
3 know if the rest of that sample was mostly cut or
4 not, would you?
5     A. If I -- if it wasn't homogenized
6 correctly, that would be correct.
7     Q. That's if your sample is correct?
8     My question again: You were testing
9 two samples; correct?
10     A. Of the homogenized --
11     Q. Yes.
12     A. -- total, correct.
13     Q. As you stated, you weren't testing the
14 whole big piece; correct?
15     A. That is correct.
16     Q. So of those two little samples, you
17 have an analysis of its purity; correct?
18     A. That is correct.
19     Q. But as you testified, the reason why
20 you homogenize is because you're trying not to
21 make sure that you're just testing -- or you have
22 two samples, you're not just testing pure cut or
23 whatever else it is; correct?
24     A. That is correct.
25     Q. But it's possible that a -- you

1289

1 can't -- can you say for sure that the whole large
2 piece cannot have a larger portion of cut in it?
3 It's just, you didn't take that particular little
4 sample to show that; correct?
5         Can you say for sure that the whole
6 piece might have more cut in it?  Can you say for
7 sure?  That's all I'm wondering.
8         A.  I would say --
9         MS. LAMPRECHT:  I'm going to object.  I
10 think there is a misunderstanding.  I believe he
11 said he homogenized the entire sample, and then
12 took his samples from that.
13        MR. HEINEMAN:  No.  Actually, I --
14        THE COURT:  The objection is overruled.  Go
15 ahead and answer.
16        THE WITNESS:  To be 100 percent, it is
17 possible that when you're homogenizing, you know,
18 I guess it is possible.  I don't think it's
19 conceivable that it could be otherwise.
20 BY MR. HEINEMAN:
21        Q.  Well, I think possibly that I am being
22 misunderstood.  Let me try to ask this again.
23        I know you took these two samples and
24 you homogenized them.  Okay?
25        A.  I homogenized first, and then I took

1290

1 two samples of the homogenized mix.
2        Q.  Right.  Correct.
3        And those two came from samples of the
4 bigger piece; correct?
5        A.  It came from the entire contents of the
6 bag, or bags, in this particular one.
7        Q.  Okay.  But it wasn't all the meth; it
8 was just two little samples of it; correct?
9        A.  Correct.
10        Q.  Okay.  So again, my question is:  You
11 don't know for sure with that entire piece of
12 meth, okay, you don't know for sure whether there
13 might have been more cut in, say, more than half
14 of it; correct?
15        Because you didn't test that; correct?
16        Yes or no, are you for sure?
17        MS. LAMPRECHT:  Well, objection to yes or
18 no.  I think counsel is asking a question based on
19 something that didn't happen, so it's difficult
20 for this witness to answer.
21        THE COURT:  All right.  Rephrase the
22 question, Mr. Heineman.
23 BY MR. HEINEMAN:
24        Q.  Do you have knowledge of knowing,
25 within that whole piece of meth, exactly how much

1291

1 cut is in there, other than by estimating based on
2 your samples?
3        A.  From the testing that I did, it
4 is -- would be my opinion that --
5        Q.  No, actually, I think I asked a pretty
6 straight question.
7        MS. LAMPRECHT:  I think he is allowed to
8 offer his opinion.
9        MR. HEINEMAN:  Move to strike.
10        THE COURT:  Restate the question, Counsel.
11 As I looked at, I'm not sure is -- if the question
12 is --
13 BY MR. HEINEMAN:
14        Q.  The question is:  Can you state for
15 sure for the whole piece, whether or not there
16 might be more cut in the untested parts of it?
17        A.  Well, there would be -- you know, there
18 would be some cut, if there was some in there to
19 begin with, there would still be some in that
20 section.  But the point of homogenizing it is to
21 make sure that it is one uniform sample.
22        Q.  Of the small little samples you took;
23 correct?
24        A.  Of, in this particular one, of the
25 whole, because I homogenized the entire -- in this

1292

1 particular item, I homogenized all of the crystals
2 into a uniform powder.
3        Q.  Okay.  Then you possibly misunderstood
4 my first question, because I asked if you did
5 homogenize the whole sample, the whole 6.1 grams.
6        So you did homogenize that entire 6.1
7 grams?
8        A.  In this 6.1 gram one; correct.
9        Q.  Did you do that with all the other
10 ones?
11        A.  We did a partial homogenization on all
12 of the rest of them.
13        Q.  Okay.  So then I guess my question
14 would be more to all the rest of them.  There
15 is -- is there a possibility -- excuse me.
16        Can you say for sure, then, that all
17 the parts of the other ones that you did not test,
18 that there could be more cut in those?
19        A.  We do a -- I did a partial
20 homogenization on all of the other exhibits --
21        Q.  Right.
22        A.  -- and then took a representative
23 sample of that one, homogenized that all the way
24 down.
25        Is it possible that some of the

**1293**

1 crystals were differentiated?  It is possible.  It
2 is not probable.
3     Q.  Okay.
4     MR. HEINEMAN:  Thank you, Your Honor.
5          Thank you, Mr. Sincerbeaux.
6     THE COURT:  Ms. Lamprecht, redirect.
7          REDIRECT EXAMINATION
8 BY MS. LAMPRECHT:
9     Q.  Did you -- I believe you said when
10 those exhibits came in, you examined the seals?
11    A.  Yes, I did.
12    Q.  Had any of the seals been broken with
13 or did they -- is there anything that shows that
14 they might have been tampered with in any way?
15    A.  No, there was not.
16    Q.  And are the initials of the last person
17 who handled it, is there something on the seal
18 that shows who the last person who handled it
19 would have been?
20    A.  There are initials and a date, which I
21 assume is the date that they actually did the
22 sealing.  I don't recognize the initials or the
23 writing, but they are there.
24    Q.  You don't need to know the person who
25 sent it in, do you, to analyze the substance?

**1294**

1     A.  No, I do not.
2     Q.  Okay.  And is it your procedure in the
3 laboratory that after you have analyzed the
4 evidence, it goes back to the agency who sent it
5 to you?
6     A.  Yes, it is.
7     Q.  If someone at FedEx or anywhere along
8 the way had tampered with those packages, would
9 the seals still be intact?
10    MR. BORTON:  Objection, Your Honor, calls
11 for speculation.
12    MS. LAMPRECHT:  Well, I think that's what we
13 were doing before, Your Honor.
14    THE COURT:  Just a moment.
15         Counsel, I think this is really in the
16 province of the jury to sort out.  Why don't you
17 rephrase the question about -- based upon the
18 witness's experience and not just his speculation
19 as to --
20    MS. LAMPRECHT:  I will.
21    THE COURT:  -- what might or might not have
22 occurred.
23    MS. LAMPRECHT:  Thank you, Your Honor.
24    THE COURT:  Or the protocols that are
25 followed.  But I think just to ask him what is

**1295**

1 possible just calls for speculation.
2     MS. LAMPRECHT:  Thank you, Your Honor.
3 BY MS. LAMPRECHT:
4     Q.  Looking at each one of those
5 exhibits -- and let's just take Exhibit 47 first.
6 Would you look at the packaging and the seal on
7 that exhibit.
8     A.  Yes.
9     Q.  Is there anything other than where you
10 cut it open that shows, to your trained eye, that
11 anyone tampered or did anything with it?
12    A.  No, there is no evidence.
13    Q.  How about Exhibit 48?
14    A.  It appears to have original seals.
15    Q.  So there is nothing on it -- is it fair
16 to say that, in your opinion, there is nothing
17 that shows that anybody tampered with it since it
18 was sealed?
19    A.  Correct.
20    Q.  Exhibit 49.
21    A.  Would be the same.
22    Q.  Exhibit 53?
23         Is it 53 or 52?
24    A.  Fifty-two.
25    Q.  Okay.  Thank you.

**1296**

1     A.  Those appear to be original seals.
2     Q.  No tampering, no evidence of tampering?
3     A.  Correct.
4     Q.  Is there any evidence of any tampering
5 in Exhibit 53?
6     A.  No, there is not.
7     Q.  And just to be clear, your uncertainty
8 factor, would that take into account if you
9 only -- how much of those samples did you actually
10 homogenize, the larger samples?
11    A.  About 10 grams.
12    Q.  Would your uncertainty factor take into
13 account any difference in purity between the
14 amount you homogenized and the amount that was
15 left in the bag?
16    A.  We take everything out of the bag.  We
17 don't take -- you know, I will dump the entire
18 thing out.  I will grind it up so that it fits
19 through a quarter-inch sieve, so it's basically a
20 screen, to make sure that all of the larger
21 crystals will pass through.
22         I will then take a -- it's called cone
23 and quartering, basically make a pile, you take a
24 quarter, logic being that certain sizes of the
25 crystals will all fall uniformly around basically

1297

1 a circle of a cone.

2      I will take a quarter of that cone and

3 basically keep doing that until I get down to

4 about 10 grams. I will take that 10 grams. I

5 will grind that up into a fine powder, and then I

6 will take my subsamples of that and then run that

7 through our instrument.

8     **Q.** Okay. So then I guess my question

9 would be: Would it be fair to say that that

10 uncertainty factor would cover any difference that

11 there might be?

12     **A.** It is intended to.

13     MS. LAMPRECHT: No further questions,

14 Your Honor.

15     THE COURT: Ms. Berglund.

16     MS. BERGLUND: No, Your Honor.

17     THE COURT: Mr. Borton.

18     MR. BORTON: Nothing, Your Honor.

19     THE COURT: Mr. Heineman.

20     MR. HEINEMAN: No further questions,

21 Your Honor.

22     THE COURT: You may step down. Thank you.

23 You may call your next witness.

24     MS. LAMPRECHT: At this time, Your Honor,

25 the government rests.

1298

1     THE COURT: All right.

2     Ladies and gentlemen, I need to take up

3 a matter with counsel that's going to take a

4 little bit of time. I think I'll just have you

5 retire to the jury room.

6     You are still subject to the same

7 admonition of the court. You are not to discuss

8 the case among yourselves or with anyone else, and

9 you must not form or express any opinions about

10 the case until it is submitted to you.

11     We'll be in recess -- well, I'll just

12 have the jury escorted out and then I'll take up

13 this with counsel.

14     (Jury absent.)

15     THE COURT: I assume we have a motion from

16 the defendants.

17     MS. BERGLUND: Yes, Your Honor.

18     THE COURT: Ms. Berglund.

19     MS. BERGLUND: Your Honor, I am going to

20 move that this court enter judgment of acquittal

21 under 29(a). I think the evidence in this case

22 was insufficient to sustain a conviction against

23 Mr. Loveland for conspiracy to possess

24 methamphetamine with an intent to deliver.

25     In this case, we have only had three

1299

1 coconspirators claim that Mr. Loveland was

2 receiving two ounces a week of methamphetamine

3 from November through May. There is no evidence

4 in this case that he contacted anyone until

5 December of -- or excuse me -- December 27th,

6 which was Mr. Johnny Tambunga.

7     Mr. Tambunga testified that he had

8 never delivered after December because of his DUI.

9 He said he never received calls from one of

10 Mr. Sanchez's customers after December.

11     In this case, there is no evidence that

12 Mr. Loveland ever sold or gave methamphetamine to

13 anyone. No one has said that he said he would.

14 Nobody has said that he bought on a front,

15 indicating that he would have to then go sell the

16 methamphetamine to pay for it.

17     There is no indicia of distribution.

18 He was never in possession of methamphetamine; no

19 baggies, no scales, no paraphernalia, no cutting

20 agents.

21     The government even introduced business

22 cards that he had. He had evidence of

23 self-support. He wasn't in possession of money or

24 living a lifestyle that was inconsistent with his

25 employment.

1300

1     The testimony concerning amounts for

2 personal use has been inconsistent. Mr. Hensley

3 said he would use up to a quarter ounce a day,

4 which is roughly two ounces a week, just shy of

5 two ounces a week. We don't have any definitive

6 testimony concerning what personal use amounts

7 are.

8     And without indication that Mr.

9 Loveland ever did anything showing intent to

10 distribute methamphetamine, I believe the evidence

11 introduced here is just simply shy of the mark of

12 beyond a reasonable doubt.

13     THE COURT: Mr. Borton.

14     MR. BORTON: Your Honor, on behalf of

15 Michael Morris, we would make a similar motion for

16 judgment of acquittal under Rule 29.

17     Among other reasons, I find some

18 disconnect in the proof that's been provided. The

19 841 possession with intent to deliver, I think

20 there is a fatal gap in what the government has

21 provided connecting the methamphetamine that they

22 have provided to the methamphetamine that's

23 claimed to be found in this case, and which would

24 then tie to it the conspiracy that Mr. Morris is

25 tied to.

1301

1  I don't think they have bridged that in
2  a sufficient manner to allow the case to go
3  forward, and we would ask that the single count of
4  conspiracy as to Mr. Morris be dismissed
5  accordingly.
6        Thank you.
7        THE COURT:  Thank you.
8        Mr. Heineman.
9        MR. HEINEMAN:  On behalf of my client,
10  Your Honor, I guess I would also move for
11  dismissal.  My basis is mostly just the testimony
12  of the alleged coconspirators seemed to be a lot
13  of vagueness, not a lot of certainty on dates.
14  They seemed to, to a certain degree from my review
15  of things, seemed to contradict themselves.
16        Mr. Sanchez was noted to be arrested
17  well after the original trailer was searched.
18  When he was arrested, I haven't -- I guess I
19  haven't seen any direct evidence that anything was
20  found on him.
21        And now it's -- you know, right now, as
22  I say, I take great caution with what they have
23  testified to, because obviously they have a
24  tremendous love to get the best deal they can.
25  And from that standpoint, you know, without

1302

1  something more physically -- physical
2  evidence-wise with Mr. Sanchez, that was in and
3  around the time that the trailer was raided -- and
4  certainly it's already been known that he wasn't
5  there at that time, he was in Mexico -- that I
6  think for those reasons I think that the charges
7  against him should be dismissed.
8        Thank you.
9        THE COURT:  All right.  Thank you.
10        Ms. Lamprecht, your response.
11        MS. LAMPRECHT:  I'll go from last to first.
12        With respect to Mr. Sanchez, the
13  evidence was -- his argument was that there was no
14  evidence linking him to the drugs.
15        The evidence in this case was -- is
16  that the last load that Che picked up,
17  Mr. Sanchez, was in California.  It was three
18  pounds.  It came back to the trailer.  It was
19  distributed to his usual clients by Fabian and
20  himself, by Mr. Sanchez, and Victor.  And it went
21  through Ben Vertner to K.C. Hensley, and to Ben
22  Vertner.
23        It was seized -- some of this meth was
24  seized from the trailer.  Some was seized from Ben
25  Vertner.  Some was seized from Tanya Olson, who

1303

1  got it from Ben Vertner.
2        And then the undercover buy, of course,
3  was also from the same meth that Mr. Sanchez
4  brought back the last time that he went down to
5  pick up a load.
6        I suggest that the evidence is more
7  than sufficient to show that Mr. Sanchez was part
8  of the conspiracy.  I don't believe there has to
9  be a link between him and any actual
10  methamphetamine, as long as there is testimony
11  that he was part of an agreement to possess with
12  intent to deliver.
13        But in this case, there is -- all the
14  methamphetamine that we have tested came directly
15  from Che, and that's what the evidence shows.
16        With respect to Michael Morris, Michael
17  Morris was in the lower end of the distribution
18  chain.  He was getting methamphetamine all the
19  time from Ben Vertner, who delivered it to him
20  personally.  Also, Rachel Coblentz, Patric
21  Campbell, K.C. Hensley delivered it to him before
22  Vertner, and he helped K.C. Hensley wash
23  methamphetamine, I believe, was the testimony.
24        Amber Hites lived with him and saw him
25  both receiving and selling methamphetamine.  She

1304

1  listed some of his customers.
2        Fabian Beltran even delivered to his
3  house and saw him.
4        So there is -- I think there is more
5  than enough evidence to show that Michael Morris,
6  who bought meth from Vertner which came from
7  Fabian and Che, and then sold it to his
8  customers -- is more than sufficient to
9  sustain [sic] a Rule 29 motion.
10        Finally, with respect to Mr. Loveland,
11  there were three witnesses who testified that they
12  dealt with him directly, as did Mr. Sanchez.
13  Those witnesses were Fabian, Victor, and Johnny
14  Tambunga.
15        The evidence that Johnny Tambunga
16  testified to, although it is not shown in the
17  phone calls, is that he delivered twice to him in
18  November and December.  He said that the calls
19  after that were because Loveland was looking for
20  Che.
21        The calls show that there were numerous
22  phone calls between Jim Loveland and Fabian
23  Beltran, and there were also a number of contacts
24  between Jim Loveland and Che, Mr. Sanchez.
25        There is no -- Fabian and Victor, who

1305

1 came on a visit, who was only in Idaho for a
2 limited number of days, knew where he lived
3 because he went with Fabian to deliver to
4 Mr. Loveland. There is no evidence as to why
5 Mr. Loveland would have any association with them
6 other than this methamphetamine.
7        And as -- and the amounts that he was
8 buying, two ounces at a time every two -- every
9 week or two, is more than a personal use amount, I
10 believe we have --
11       THE COURT: What evidence --
12       MS. LAMPRECHT: -- heard from the witnesses.
13       THE COURT: -- is there of that?
14       MS. LAMPRECHT: Hmm?
15       THE COURT: What evidence is there that that
16 is more than --
17       MS. LAMPRECHT: Most of the witnesses
18 testified that they would take, at most, a fourth
19 of a gram at a time.
20       We don't even -- there is no evidence
21 that Mr. Loveland is a user, Your Honor.
22       And so -- and there is also evidence,
23 however, that when they made these deliveries, he
24 was giving them $2,400 at a time, everybody. So I
25 think that sort of negates the personal use

1306

1 argument.
2       THE COURT: All right.
3       Well, I'm going to deny the motion as
4 to Mr. Morris and Mr. Sanchez.
5       I'm going to reserve ruling on it as to
6 Mr. Loveland. I want to review the transcript. I
7 may try to do that over the weekend. I have it
8 available. I'm -- I think the case is clearly the
9 most weak as to Mr. Loveland, and the question is:
10 Is there enough evidence from which the jury could
11 find beyond a reasonable doubt that Mr. Loveland
12 was involved in the drug conspiracy?
13       Simply receiving the drugs, if it was
14 only for his personal use, may not be enough. I
15 need to review that question as a matter of law,
16 as well. But I think it's a matter that I'll
17 reserve ruling on.
18       And I will allow the defendants to go
19 forward, and then I'll make a determination on
20 that after all the evidence is in, and perhaps
21 even in posttrial motions, if need be.
22       So that will be the ruling of the
23 court.
24       How much time does the defense need to
25 be ready to proceed?

1307

1       MS. BERGLUND: Nothing from Mr. Loveland.
2       MR. BORTON: Ten minutes --
3       THE COURT: I'm sorry?
4       MR. BORTON: Ten minutes, Your Honor. I
5 just need to make a final discussion and decision.
6       THE COURT: Again, I don't want to put you
7 on the spot, but are we -- do we have evidence
8 lined up that's going to take us through the
9 balance of the day?
10       MR. BORTON: I don't believe so.
11       THE COURT: Okay. So we will probably be
12 sending the jury home?
13       MR. BORTON: Correct.
14       THE COURT: My intention would be, even if
15 we wrap up, including any rebuttal evidence from
16 the government, today early, is to send the jury
17 home and then we'll come back and instruct and
18 argue on Tuesday morning.
19       Is that agreeable?
20       MR. BORTON: Yes, Your Honor.
21       MR. HEINEMAN: Yes, that is agreeable,
22 Your Honor.
23       THE COURT: Ms. Lamprecht.
24       MS. LAMPRECHT: I'm sorry, Your Honor. I
25 didn't hear the question.

1308

1       THE COURT: I said that even if we're able
2 to wrap up the evidence, let's say in the next
3 hour or two, I think the better course, since we
4 haven't had time to work on jury instructions, is
5 to send the jury home, have them come back Tuesday
6 morning after the long weekend and then instruct
7 and argue at that time.
8       MS. LAMPRECHT: Yes, Your Honor. I'm sorry.
9 That would be fine.
10       THE COURT: All right. We'll be in recess
11 for 15 minutes. We'll consider this our first
12 break of the day. We'll be in recess.
13       (Recess.)
14       (Jury present.)
15       THE COURT: I'll note for the record that
16 the jury is present.
17       Ms. Berglund.
18       MS. BERGLUND: Your Honor, the defense will
19 rest.
20       THE COURT: Mr. Borton.
21       MR. BORTON: Your Honor, the defense will
22 rest as well.
23       THE COURT: And Mr. Heineman.
24       MR. HEINEMAN: Your Honor, just for
25 standpoint of procedure, I did have a motion

1309

1 regarding relevancy that came up earlier, and I
2 didn't know, to make that before I formally
3 rested, or can that be taken up after?
4     THE COURT:  Let's take it up at a sidebar so
5 I know exactly what you're referring to.  I do not
6 want to make any mistakes in that regard.
7     (Sidebar commences as follows:)
8     MR. HEINEMAN:  Earlier I made objections to
9 the relevancy of the Western Union money transfers
10 that were going down to Mr. Sanchez, as to the
11 relevancy.
12     And the prosecutor was saying she was
13 going to tie it together and tie it together.
14     I just don't think there has been any
15 tie of those things to this conspiracy in any way,
16 other than the fact there was simply money
17 transferred to him.
18     THE COURT:  Ms. Lamprecht.
19     MS. LAMPRECHT:  I don't remember those
20 objections or saying that I was going to tie it
21 together.
22     The relevancy from the government point
23 of view has always been that not only does he have
24 all this cash in the trailer he is using to
25 buy meth, but he is also sending large amounts of

1310

1 money to people in Mexico, and he is -- at
2 anywhere, and he is depositing and withdrawing
3 large amounts of money from his bank account.  And
4 it just goes to -- and he has no job.  So it just
5 goes to show that he is gaining a lot of income
6 from drug dealing.
7     THE COURT:  All right.  The concern is that
8 there has been no direct evidence of a tie to any
9 kind of a Mexican drug cartel, and the concern is
10 that money being sent to Mexico might be
11 suggestive of that.
12     MS. LAMPRECHT:  We're not going to argue
13 that, certainly.
14     THE COURT:  That was going to be my point,
15 if the government will -- if I get any sense that
16 you argue that or mention anything suggesting that
17 there is a tie-in to any Mexican drug
18 organization, even hint at it, I will sustain the
19 objection and you may end up with a mistrial.
20     MS. LAMPRECHT:  We never intended to do
21 that, Your Honor.
22     THE COURT:  Okay.
23     MS. LAMPRECHT:  The whole purpose is as I
24 just explained --
25     THE COURT:  All right.

1311

1     MS. LAMPRECHT:  -- to show that he had
2 access to large amounts of money and he had no
3 legitimate way of getting it.
4     THE COURT:  Mr. Heineman.
5     MR. HEINEMAN:  The fact that he had large
6 amounts of money show up in his bank account.  In
7 fact, if you look at his bank account records,
8 they will show that that money came out.
9     The transfers, I think, are -- possibly
10 will give the suggestion that he is sending money
11 down to Mexico to people in cartels.  So the bank
12 account records, I have no problem with.  It is
13 the actual Western -- I think on to women, and to
14 be honest with you, considering how much they are
15 allegedly paying for the pound of the meth, it's
16 not a large amount.  But I don't want that
17 possibly to cloud.
18     THE COURT:  All right.  I'm going to
19 overrule the objection, but the objection is noted
20 and ruled upon, and we'll deal with it in that
21 way.  All right?
22     MR. HEINEMAN:  Okay.  Thank you, Your Honor.
23     (Sidebar concluded.)
24     THE COURT:  Mr. Heineman.
25     MR. HEINEMAN:  Thank you, Your Honor.  At

1312

1 this time, our defense rests.
2     THE COURT:  All right.
3     Ladies and gentlemen, we had
4 planned -- there was no way of knowing precisely
5 how long it's going to take, and I had just kind
6 of settled in my own mind that we would not try to
7 argue and instruct today, because I see that it's
8 at least possible that we could do that.
9     I'm going to have you retire back to
10 the jury room.  Let me confer with counsel for a
11 moment, and then I will be back with you.
12     Because I had -- had been working with
13 counsel and kind of assuming that we would have
14 the case submitted to you sometime next week,
15 there is a fair amount of work that we still would
16 have to do in terms of jury instructions and
17 things of that sort that I would have to work
18 through with counsel.
19     Whether I can get that done and we can
20 still instruct and argue and have the case
21 submitted today is a little bit of an open
22 question.
23     In addition, we did not give you any
24 forewarning that you might have the case
25 submitted.  Normally, when that occurs, we expect

1313

1 the jury to stay until 5:00 or so. You have not
2 had the opportunity to make plans for that, since
3 we have been on an 8:30 to 2:30 trial day.
4        So I think we will probably end up just
5 recessing for the weekend, come back Tuesday
6 morning. Monday is a federal holiday. We'll come
7 back Tuesday morning and go directly into
8 instructions and arguments, and then you will be
9 allowed to begin your deliberations probably
10 sometime late Tuesday morning.
11        If we do end up taking the
12 recess -- and I will come down and advise you in
13 the jury room after I confer with counsel. But if
14 we do as I think we will, which is wait until
15 Tuesday morning to resume the trial, you will be
16 under the very same admonition that the court has
17 given you throughout the trial: Do not form or
18 express any opinions about the case. Don't
19 discuss it with anyone else. Don't listen to any
20 news accounts.
21        Don't engage in any outside research,
22 including consulting Internet sources, Google,
23 reference books. Don't visit any site that has
24 been mentioned. Don't -- just simply put the
25 matter out of your mind, and we'll start up again

1314

1 Tuesday morning.
2        The reason -- you may think, well, we
3 have heard all the evidence. What you haven't
4 heard is my instructions as to the law. And it is
5 absolutely critical that you have that before you
6 begin to form any opinions about the case or
7 before you begin to discuss it. So for that
8 reason you will be under the same admonition.
9        At this time, I think what we'll do is
10 we will be in recess. I will ask you to remain in
11 the jury room for just a few minutes while I visit
12 with counsel, and then I will come down and advise
13 you personally whether you will be allowed to
14 leave and come back Tuesday, or whether there may
15 be an alternative plan where we'll just send you
16 out to an early lunch and have you come back, and
17 we'll move directly into instructions and
18 argument.
19        It somewhat depends upon how complex
20 the arguments and challenges are going to be in
21 putting together the court's instructions.
22        But in any event, we'll be in recess
23 then until further call, which will either be
24 sometime after a long lunch or, more likely,
25 Tuesday morning at 8:30. All right?

1315

1        We'll be in recess.
2        (Recess.)
3        (Jury absent.)
4        INSTRUCTIONS CONFERENCE
5        THE COURT: Let me note for the record, we
6 have provided -- we're going to go on the record
7 for a formal instruction conference.
8        The court has provided counsel with a
9 set of instructions numbered 1 through 24, and
10 also a verdict form. We have had actually two
11 informal sessions to go over and make proposed
12 changes to the instructions.
13        I would note that the instruction
14 changes which we just made from the written text
15 which you were provided, I want to state that for
16 the record so there is no uncertainty.
17        First, Instruction No. 9, a new
18 paragraph is going to be inserted. It will be the
19 second paragraph of the instruction, and it will
20 read as follows: Each of these witnesses'
21 testimony was given in exchange for a promise that
22 the government would not use new information that
23 the witness provided about his or her own criminal
24 conduct.
25        That's essentially verbatim out of the

1316

1 plea agreement with the parties.
2        The other change was Instruction
3 No. 10. That will be modified to read: You have
4 heard evidence that -- and then we'll list the
5 name of the defendant -- was convicted of -- and
6 then we'll list the specific crimes of which they
7 were convicted -- and the defendant's -- the
8 witnesses whose names will be included will be
9 Mario Martinez, Benjamine Vertner, Patric
10 Campbell, K.C. Hensley and Amy Cavazos.
11        And Ms. Cavazos -- the other four, I
12 think were all drug offenses, prior drug offenses,
13 but they were all felonies. Ms. Cavazos's prior
14 conviction was for giving false information to a
15 police officer.
16        MS. LAMPRECHT: Patric Campbell was an
17 aggravated assault.
18        THE COURT: I'm sorry?
19        MS. LAMPRECHT: Patric Campbell was not a
20 drug offense. He was an assault and agg battery.
21        THE COURT: It will be whatever the record
22 reveals the conviction was, and I'll be going
23 through the transcript to confirm that.
24        All right. And I think that was the
25 only change we made.

1317

1    So with that, Counsel, this will be
2  your opportunity to put on the record your
3  objection to the court's proposed charge to the
4  jury.
5    Ms. Lamprecht.
6    MS. LAMPRECHT:  We object to the recent
7  decision to 4.9 and to the eyewitness
8  identification.
9    THE COURT:  Okay.  Would you bring the
10 microphone a little closer, so I can hear you?
11   MS. LAMPRECHT:  I'm sorry.  We object to the
12 court's Instruction No. 12, eyewitness
13 identification, and the recent addition to, I
14 believe it is the court's Instruction No. 9, which
15 is model instruction 4.9, adding the immunity
16 language -- or the -- yes, immunity from
17 prosecution.
18   THE COURT:  Any other objections?
19   MS. LAMPRECHT:  No, sir.
20   THE COURT:  All right.
21   Ms. Berglund.
22   MS. BERGLUND:  I have no objections.
23   THE COURT:  Okay.  Mr. Borton.  Any
24 objections?
25   MR. BORTON:  Yes, Your Honor.  On

1318

1  Instruction No. 16, elements of the conspiracy, I
2  think added -- understanding the court's position,
3  the Hegwood paragraph from our proposed conspiracy
4  instruction should also be included, with regards
5  to the clear evidence requirement, required for
6  the intent for the underlying offense.
7    We would object to, if the court were
8  to exclude or fail to provide Model Instruction
9  8.22 on multiple conspiracies that we requested.
10 I know that's under advisement.  We object to the
11 extent that that's omitted.
12   THE COURT:  Okay.  Let me note -- I should
13 have noted that earlier.  I am not going to give
14 that requested instruction.  As I have mulled over
15 the evidence, I don't think there really is
16 evidence of multiple conspiracies.  It really is a
17 single conspiracy with Mr. Sanchez and perhaps
18 Mr. Beltran essentially at the core, and with just
19 the drugs being disseminated outward.  And I don't
20 think there is any evidence of any conspiracy or
21 drug distribution networks.
22   So I understand.  The objection is
23 noted, but I just wanted to state my reason for
24 not giving that instruction.
25   MR. BORTON:  And we addressed this earlier,

1319

1  but, again, just for the record, the request and
2  motion in limine for a jury instruction with
3  regard to the 801(d)(2).  I know it's been
4  addressed and ruled on by the court, but to the
5  extent that requested instruction is not provided,
6  I would object to its exclusion.
7    That's it.
8    THE COURT:  Okay.
9    Mr. Heineman.
10   MR. HEINEMAN:  No objections, Your Honor.
11   THE COURT:  All right.
12   Let me just briefly address the
13 objections.  I think with regard to the
14 government's objection to my inclusion of the
15 additional language in Instruction No. 9, the plea
16 agreement did include language very much akin to a
17 grant of immunity.  It's essentially use immunity
18 that whatever evidence the witness -- or the
19 defendant provided pursuant to the plea agreement
20 would not be used against them.
21   I think that is close enough to what is
22 envisioned by an immunity agreement that the court
23 should give the agreement that would apply if,
24 indeed, there had been a formal grant of immunity.
25   With regard to No. 12 and eyewitness

1320

1  identification, Ms. Berglund correctly pointed out
2  that her client was -- was, in fact, identified
3  under -- by I think it was Mr. Ruiz in a -- under
4  circumstances where it was not clear that he had
5  the opportunity to see him closely.
6    I think, given that fact, if there is
7  evidence to support an instruction concerning
8  eyewitness identification, then I think I'm
9  duty-bound to give it.  And I think for that
10 reason I feel compelled to give the eyewitness
11 identification instruction.
12   With regard to Mr. Borton's objection
13 to the clear evidence instruction, I think that is
14 language from a circuit decision.  I have always
15 been skeptical of just taking language from a
16 circuit decision and stick it into a jury
17 instruction.
18   The circuit deals with different
19 matters.  They are not concerned with properly
20 instructing the jury, unless they're dealing with
21 a challenge to the court's charge to the jury.
22 And I think for that reason a lot of mischief can
23 occur when trial judges pick up language from case
24 law and then just put them into instructions.
25   Moreover, it's a comment on the

1321

1    evidence, and although I may be free to do so my
2    practice is not to comment on the evidence.  I
3    declined Ms. Lamprecht's suggestion that I include
4    more specific instructions concerning conspiracy
5    that in my view also constituted a comment on the
6    evidence.
7            And to be consistent with both the
8    government and the defendants, I think I'm -- it's
9    necessary that I be consistent and not offer those
10   kinds of instructions, even if there is language
11   from a Ninth Circuit decision that the instruction
12   is relied -- is based upon.  I think it is far
13   better for the court just to avoid that and to
14   give more simple, plain instructions to the jury
15   and allow counsel to argue what the effect of the
16   evidence should be.
17           With regard to multiple conspiracies,
18   as I noted earlier, I have concluded there simply
19   is no evidence to support that instruction.
20           With regard to 801(d)(2)(E), I think
21   the record is also clear on that point, that the
22   court has concluded that that language was really
23   intended for the court in its consideration of the
24   preliminary question of the admissibility of
25   coconspirator testimony and was not intended to

1322

1    create a substantive evidentiary requirement or
2    standard for the jury to consider; and therefore
3    to instruct the jury on that, I think would be an
4    error.
5            So that will be the court's rulings on
6    the objections.
7            Counsel, the only thing we will do is
8    confirm with you Monday [sic] morning that -- the
9    changes we have made to Instruction No. 10 and --
10   I think just Instruction No. 10 comports with what
11   we agreed upon here.
12           I have also indicated that I'm going to
13   give the government an opportunity to confirm that
14   there will no problems created by the form of the
15   questions which we're submitting to the jury
16   concerning drug quantities in the circumstance
17   where there might be some inconsistency between
18   the detectable amount of methamphetamine weight
19   and the pure methamphetamine weight, just to
20   confirm that there won't be some problem
21   potentially arise with some inconsistency, and if
22   the jury answers both as to a particular
23   defendant.
24           So, Counsel, is there anything else?
25           MS. LAMPRECHT:  Not on behalf of the

1323

1    United States, Your Honor.
2            MS. BERGLUND:  Nothing from Mr. Loveland.
3            MR. BORTON:  No, Your Honor.
4            MR. HEINEMAN:  No, Your Honor.
5            THE COURT:  All right.  With that, then, we
6    will see you at 3:30, and the rest of you Tuesday
7    morning at 8:30.
8            (Court recessed at 2:10 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1           R E P O R T E R' S   C E R T I F I C A T E

2

3

4

5           I, Tamara I. Hohenleitner, Official

6     Court Reporter, State of Idaho, do hereby certify:

7           That I am the reporter who transcribed

8     the proceedings had in the above-entitled action

9     in machine shorthand and thereafter the same was

10    reduced into typewriting under my direct

11    supervision; and

12          That the foregoing transcript contains a

13    full, true, and accurate record of the proceedings

14    had in the above and foregoing cause.

15          IN WITNESS WHEREOF, I have hereunto set

16    my hand March 4, 2013.

17

18

19

20                        -s-
       Tamara I. Hohenleitner
21     Official Court Reporter
       CSR No. 619
22

23

24

25

**$**

**$1,400** [1] - 1251:5
**$100** [1] - 1249:21
**$2,400** [1] - 1305:24
**$24,000** [1] - 1249:25

**0**

**08** [1] - 1287:2

**1**

**1** [2] - 1258:3, 1315:9
**1.99** [2] - 1280:1, 1281:18
**10** [10] - 1241:14, 1270:11, 1270:17, 1274:19, 1296:11, 1297:4, 1316:3, 1322:9, 1322:10
**100** [2] - 1274:21, 1289:16
**104.8** [1] - 1231:10
**12** [2] - 1317:12, 1319:25
**12-155-S-BLW** [1] - 1225:5
**12/27** [1] - 1248:15
**13th** [1] - 1251:3
**148** [1] - 1274:14
**14A** [1] - 1242:23
**15** [2] - 1260:3, 1308:11
**16** [3] - 1256:12, 1260:3, 1318:1
**1620** [1] - 1247:10
**16th** [4] - 1245:23, 1246:2, 1246:23, 1247:5
**17** [3] - 1238:13, 1238:21
**17th** [1] - 1247:15
**18** [1] - 1225:2
**1985** [1] - 1256:25

**2**

**2** [1] - 1258:5
**2.84** [2] - 1278:9, 1281:13
**2/15** [1] - 1248:17
**2/21** [1] - 1248:13
**20** [1] - 1274:20
**2011** [1] - 1248:15
**2012** [3] - 1248:13, 1248:17, 1248:19
**2013** [1] - 1225:2
**21** [2] - 1238:13, 1240:20

**22** [1] - 1241:5
**24** [1] - 1315:9
**241111** [1] - 1241:1
**25** [3] - 1238:11, 1238:15
**26** [8] - 1238:12, 1238:16, 1238:17, 1239:5, 1240:12, 1243:3, 1243:8
**26th** [1] - 1245:25
**27th** [4] - 1245:19, 1248:3, 1248:21, 1299:5
**28.35** [1] - 1282:4
**28.45** [2] - 1280:1, 1281:17
**28.98** [1] - 1268:3
**29** [3] - 1235:16, 1300:16, 1304:9
**29(a)** [1] - 1298:21
**2:10** [1] - 1323:8
**2:30** [1] - 1313:3

**3**

**3** [2] - 1257:24, 1258:7
**3.77** [2] - 1280:6, 1281:21
**3/31** [2] - 1248:19, 1249:5
**31st** [1] - 1250:12
**37-plus** [1] - 1278:11
**380** [2] - 1238:22, 1239:6
**39** [1] - 1251:23
**3:00** [1] - 1246:23
**3:26** [1] - 1245:23
**3:30** [2] - 1247:6, 1323:6

**4**

**4.9** [2] - 1317:7, 1317:15
**40** [6] - 1246:9, 1259:25, 1260:1, 1271:5, 1274:20, 1282:22
**40.57** [3] - 1278:1, 1278:7, 1281:13
**41** [1] - 1275:22
**41.51** [2] - 1267:24, 1278:6
**43** [2] - 1251:24, 1278:16
**44** [3] - 1277:6, 1278:13, 1281:10
**468** [2] - 1240:10, 1240:11
**47** [15] - 1265:8,

1265:9, 1265:23, 1266:1, 1266:24, 1267:2, 1267:15, 1268:23, 1272:12, 1272:21, 1275:24, 1280:19, 1281:8, 1285:6, 1295:5
**48** [14] - 1265:9, 1265:15, 1265:23, 1266:24, 1267:23, 1272:12, 1277:11, 1277:15, 1277:22, 1277:23, 1280:20, 1281:11, 1285:6, 1295:13
**49** [12] - 1265:16, 1265:23, 1266:7, 1266:24, 1268:1, 1272:12, 1279:17, 1279:21, 1280:20, 1281:16, 1285:6, 1295:20

**5**

**5.01** [2] - 1280:10, 1282:2
**5/5** [1] - 1249:5
**50** [3] - 1260:1, 1282:22, 1283:2
**52** [11] - 1265:17, 1265:24, 1266:10, 1266:25, 1268:4, 1272:12, 1280:2, 1280:20, 1281:19, 1285:6, 1295:23
**53** [15] - 1265:18, 1265:24, 1266:13, 1266:25, 1268:7, 1269:6, 1272:13, 1280:7, 1280:8, 1280:20, 1281:24, 1285:6, 1295:22, 1295:23, 1296:5
**53.79** [2] - 1280:5, 1281:20
**55.36** [1] - 1268:6
**57** [2] - 1265:14, 1266:1
**58** [2] - 1266:4, 1274:13
**5:00** [1] - 1313:1

**6**

**6** [2] - 1229:7, 1272:23
**6.1** [4] - 1286:24, 1292:5, 1292:6, 1292:8
**6.22** [3] - 1276:11,

1277:4, 1281:10
**6.61** [3] - 1267:9, 1275:25, 1276:10
**60** [1] - 1274:20
**611** [1] - 1235:7

**7**

**7** [4] - 1240:7, 1276:20, 1277:3, 1278:20
**71.52** [2] - 1280:9, 1282:1
**72.7** [1] - 1268:8
**77** [1] - 1274:14
**798469** [1] - 1240:8

**8**

**8.22** [1] - 1318:9
**80** [1] - 1274:21
**801** [1] - 1233:19
**801(d)(2)(2** [1] - 1225:17, 1233:12
**801(d)(2)** [1] - 1319:3
**801(d)(2)(E)(2** [1] - 1232:10, 1321:20
**801(d)(2)(E)** [1] - 1231:21
**841** [1] - 1300:19
**8:30** [3] - 1313:3, 1314:25, 1323:7

**9**

**9** [3] - 1315:17, 1317:14, 1319:15
**90** [1] - 1276:14
**95** [1] - 1276:25
**9A** [1] - 1249:6
**9B** [4] - 1246:16, 1246:18, 1249:2, 1252:12
**9th** [1] - 1249:8

**A**

**ability** [1] - 1242:3
**able** [3] - 1277:12, 1283:22, 1308:1
**absent** [3] - 1225:3, 1298:14, 1315:3
**absolute** [1] - 1279:11
**absolutely** [2] - 1246:1, 1314:5
**accepted** [3] - 1261:2, 1263:1, 1269:10
**access** [3] - 1264:8, 1264:14, 1311:2
**accordingly** [1] -

1301:5
**account** [6] - 1296:8, 1296:13, 1310:3, 1311:6, 1311:7, 1311:12
**accounts** [1] - 1313:20
**accuracy** [1] - 1276:25
**accurate** [1] - 1229:24
**accurately** [1] - 1287:17
**acquittal** [2] - 1298:20, 1300:16
**actual** [13] - 1273:3, 1273:16, 1274:5, 1276:10, 1277:15, 1278:3, 1278:11, 1278:15, 1278:18, 1279:6, 1284:3, 1303:9, 1311:13
**add** [1] - 1230:5
**added** [1] - 1318:2
**adding** [1] - 1317:15
**addition** [5] - 1225:10, 1258:8, 1261:8, 1312:23, 1317:13
**additional** [3] - 1229:11, 1253:9, 1319:15
**address** [2] - 1228:2, 1319:12
**addressed** [2] - 1318:25, 1319:4
**admissibility** [1] - 1321:24
**admit** [3] - 1225:14, 1234:20, 1235:9
**admits** [1] - 1226:17
**admitted** [3] - 1246:15, 1280:22, 1280:23
**admonition** [3] - 1298:7, 1313:16, 1314:8
**advise** [3] - 1231:7, 1313:12, 1314:12
**advisement** [1] - 1318:10
**agency** [5] - 1242:6, 1263:23, 1264:21, 1284:20, 1294:4
**agent** [2] - 1250:3, 1265:10
**agents** [1] - 1299:20
**agg** [1] - 1316:20
**aggravated** [1] - 1316:17
**ago** [1] - 1276:22
**agree** [2] - 1229:14, 1246:18

**agreeable** [1] - 1307:19, 1307:21

**agreed** [1] - 1322:11

**agreement** [6] - 1303:11, 1316:1, 1319:16, 1319:19, 1319:22, 1319:23

**ahead** [3] - 1233:1, 1238:3, 1289:15

**akin** [1] - 1319:16

**algebra** [1] - 1274:24

**aliquots** [1] - 1262:15

**alleged** [1] - 1301:12

**allegedly** [1] - 1311:15

**Allen** [1] - 1225:7

**allow** [5] - 1235:4, 1252:9, 1301:2, 1306:18, 1321:15

**allowed** [4] - 1264:8, 1291:7, 1313:9, 1314:13

**allowing** [1] - 1237:25

**allows** [1] - 1235:8

**almost** [5] - 1229:5, 1231:4, 1235:2, 1235:3, 1260:3

**alone** [4] - 1228:25, 1229:17, 1231:11

**alternative** [1] - 1314:15

**Amber** [1] - 1303:24

**America** [1] - 1225:5

**amount** [21] - 1244:8, 1244:10, 1249:19, 1249:20, 1252:16, 1261:17, 1270:13, 1273:16, 1275:8, 1278:11, 1278:12, 1278:14, 1279:5, 1279:11, 1279:25, 1296:14, 1305:9, 1311:16, 1312:15, 1322:18

**amounts** [9] - 1249:16, 1281:6, 1300:1, 1300:6, 1305:7, 1309:25, 1310:3, 1311:2, 1311:6

**Amy** [1] - 1316:10

**analysis** [4] - 1264:9, 1276:23, 1283:24, 1288:17

**analytical** [1] - 1256:25

**analyze** [4] - 1256:19, 1259:19, 1264:25, 1293:25

**analyzed** [1] - 1294:3

**analyzing** [2] -

1257:18, 1258:8

**announce** [1] - 1255:12

**announcing** [1] - 1233:2

**answer** [3] - 1272:7, 1289:15, 1290:20

**answers** [2] - 1272:1, 1322:22

**anyway** [1] - 1226:23

**apart** [1] - 1272:1

**apologize** [1] - 1238:16

**appealed** [1] - 1228:13

**appear** [4] - 1254:18, 1284:18, 1284:23, 1296:1

**appearance** [1] - 1270:9

**apply** [1] - 1319:23

**approach** [2] - 1227:21, 1236:9

**appropriate** [3] - 1228:17, 1229:9, 1230:1

**April** [2] - 1244:13, 1249:3

**area** [3] - 1237:2, 1241:16, 1242:6

**argue** [7] - 1307:18, 1308:7, 1310:12, 1310:16, 1312:7, 1312:20, 1321:15

**argument** [3] - 1302:13, 1306:1, 1314:18

**arguments** [4] - 1227:17, 1230:6, 1313:8, 1314:20

**arise** [1] - 1322:21

**arose** [1] - 1241:25

**arrested** [3] - 1249:10, 1301:16, 1301:18

**assault** [2] - 1316:17, 1316:20

**assigned** [1] - 1243:18

**associated** [2] - 1248:2, 1285:8

**association** [1] - 1305:5

**Association** [1] - 1257:9

**associations** [1] - 1257:6

**assume** [3] - 1246:17, 1293:21, 1298:15

**assuming** [1] - 1312:13

**assumption** [1] - 1226:17

**ate** [1] - 1250:25

**attend** [1] - 1257:21

**attorneys** [1] - 1251:15

**August** [2] - 1249:11, 1251:3

**authority** [7] - 1225:21, 1228:3, 1228:4, 1228:12, 1228:14, 1230:13, 1230:22

**available** [1] - 1306:8

**average** [2] - 1259:25, 1283:2

**avoid** [1] - 1321:13

**aware** [3] - 1226:12, 1229:19, 1252:18

## B

**bachelor's** [1] - 1256:23

**background** [2] - 1241:25, 1242:3

**bag** [4] - 1286:3, 1290:6, 1296:15, 1296:16

**baggies** [2] - 1250:6, 1299:19

**bags** [6] - 1267:4, 1267:11, 1267:12, 1267:13, 1272:22, 1290:6

**balance** [1] - 1307:9

**bank** [4] - 1310:3, 1311:6, 1311:7, 1311:11

**bar** [2] - 1264:4, 1285:9

**based** [6] - 1258:24, 1287:25, 1290:18, 1291:1, 1294:17, 1321:12

**basis** [1] - 1301:11

**batch** [1] - 1265:5

**bathroom** [2] - 1241:19, 1241:22

**battery** [1] - 1316:20

**bedroom** [1] - 1241:20

**begin** [4] - 1291:19, 1313:9, 1314:6, 1314:7

**behalf** [4] - 1227:22, 1300:14, 1301:9, 1322:25

**belong** [1] - 1257:7

**Beltran** [8] - 1245:23, 1246:10, 1248:11,

1249:2, 1254:18, 1304:2, 1304:23, 1318:18

**Beltran's** [2] - 1243:23, 1247:18

**Ben** [5] - 1302:21, 1302:24, 1303:1, 1303:19

**bench** [2] - 1258:6, 1264:11

**Benjamine** [1] - 1316:9

**Berglund** [9] - 1230:5, 1242:10, 1245:3, 1253:21, 1297:15, 1298:18, 1308:17, 1317:21, 1320:1

**BERGLUND** [20] - 1230:7, 1242:12, 1244:17, 1245:6, 1245:10, 1246:15, 1246:20, 1250:18, 1250:23, 1251:7, 1253:23, 1254:23, 1282:12, 1297:16, 1298:17, 1298:19, 1307:1, 1308:18, 1317:22, 1323:2

**best** [3] - 1239:8, 1246:25, 1301:24

**better** [2] - 1308:3, 1321:13

**between** [11] - 1246:8, 1248:2, 1249:4, 1249:7, 1253:14, 1267:19, 1296:13, 1303:9, 1304:22, 1304:24, 1322:17

**beyond** [3] - 1232:23, 1300:12, 1306:11

**big** [1] - 1288:14

**bigger** [2] - 1274:22, 1290:4

**bit** [6] - 1247:1, 1249:18, 1260:13, 1274:2, 1298:4, 1312:21

**bits** [1] - 1274:7

**BlackBerry** [3] - 1243:2, 1244:4, 1254:19

**BlackBerry's** [1] - 1244:7

**blows** [1] - 1274:7

**books** [1] - 1313:23

**Borton** [12] - 1227:20, 1228:1, 1231:6, 1232:15, 1236:4, 1251:8, 1254:24, 1282:13, 1297:17,

1300:13, 1308:20, 1317:23

**BORTON** [22] - 1228:9, 1230:3, 1236:3, 1236:5, 1236:8, 1251:9, 1254:25, 1282:14, 1282:17, 1286:7, 1294:10, 1297:18, 1300:14, 1307:2, 1307:4, 1307:10, 1307:13, 1307:20, 1308:21, 1317:25, 1318:25, 1323:3

**Borton's** [1] - 1320:12

**bought** [2] - 1299:14, 1304:6

**bound** [1] - 1320:9

**Bourjaily** [1] - 1230:23

**break** [2] - 1252:22, 1308:12

**bridged** [1] - 1301:1

**brief** [1] - 1225:11

**briefly** [2] - 1282:14, 1319:12

**bring** [7] - 1229:18, 1236:5, 1237:14, 1237:15, 1263:23, 1276:7, 1317:9

**broken** [1] - 1293:12

**brought** [1] - 1303:4

**built** [1] - 1241:15

**built-on** [1] - 1241:15

**bunch** [4] - 1245:13, 1271:10, 1274:8, 1276:23

**business** [1] - 1299:21

**busy** [2] - 1282:23, 1282:24

**buy** [2] - 1303:2, 1309:25

**buying** [1] - 1305:8

**BY** [20] - 1238:9, 1239:21, 1242:12, 1245:10, 1246:20, 1250:23, 1251:12, 1252:11, 1253:5, 1253:23, 1256:5, 1265:12, 1281:7, 1282:17, 1286:11, 1289:20, 1290:23, 1291:13, 1293:8, 1295:3

## C

**C11** [9] - 1265:16, 1266:5, 1267:23, 1267:24, 1277:12,

1277:20, 1277:21, 1277:22, 1281:11
**C2** [7] - 1265:9, 1265:15, 1267:3, 1267:15, 1275:24, 1276:4, 1281:8
**C7** [5] - 1265:17, 1266:8, 1268:2, 1279:18, 1281:17
**C8** [5] - 1265:18, 1266:11, 1268:5, 1280:3, 1281:19
**C9** [4] - 1265:19, 1266:14, 1280:8, 1281:25
**calculation** [6] - 1262:23, 1269:21, 1269:23, 1272:6, 1273:11, 1277:17
**calculations** [3] - 1273:12, 1276:16, 1277:16
**calculator** [1] - 1276:13
**caliber** [1] - 1241:5
**calibrated** [1] - 1262:19
**California** [2] - 1257:4, 1302:17
**Campbell** [4] - 1303:21, 1316:10, 1316:16, 1316:19
**candidly** [1] - 1230:12
**cannot** [1] - 1289:2
**capture** [1] - 1228:23
**card** [1] - 1244:8
**cards** [1] - 1299:22
**career** [1] - 1259:24
**cartel** [1] - 1310:9
**cartels** [1] - 1311:11
**Case** [1] - 1225:5
**case** [48] - 1226:4, 1226:22, 1226:23, 1229:21, 1231:16, 1232:16, 1235:14, 1235:17, 1240:5, 1240:15, 1248:3, 1254:1, 1260:5, 1261:6, 1261:14, 1262:1, 1264:15, 1264:24, 1274:14, 1276:7, 1277:5, 1283:23, 1284:5, 1284:6, 1285:8, 1285:10, 1285:14, 1285:25, 1286:1, 1298:8, 1298:10, 1298:21, 1298:25, 1299:4, 1299:11, 1300:23, 1301:2,

1302:15, 1303:13, 1306:8, 1312:14, 1312:20, 1312:24, 1313:18, 1314:6, 1320:23
**cases** [8] - 1234:19, 1259:25, 1260:1, 1263:15, 1263:24, 1282:22, 1283:2, 1284:12
**cash** [3] - 1249:16, 1249:18, 1309:24
**causes** [1] - 1236:9
**caution** [2] - 1236:20, 1301:22
**cautionary** [1] - 1234:16
**Cavazos** [2] - 1316:10, 1316:11
**Cavazos's** [1] - 1316:13
**cell** [8] - 1247:18, 1253:7, 1253:9, 1253:11, 1253:15, 1254:4, 1254:14, 1254:15
**certain** [4] - 1255:7, 1279:4, 1296:24, 1301:14
**certainly** [4] - 1227:20, 1230:18, 1302:4, 1310:13
**certainty** [1] - 1301:13
**cetera** [1] - 1286:3
**chain** [1] - 1303:18
**challenge** [1] - 1320:21
**challenges** [1] - 1314:20
**chance** [2] - 1225:9, 1242:22
**change** [5] - 1270:9, 1278:16, 1286:2, 1316:2, 1316:25
**changed** [2] - 1254:21, 1254:22
**changes** [3] - 1315:12, 1315:14, 1322:9
**charge** [2] - 1317:3, 1320:21
**charges** [1] - 1302:6
**Charles** [1] - 1255:25
**chart** [1] - 1249:9
**chat** [1] - 1233:3
**Che** [5] - 1302:16, 1303:15, 1304:7, 1304:20, 1304:24
**check** [7] - 1241:25, 1264:10, 1265:22,

1271:22, 1283:7, 1285:21, 1285:22
**checking** [3] - 1280:4, 1283:8, 1283:16
**chemical** [1] - 1283:24
**chemically** [1] - 1259:19
**chemist** [5] - 1255:10, 1256:25, 1258:6, 1259:6, 1283:23
**chemistry** [1] - 1256:24
**chemists** [1] - 1258:17
**Chemists** [1] - 1257:9
**chroma** [1] - 1273:22
**chromatograph** [1] - 1273:23
**chromatograph/ mass** [1] - 1260:24
**circle** [1] - 1297:1
**Circuit** [3] - 1231:5, 1231:15, 1321:11
**circuit** [3] - 1231:10, 1320:16, 1320:18
**circumstance** [1] - 1322:16
**circumstances** [1] - 1320:4
**claim** [1] - 1299:1
**claimed** [1] - 1300:23
**Clandestine** [1] - 1257:8
**clarification** [2] - 1237:3, 1286:17
**clarify** [1] - 1243:19
**clear** [8] - 1233:17, 1239:10, 1286:13, 1296:7, 1318:5, 1320:4, 1320:13, 1321:21
**clearly** [3] - 1231:10, 1234:7, 1306:8
**CLERK** [2] - 1225:4, 1255:23
**CLIC** [2] - 1257:8, 1257:20
**client** [3] - 1227:22, 1301:9, 1320:2
**clients** [1] - 1302:19
**close** [6] - 1226:22, 1235:14, 1235:17, 1272:4, 1279:6, 1319:21
**closely** [1] - 1320:5
**closer** [2] - 1230:16, 1317:10
**cloud** [1] - 1311:17
**Coblentz** [1] - 1303:20
**coconspirator** [2] - 1231:17, 1321:25

**coconspirator's** [2] - 1231:22, 1232:12
**coconspirators** [2] - 1299:1, 1301:12
**coconspirators'** [1] - 1231:2
**code** [2] - 1264:4, 1285:10
**Coeur** [1] - 1256:8
**coming** [2] - 1226:15, 1266:20
**commences** [1] - 1309:7
**comment** [3] - 1320:25, 1321:2, 1321:5
**committee** [1] - 1237:7
**commonly** [2] - 1260:24, 1263:23
**community** [3] - 1261:3, 1263:2, 1269:11
**compare** [3] - 1238:12, 1254:7, 1262:21
**compared** [1] - 1274:18
**compelled** [1] - 1320:10
**complete** [3] - 1228:19, 1229:24, 1255:23
**complex** [1] - 1314:19
**complied** [2] - 1239:3, 1272:21
**compliment** [1] - 1237:10
**component** [2] - 1229:2, 1229:6
**comports** [1] - 1322:10
**composite** [1] - 1267:7
**compound** [1] - 1274:6
**conceivable** [1] - 1289:19
**concentration** [1] - 1273:9
**concentrations** [1] - 1262:21
**concern** [3] - 1234:11, 1310:7, 1310:9
**concerned** [2] - 1231:25, 1320:19
**concerning** [5] - 1300:1, 1300:6, 1320:7, 1321:4, 1322:16

**concluded** [3] - 1311:23, 1321:18, 1321:22
**condition** [3] - 1226:15, 1266:2, 1266:5
**conditionally** [1] - 1235:9
**conduct** [1] - 1315:24
**cone** [3] - 1296:22, 1297:1, 1297:2
**confer** [3] - 1245:3, 1312:10, 1313:13
**CONFERENCE** [1] - 1315:4
**conference** [1] - 1315:7
**confidence** [1] - 1277:1
**confident** [1] - 1227:10
**confirm** [4] - 1316:23, 1322:8, 1322:13, 1322:20
**connecting** [1] - 1300:21
**consequence** [1] - 1226:21
**consider** [11] - 1226:8, 1231:4, 1233:9, 1234:1, 1236:19, 1236:23, 1237:4, 1237:8, 1308:11, 1322:2
**consideration** [1] - 1321:23
**considered** [8] - 1225:16, 1225:20, 1234:4, 1236:11, 1236:12, 1236:13, 1236:14, 1236:16
**considering** [1] - 1311:14
**consistent** [2] - 1321:7, 1321:9
**consistently** [1] - 1243:17
**conspiracies** [3] - 1318:9, 1318:16, 1321:17
**conspiracy** [37] - 1225:23, 1226:5, 1226:7, 1226:11, 1226:14, 1226:20, 1227:3, 1227:4, 1227:6, 1227:13, 1227:14, 1227:25, 1229:1, 1232:2, 1232:5, 1232:24, 1233:10, 1233:16,

1233:23, 1233:25,
1234:5, 1234:18,
1234:23, 1235:12,
1236:22, 1236:25,
1298:23, 1300:24,
1301:4, 1303:8,
1306:12, 1309:15,
1318:1, 1318:3,
1318:17, 1318:20,
1321:4
**constituted** [1] -
1321:5
**consulting** [1] -
1313:22
**contact** [1] - 1242:18
**contacted** [1] - 1299:4
**contacts** [1] - 1304:23
**contain** [4] - 1259:20,
1260:1, 1263:10,
1269:19
**contained** [6] -
1268:24, 1269:1,
1269:5, 1269:7,
1270:1, 1270:23
**containing** [1] -
1268:17
**contains** [2] -
1260:11, 1261:9
**contamination** [1] -
1267:19
**contents** [8] -
1228:25, 1236:10,
1243:13, 1244:1,
1253:12, 1254:16,
1267:6, 1290:5
**context** [1] - 1254:11
**CONTINUED** [1] -
1238:8
**contradict** [1] -
1301:15
**control** [1] - 1258:10
**controlled** [6] -
1256:16, 1256:20,
1257:19, 1258:9,
1259:1, 1260:16
**convicted** [2] -
1316:5, 1316:7
**conviction** [3] -
1298:22, 1316:14,
1316:22
**copy** [3] - 1244:18,
1244:25, 1245:6
**core** [1] - 1318:10
**Correct** [1] - 1277:9
**correct** [60] - 1240:2,
1242:25, 1243:9,
1248:22, 1249:11,
1249:14, 1251:21,
1253:16, 1253:17,
1267:21, 1268:10,

1268:11, 1268:18,
1271:17, 1275:9,
1275:11, 1278:4,
1278:19, 1278:22,
1279:12, 1279:13,
1279:15, 1279:16,
1281:22, 1281:23,
1283:25, 1284:1,
1284:13, 1286:5,
1286:6, 1286:15,
1286:16, 1287:4,
1287:5, 1287:6,
1287:19, 1287:23,
1287:24, 1288:6,
1288:7, 1288:9,
1288:12, 1288:14,
1288:15, 1288:17,
1288:18, 1288:23,
1288:24, 1289:4,
1290:2, 1290:4,
1290:8, 1290:9,
1290:14, 1290:15,
1291:23, 1292:8,
1295:19, 1296:3,
1307:13
**correctly** [2] - 1288:6,
1320:1
**correlates** [1] - 1275:3
**Counsel** [4] - 1225:8,
1291:10, 1317:1,
1322:24
**counsel** [17] -
1226:12, 1230:12,
1230:21, 1232:10,
1234:19, 1290:18,
1294:15, 1298:3,
1298:13, 1312:10,
1312:13, 1312:18,
1313:13, 1314:12,
1315:8, 1321:15,
1322:7
**count** [4] - 1246:25,
1274:12, 1274:14,
1301:3
**couple** [4] - 1235:25,
1238:2, 1249:21,
1257:3
**course** [4] - 1226:16,
1226:20, 1303:2,
1308:3
**Court** [1] - 1323:8
**court** [36] - 1225:4,
1225:25, 1226:12,
1226:17, 1227:11,
1228:2, 1229:8,
1230:25, 1231:1,
1231:15, 1232:1,
1232:15, 1232:18,
1233:7, 1233:22,
1234:1, 1235:7,

1236:20, 1237:4,
1260:12, 1260:18,
1263:5, 1298:7,
1298:20, 1306:23,
1313:16, 1315:8,
1318:7, 1319:4,
1319:22, 1321:13,
1321:22, 1321:23
**court's** [10] - 1227:1,
1227:24, 1234:12,
1314:21, 1317:3,
1317:12, 1317:14,
1318:2, 1320:21,
1322:5
**cover** [2] - 1238:1,
1297:10
**create** [3] - 1233:20,
1235:1, 1322:1
**created** [1] - 1322:14
**creative** [1] - 1227:21
**crimes** [1] - 1316:6
**Criminal** [1] - 1225:4
**criminal** [1] - 1315:23
**critical** [1] - 1314:5
**CROSS** [4] - 1242:11,
1251:11, 1282:16,
1286:10
**cross** [3] - 1236:1,
1242:10, 1282:11
**CROSS-
EXAMINATION** [4] -
1242:11, 1251:11,
1282:16, 1286:10
**cross-examination** [2]
- 1236:1, 1282:11
**crystal** [2] - 1259:15,
1271:9
**crystals** [12] -
1259:16, 1261:25,
1262:9, 1262:10,
1267:24, 1270:6,
1271:3, 1273:15,
1292:1, 1293:1,
1296:21, 1296:25
**curve** [2] - 1262:22,
1274:23
**curves** [1] - 1274:19
**custody** [6] - 1245:24,
1246:3, 1246:4,
1246:7, 1246:10,
1247:23
**customers** [3] -
1299:10, 1304:1,
1304:8
**cut** [15] - 1262:9,
1271:12, 1271:16,
1287:16, 1287:23,
1288:3, 1288:22,
1289:2, 1289:6,
1290:13, 1291:1,

1291:16, 1291:18,
1292:18, 1295:10
**cutting** [2] - 1250:3,
1299:19

# D

**d'Alene** [1] - 1256:9
**d)(2** [3] - 1228:22,
1229:16, 1229:23
**data** [2] - 1244:10,
1244:12
**date** [4] - 1248:5,
1248:11, 1293:20,
1293:21
**dates** [1] - 1301:13
**dating** [1] - 1245:19
**David** [3] - 1255:10,
1255:14, 1255:25
**DAVID** [1] - 1255:20
**Davis** [1] - 1241:4
**days** [1] - 1305:2
**deal** [4] - 1235:8,
1282:7, 1301:24,
1311:20
**dealing** [2] - 1310:6,
1320:20
**deals** [1] - 1320:18
**dealt** [1] - 1304:12
**December** [7] -
1248:3, 1248:21,
1299:5, 1299:8,
1299:10, 1304:18
**decision** [9] -
1228:13, 1231:10,
1231:11, 1234:13,
1307:5, 1317:7,
1320:14, 1320:16,
1321:11
**declarant** [3] - 1227:4,
1232:3, 1233:25
**declarant's** [2] -
1225:21, 1234:1
**declined** [1] - 1321:3
**defendant** [6] -
1226:5, 1227:5,
1233:24, 1316:5,
1319:19, 1322:23
**defendant's** [1] -
1316:7
**defendants** [6] -
1227:10, 1227:13,
1254:1, 1298:16,
1306:18, 1321:8
**defense** [5] - 1234:19,
1306:24, 1308:18,
1308:21, 1312:1
**definitive** [1] - 1300:5
**degree** [2] - 1256:24,
1301:14

**delay** [1] - 1235:2
**deliberations** [1] -
1313:9
**deliver** [4] - 1298:24,
1300:19, 1303:12,
1305:3
**delivered** [5] - 1299:8,
1303:19, 1303:21,
1304:2, 1304:17
**deliveries** [1] -
1305:23
**Dennis** [1] - 1225:6
**deny** [3] - 1232:18,
1235:21, 1306:3
**department** [2] -
1284:11, 1286:4
**depositing** [1] -
1310:2
**derived** [1] - 1276:21
**Derringer** [1] - 1241:4
**Derringers** [1] -
1241:21
**describe** [1] - 1241:11
**described** [1] - 1270:5
**desire** [1] - 1229:23
**detail** [1] - 1274:3
**detectable** [1] -
1322:18
**Detective** [4] -
1242:13, 1251:14,
1255:5, 1255:6
**detector** [1] - 1274:5
**determination** [24] -
1226:3, 1226:4,
1226:8, 1227:2,
1227:25, 1229:3,
1231:24, 1232:2,
1232:8, 1232:21,
1233:14, 1233:23,
1234:9, 1234:22,
1235:5, 1235:13,
1236:14, 1268:13,
1268:22, 1269:8,
1269:25, 1270:23,
1285:15, 1306:19
**determine** [17] -
1230:25, 1232:23,
1233:21, 1235:10,
1259:14, 1259:19,
1260:4, 1260:8,
1260:10, 1266:25,
1269:23, 1271:14,
1271:15, 1273:3,
1277:12, 1279:20,
1287:18
**determined** [2] -
1269:15, 1269:21
**determines** [1] -
1231:2
**determining** [3] -

1233:9, 1261:8, 1269:18
**deviations** [1] - 1277:2
**difference** [2] - 1296:13, 1297:10
**different** [8] - 1247:4, 1260:13, 1262:16, 1262:20, 1263:6, 1271:3, 1276:7, 1320:18
**differentiated** [1] - 1293:1
**difficult** [1] - 1290:19
**dilute** [1] - 1262:16
**dinner** [2] - 1250:13, 1250:25
**DIRECT** [2] - 1238:8, 1256:4
**direct** [4] - 1228:12, 1238:1, 1301:19, 1310:8
**directed** [1] - 1234:8
**direction** [1] - 1229:11
**directions** [1] - 1255:18
**directly** [5] - 1258:18, 1303:14, 1304:12, 1313:7, 1314:17
**disciplinary** [1] - 1258:16
**discipline** [2] - 1256:15, 1256:17
**disconnect** [1] - 1300:18
**discuss** [3] - 1298:7, 1313:19, 1314:7
**discussed** [1] - 1279:11
**discussion** [3] - 1232:9, 1234:11, 1307:5
**dismissal** [1] - 1301:11
**dismissed** [3] - 1226:22, 1301:4, 1302:7
**disseminated** [1] - 1318:19
**dissolves** [1] - 1262:17
**distribute** [1] - 1300:10
**distributed** [1] - 1302:19
**distributing** [1] - 1251:4
**distribution** [3] - 1299:17, 1303:17, 1318:21

**done** [9] - 1226:16, 1226:24, 1228:4, 1259:23, 1262:14, 1262:23, 1264:15, 1265:4, 1312:19
**door** [1] - 1241:14
**dosage** [1] - 1283:1
**doubt** [3] - 1232:24, 1300:12, 1306:11
**down** [15] - 1237:15, 1246:25, 1247:9, 1252:22, 1255:3, 1257:4, 1261:24, 1292:24, 1297:3, 1297:22, 1303:4, 1309:10, 1311:11, 1313:12, 1314:12
**drug** [10] - 1255:11, 1306:12, 1310:6, 1310:9, 1310:17, 1316:12, 1316:20, 1318:21, 1322:16
**drugs** [4] - 1283:1, 1302:14, 1306:13, 1318:19
**DUI** [1] - 1299:8
**duly** [2] - 1238:6, 1255:21
**dump** [1] - 1296:17
**duration** [3] - 1247:19, 1252:1, 1252:21
**durations** [3] - 1251:18, 1251:19, 1252:14
**duties** [1] - 1228:20
**duty** [1] - 1320:9
**duty-bound** [1] - 1320:9

## E

**early** [3] - 1234:18, 1307:16, 1314:16
**ears** [1] - 1228:3
**easier** [4] - 1240:25, 1248:9, 1265:1, 1276:13
**easiest** [1] - 1265:6
**easy** [2] - 1240:8, 1240:18
**educational** [1] - 1256:21
**effect** [2] - 1233:13, 1321:15
**effort** [1] - 1227:21
**eight** [2] - 1247:11, 1268:25
**eighteen** [1] - 1247:12
**either** [4] - 1263:22, 1284:21, 1314:23

**electronic** [1] - 1274:16
**electrons** [1] - 1274:8
**elements** [1] - 1318:1
**eleven** [1] - 1247:11
**employed** [1] - 1256:6
**employment** [1] - 1299:25
**end** [7] - 1235:20, 1237:11, 1244:12, 1303:17, 1310:19, 1313:4, 1313:11
**enforcement** [2] - 1242:2, 1242:5
**engage** [1] - 1313:21
**engaging** [1] - 1233:2
**ensure** [1] - 1266:18
**ensuring** [1] - 1228:18
**enter** [1] - 1298:20
**entire** [8] - 1231:18, 1287:11, 1289:11, 1290:5, 1290:11, 1291:25, 1292:6, 1296:17
**entries** [1] - 1243:3
**envelope** [1] - 1285:18
**environmental** [1] - 1257:3, 1259:6
**envisioned** [1] - 1319:22
**err** [1] - 1272:8
**error** [5] - 1276:15, 1276:18, 1278:18, 1278:24, 1322:4
**escorted** [1] - 1298:12
**especially** [1] - 1263:24
**essentially** [6] - 1235:8, 1235:18, 1253:13, 1315:25, 1318:18, 1319:17
**establish** [7] - 1225:20, 1226:10, 1226:18, 1229:1, 1234:5, 1236:22, 1236:24
**established** [1] - 1235:15
**estimating** [1] - 1291:1
**et** [1] - 1286:3
**event** [1] - 1314:22
**evidence** [86] - 1226:2, 1226:14, 1226:15, 1226:17, 1226:19, 1227:2, 1227:12, 1229:19, 1230:24, 1231:12, 1232:6, 1234:20, 1234:24, 1235:3,

1235:6, 1235:9, 1235:11, 1235:15, 1236:17, 1236:19, 1237:7, 1246:13, 1253:24, 1254:13, 1256:19, 1258:8, 1261:21, 1263:18, 1263:19, 1263:22, 1264:3, 1264:4, 1264:5, 1264:7, 1264:18, 1266:22, 1267:8, 1270:10, 1280:14, 1283:10, 1285:16, 1285:17, 1285:23, 1294:4, 1295:12, 1296:2, 1296:4, 1298:21, 1299:3, 1299:11, 1299:22, 1300:10, 1301:19, 1302:2, 1302:13, 1302:14, 1302:15, 1303:6, 1303:15, 1304:5, 1304:15, 1305:4, 1305:11, 1305:15, 1305:20, 1305:22, 1306:10, 1306:20, 1307:7, 1307:15, 1308:2, 1310:8, 1314:3, 1316:4, 1318:5, 1318:15, 1318:16, 1318:20, 1319:18, 1320:7, 1320:13, 1321:1, 1321:2, 1321:6, 1321:16, 1321:19
**evidence-wise** [1] - 1302:2
**evidentiary** [2] - 1231:3, 1322:1
**evidently** [1] - 1261:23
**exact** [2] - 1252:23, 1252:25
**exactly** [5] - 1243:4, 1247:21, 1248:5, 1290:25, 1309:5
**examination** [3] - 1236:1, 1238:1, 1282:11
**EXAMINATION** [9] - 1238:8, 1242:11, 1251:11, 1253:4, 1253:22, 1256:4, 1282:16, 1286:10, 1293:7
**examined** [2] - 1239:14, 1293:10
**example** [1] - 1286:24
**examples** [1] - 1261:13

**except** [1] - 1227:24
**exception** [2] - 1231:22, 1232:12
**exceptionally** [1] - 1262:4
**exchange** [1] - 1315:21
**exclude** [1] - 1318:8
**exclusion** [1] - 1319:6
**excuse** [3] - 1243:7, 1292:15, 1299:5
**exhibits** [20] - 1238:13, 1248:8, 1255:7, 1255:11, 1264:24, 1265:11, 1265:13, 1265:21, 1267:19, 1268:20, 1269:17, 1272:18, 1275:20, 1283:4, 1283:13, 1283:20, 1284:15, 1292:20, 1293:10, 1295:5
**Exhibits** [8] - 1238:13, 1265:8, 1265:23, 1266:24, 1272:12, 1280:13, 1280:19, 1285:6
**exist** [1] - 1232:3
**existed** [3] - 1227:13, 1232:24, 1233:24
**existence** [10] - 1225:21, 1225:23, 1226:10, 1226:19, 1227:25, 1234:5, 1234:23, 1235:12, 1236:22, 1236:24
**existing** [2] - 1229:10, 1233:16
**exists** [1] - 1233:10
**expect** [1] - 1312:25
**experience** [5] - 1241:6, 1258:24, 1294:18
**explain** [2] - 1263:18, 1276:19
**explained** [1] - 1310:24
**explanation** [1] - 1227:9
**express** [2] - 1298:9, 1313:18
**extent** [2] - 1318:11, 1319:5
**extra** [1] - 1245:5
**extraction** [1] - 1273:6
**extracts** [1] - 1262:18
**eye** [1] - 1295:10
**eyewitness** [5] - 1317:7, 1317:12, 1319:25, 1320:8,

1320:10

## F

**Fabian** [7] - 1302:19, 1304:2, 1304:7, 1304:13, 1304:22, 1304:25, 1305:3
**fact** [11] - 1226:1, 1226:5, 1230:22, 1234:2, 1237:12, 1260:6, 1309:16, 1311:5, 1311:7, 1320:2, 1320:6
**factor** [10] - 1276:15, 1276:18, 1278:8, 1278:18, 1278:25, 1279:9, 1279:10, 1296:8, 1296:12, 1297:10
**factors** [1] - 1235:19
**fail** [1] - 1318:8
**fails** [1] - 1226:21
**fair** [8] - 1258:25, 1272:8, 1284:2, 1284:7, 1285:5, 1295:15, 1297:9, 1312:15
**fairly** [2] - 1227:9, 1261:19
**fall** [1] - 1296:25
**false** [1] - 1316:14
**familiar** [1] - 1258:25
**far** [3] - 1232:17, 1272:1, 1321:12
**fatal** [1] - 1300:20
**federal** [5] - 1230:23, 1260:12, 1260:17, 1263:5, 1313:6
**FedEx** [6] - 1263:25, 1283:18, 1284:11, 1285:2, 1286:4, 1294:7
**felonies** [1] - 1316:13
**few** [1] - 1314:11
**fifteen** [1] - 1247:12
**fifty** [2] - 1269:4, 1295:24
**fifty-two** [2] - 1269:4, 1295:24
**final** [4] - 1249:7, 1250:10, 1272:7, 1307:5
**finally** [4] - 1241:24, 1264:20, 1281:24, 1304:10
**findings** [1] - 1226:1
**fine** [5] - 1239:24, 1270:12, 1270:15, 1270:20, 1270:21,
1287:4, 1297:5, 1308:9
**finest** [2] - 1262:7, 1272:25
**fingerprints** [1] - 1241:9
**finished** [1] - 1264:21
**first** [17] - 1234:18, 1241:13, 1248:11, 1250:12, 1255:21, 1259:20, 1260:9, 1261:20, 1265:22, 1282:18, 1283:8, 1289:25, 1292:4, 1295:5, 1302:11, 1308:11, 1315:17
**fits** [1] - 1296:18
**five** [9] - 1225:7, 1247:10, 1263:16, 1264:23, 1275:20, 1276:22, 1283:4, 1283:12, 1283:20
**focus** [1] - 1228:18
**follow** [4] - 1255:18, 1269:9, 1275:12, 1275:19
**followed** [1] - 1294:25
**follows** [5] - 1235:13, 1238:7, 1255:22, 1309:7, 1315:20
**forensic** [9] - 1255:9, 1256:11, 1257:24, 1258:3, 1258:5, 1258:7, 1261:3, 1263:2, 1264:7
**Forensic** [2] - 1256:8, 1257:2
**forewarning** [1] - 1312:24
**form** [6] - 1285:23, 1298:9, 1313:17, 1314:6, 1315:10, 1322:14
**formal** [1] - 1315:7, 1319:24
**formally** [1] - 1309:2
**forty** [2] - 1268:25, 1269:2
**forty-eight** [1] - 1268:25
**forty-nine** [1] - 1269:2
**forward** [2] - 1301:3, 1306:19
**four** [2] - 1247:10, 1316:11
**fourteen** [1] - 1247:12
**fourth** [1] - 1305:18
**fragments** [1] - 1274:8
**frankly** [2] - 1228:10, 1229:14

**free** [1] - 1321:1
**front** [5] - 1234:11, 1240:20, 1241:15, 1265:13, 1299:14
**full** [2] - 1227:8, 1228:19
**function** [1] - 1269:20
**future** [1] - 1237:9

## G

**gaining** [1] - 1310:5
**gap** [2] - 1249:4, 1300:20
**gas** [4] - 1260:23, 1273:17, 1273:21, 1273:23
**GC** [1] - 1274:6
**GC/MS** [6] - 1260:25, 1262:19, 1263:7, 1273:6, 1273:17
**Gearhart** [2] - 1239:19, 1255:17
**general** [2] - 1229:23, 1243:21
**generally** [4] - 1260:14, 1261:2, 1263:1, 1270:13
**gentlemen** [2] - 1298:2, 1312:3
**given** [5] - 1264:3, 1264:4, 1313:17, 1315:21, 1320:6
**glass** [2] - 1270:15, 1272:17
**Google** [1] - 1313:22
**government** [15] - 1226:18, 1226:20, 1234:22, 1235:10, 1235:25, 1255:4, 1297:25, 1299:21, 1300:20, 1307:16, 1309:22, 1310:15, 1315:22, 1321:8, 1322:13
**government's** [5] - 1225:10, 1226:23, 1235:14, 1235:17, 1319:14
**Government's** [24] - 1238:11, 1238:20, 1238:21, 1240:19, 1246:16, 1252:12, 1265:14, 1265:15, 1265:16, 1265:17, 1265:18, 1266:4, 1266:7, 1266:10, 1266:13, 1267:23, 1268:1, 1268:4, 1268:7, 1268:23,

**gram** [7] - 1270:14, 1277:7, 1277:8, 1286:25, 1292:8, 1305:19
**gram-and-a-half** [1] - 1270:14
**grams** [31] - 1267:9, 1267:25, 1268:3, 1268:6, 1268:8, 1270:11, 1270:17, 1272:23, 1275:25, 1276:10, 1277:5, 1277:6, 1278:1, 1278:5, 1278:7, 1278:11, 1280:1, 1280:5, 1280:9, 1280:10, 1281:10, 1281:14, 1281:15, 1281:22, 1282:3, 1287:2, 1292:5, 1292:7, 1296:11, 1297:4
**grant** [3] - 1235:16, 1319:17, 1319:24
**great** [2] - 1235:8, 1301:22
**greater** [1] - 1276:14
**grind** [6] - 1262:6, 1270:12, 1270:18, 1270:19, 1296:18, 1297:5
**gross** [1] - 1262:5
**ground** [2] - 1272:24, 1287:3
**group** [2] - 1257:7, 1257:10
**Guadalupe** [2] - 1225:6, 1238:18
**guess** [10] - 1233:3, 1251:25, 1252:3, 1264:24, 1279:8, 1289:18, 1292:13, 1297:8, 1301:10, 1301:18
**guide** [1] - 1233:22
**gun** [5] - 1238:24, 1238:25, 1239:6, 1239:22, 1241:2
**guns** [3] - 1238:18, 1240:4, 1241:6

## H

**half** [4] - 1270:14, 1277:7, 1277:8, 1290:13
**hand** [3] - 1241:3, 1244:19, 1244:21

**handled** [7] - 1283:5, 1283:12, 1283:15, 1283:20, 1285:2, 1293:17, 1293:18
**handling** [1] - 1234:18
**head** [1] - 1276:3
**health** [1] - 1266:19
**hear** [5] - 1225:4, 1227:17, 1235:3, 1307:25, 1317:10
**heard** [5] - 1250:3, 1305:12, 1314:3, 1314:4, 1316:4
**hearsay** [3] - 1231:19, 1232:13, 1234:21
**heartbeat** [1] - 1228:5
**heck** [1] - 1271:5
**Hegwood** [1] - 1318:3
**Heineman** [11] - 1230:9, 1251:10, 1255:1, 1286:9, 1290:22, 1297:19, 1301:8, 1308:23, 1311:4, 1311:24, 1319:9
**HEINEMAN** [23] - 1230:10, 1251:12, 1252:9, 1252:11, 1253:1, 1255:2, 1286:11, 1289:13, 1289:20, 1290:23, 1291:9, 1291:13, 1293:4, 1297:20, 1301:9, 1307:21, 1308:24, 1309:8, 1311:5, 1311:22, 1311:25, 1319:10, 1323:4
**help** [2] - 1271:14, 1287:7
**helped** [1] - 1303:22
**Hensley** [5] - 1300:2, 1302:21, 1303:21, 1303:22, 1316:10
**Higdon** [4] - 1283:11, 1283:14, 1283:20, 1284:15
**Higgon** [1] - 1283:13
**highest** [2] - 1278:12, 1278:14
**himself** [1] - 1302:20
**hint** [1] - 1310:18
**hit** [1] - 1275:1
**Hites** [1] - 1303:24
**hits** [1] - 1274:7
**hmm** [1] - 1305:14
**hold** [3] - 1239:1, 1272:18, 1281:14
**holding** [1] - 1241:2
**holiday** [1] - 1313:6

**home** [3] - 1307:12, 1307:17, 1308:5
**homogenization** [2] - 1292:11, 1292:20
**homogenize** [12] - 1262:8, 1269:24, 1270:8, 1271:13, 1271:19, 1272:3, 1286:19, 1287:15, 1288:20, 1292:5, 1292:6, 1296:10
**homogenized** [13] - 1270:4, 1272:2, 1272:5, 1288:5, 1288:10, 1289:11, 1289:24, 1289:25, 1290:1, 1291:25, 1292:1, 1292:23, 1296:14
**homogenizing** [4] - 1270:25, 1286:20, 1289:17, 1291:20
**homogenous** [1] - 1262:13
**honest** [1] - 1311:14
**hope** [1] - 1277:23
**hour** [1] - 1308:3
**hours** [2] - 1247:10, 1247:20
**house** [2] - 1250:25, 1304:3

## I

**Idaho** [5] - 1256:7, 1257:2, 1257:16, 1257:20, 1305:1
**idea** [3] - 1235:1, 1252:6, 1286:5
**identification** [7] - 1274:10, 1285:9, 1317:8, 1317:13, 1320:1, 1320:8, 1320:11
**identified** [2] - 1275:16, 1320:2
**idiot** [1] - 1286:18
**immunity** [6] - 1317:15, 1317:16, 1319:17, 1319:22, 1319:24
**importance** [1] - 1266:16
**impression** [1] - 1279:2
**inch** [1] - 1296:19
**include** [2] - 1319:16, 1321:3
**included** [2] - 1316:8, 1318:4

**including** [2] - 1307:15, 1313:22
**inclusion** [1] - 1319:14
**income** [1] - 1310:5
**incoming** [2] - 1243:14, 1244:6
**inconsistency** [2] - 1322:17, 1322:21
**inconsistent** [2] - 1299:24, 1300:2
**indeed** [1] - 1319:24
**indicate** [1] - 1260:14
**indicated** [1] - 1322:12
**indicating** [1] - 1299:15
**indication** [2] - 1245:14, 1300:8
**indicia** [1] - 1299:17
**individual** [2] - 1283:5, 1285:1
**individually** [2] - 1265:1, 1268:19
**Industries** [1] - 1241:4
**informal** [1] - 1315:11
**information** [5] - 1244:5, 1244:8, 1285:18, 1315:22, 1316:14
**initials** [3] - 1293:16, 1293:20, 1293:22
**inoperable** [3] - 1239:17, 1239:22, 1253:8
**inquire** [1] - 1256:2
**inserted** [1] - 1315:18
**inserting** [1] - 1237:3
**inside** [4] - 1253:10, 1267:14, 1267:20, 1272:16
**instruct** [7] - 1227:11, 1231:9, 1307:17, 1308:6, 1312:7, 1312:20, 1322:3
**instructing** [1] - 1320:20
**Instruction** [10] - 1229:7, 1315:17, 1316:2, 1317:12, 1317:14, 1318:1, 1318:8, 1319:15, 1322:9, 1322:10
**instruction** [27] - 1227:8, 1227:16, 1228:17, 1228:19, 1229:7, 1229:10, 1229:24, 1232:16, 1232:17, 1232:19, 1234:16, 1235:22,

1315:7, 1315:13, 1315:19, 1317:15, 1318:4, 1318:14, 1318:24, 1319:2, 1319:5, 1320:7, 1320:13, 1320:17, 1321:11, 1321:19
**instructions** [19] - 1229:9, 1230:24, 1231:6, 1231:16, 1233:8, 1233:15, 1233:16, 1308:4, 1312:16, 1313:8, 1314:4, 1314:17, 1314:21, 1315:9, 1315:12, 1320:24, 1321:4, 1321:10, 1321:14
**INSTRUCTIONS** [1] - 1315:4
**instrument** [6] - 1260:19, 1260:21, 1260:23, 1263:13, 1274:5, 1297:7
**instruments** [1] - 1263:7
**insufficient** [1] - 1298:22
**intact** [8] - 1266:3, 1266:6, 1266:9, 1266:12, 1266:15, 1266:17, 1267:16, 1294:9
**intended** [6] - 1233:12, 1233:20, 1297:12, 1310:20, 1321:23, 1321:25
**intent** [5] - 1298:24, 1300:9, 1300:19, 1303:12, 1318:6
**intention** [1] - 1307:14
**interminably** [1] - 1235:2
**intermixed** [2] - 1262:11, 1267:6
**Internet** [1] - 1313:22
**interview** [1] - 1251:3
**interviewed** [2] - 1250:11, 1251:2
**intrigues** [1] - 1236:11
**introduced** [2] - 1299:21, 1300:11
**Investigating** [1] - 1257:9
**invites** [1] - 1229:10
**involved** [2] - 1261:19, 1306:12
**involves** [1] - 1276:23
**ion** [1] - 1274:13

**ions** [4] - 1274:10, 1274:15, 1275:15
**issue** [5] - 1225:16, 1228:6, 1231:25, 1235:15, 1237:9
**item** [4] - 1228:12, 1236:8, 1276:6, 1292:1
**items** [2] - 1238:2, 1284:10
**itself** [12] - 1225:20, 1226:9, 1226:10, 1234:5, 1236:21, 1236:24, 1238:25, 1243:1, 1243:22, 1247:5, 1254:12, 1285:13

## J

**January** [1] - 1225:2
**JESS** [1] - 1238:5
**Jesus** [2] - 1225:6, 1238:18
**Jim** [6] - 1225:7, 1242:19, 1242:24, 1253:14, 1304:22, 1304:24
**Jim's** [1] - 1250:13
**Jime** [2] - 1243:10, 1243:18
**job** [3] - 1259:18, 1286:19, 1310:4
**Johnny** [5] - 1242:16, 1251:2, 1299:6, 1304:13, 1304:15
**judge** [3] - 1234:8, 1236:14, 1236:17
**judge's** [1] - 1229:3
**judges** [1] - 1320:23
**judgment** [2] - 1298:20, 1300:16
**July** [1] - 1250:12
**Jury** [6] - 1225:3, 1229:6, 1237:18, 1298:14, 1308:14, 1315:3
**jury** [60] - 1225:7, 1227:9, 1227:11, 1228:17, 1228:18, 1229:12, 1229:19, 1229:23, 1231:4, 1231:7, 1231:15, 1231:23, 1232:7, 1233:8, 1233:21, 1234:9, 1234:12, 1234:14, 1234:4, 1235:6, 1235:16, 1235:22, 1236:15, 1236:19, 1237:15,

1237:16, 1237:20, 1239:2, 1240:14, 1246:13, 1250:21, 1272:19, 1280:15, 1280:16, 1280:24, 1281:1, 1294:16, 1298:5, 1298:12, 1306:10, 1307:12, 1307:16, 1308:4, 1308:5, 1308:16, 1312:10, 1312:16, 1313:1, 1313:13, 1314:11, 1317:4, 1319:2, 1320:16, 1320:20, 1320:21, 1321:14, 1322:2, 1322:3, 1322:15, 1322:22
**jury's** [3] - 1232:20, 1232:23, 1233:13

## K

**K.C** [4] - 1302:21, 1303:21, 1303:22, 1316:10
**keep** [2] - 1257:12, 1297:3
**kept** [1] - 1254:20
**kind** [8] - 1225:15, 1241:2, 1263:12, 1271:2, 1287:17, 1310:9, 1312:5, 1312:13
**kinds** [1] - 1321:10
**knowing** [2] - 1290:24, 1312:4
**knowledge** [4] - 1252:1, 1252:15, 1285:7, 1290:24
**known** [4] - 1262:20, 1262:22, 1274:18, 1302:4
**knows** [1] - 1232:11

## L

**laboratories** [3] - 1257:4, 1258:20, 1258:23
**Laboratory** [3] - 1256:8, 1257:2, 1257:8
**laboratory** [9] - 1256:11, 1256:14, 1258:17, 1259:12, 1263:18, 1263:19, 1263:20, 1263:21, 1294:3
**labs** [1] - 1257:11

**United States Courts, District of Idaho**

lack [1] - 1228:14
ladies [2] - 1298:2, 1312:3
LAMPRECHT [57] - 1230:12, 1230:15, 1230:18, 1232:14, 1232:25, 1233:4, 1238:4, 1238:9, 1239:21, 1242:8, 1244:23, 1245:1, 1245:4, 1245:8, 1246:19, 1253:5, 1253:18, 1255:6, 1255:14, 1256:3, 1256:5, 1265:10, 1265:12, 1280:12, 1280:19, 1280:23, 1281:4, 1281:7, 1282:9, 1289:9, 1290:17, 1291:7, 1293:8, 1294:17, 1294:20, 1294:23, 1295:2, 1295:3, 1297:13, 1297:24, 1302:11, 1305:12, 1305:14, 1305:17, 1307:24, 1308:8, 1309:19, 1310:12, 1310:20, 1310:23, 1311:1, 1316:16, 1316:19, 1317:6, 1317:11, 1317:19, 1322:25
Lamprecht [13] - 1228:11, 1230:11, 1233:1, 1237:24, 1237:25, 1238:3, 1246:17, 1253:3, 1293:6, 1302:10, 1307:23, 1309:18, 1317:5
Lamprecht's [1] - 1321:3
language [14] - 1225:17, 1227:1, 1227:24, 1229:22, 1234:3, 1237:3, 1317:16, 1319:15, 1319:16, 1320:14, 1320:15, 1320:23, 1321:10, 1321:22
large [8] - 1270:6, 1271:9, 1289:1, 1309:25, 1310:3, 1311:2, 1311:5, 1311:16
larger [4] - 1288:1, 1289:2, 1296:10, 1296:20
last [13] - 1225:9,

1225:18, 1233:11, 1233:19, 1236:8, 1243:6, 1243:7, 1282:19, 1293:16, 1293:18, 1302:11, 1302:16, 1303:4
lasted [1] - 1252:20
late [1] - 1313:10
latest [1] - 1257:12
law [10] - 1229:21, 1231:1, 1231:9, 1232:16, 1232:20, 1242:2, 1242:5, 1306:15, 1314:4, 1320:24
layout [1] - 1241:11
leader [4] - 1256:15, 1256:17, 1258:8, 1258:16
leak [1] - 1286:3
leaking [3] - 1266:19, 1267:5, 1267:14
least [5] - 1226:18, 1228:8, 1261:23, 1268:16, 1312:8
leave [2] - 1255:7, 1255:10, 1314:14
leaves [1] - 1279:2
lectern [1] - 1230:14
leeway [1] - 1235:8
left [2] - 1255:8, 1296:15
leftover [1] - 1272:23
legitimate [1] - 1311:3
less [2] - 1270:11, 1277:7
level [2] - 1277:1, 1287:18
lifestyle [1] - 1299:24
likely [1] - 1314:24
likewise [1] - 1230:9
limine [1] - 1319:2
limitation [2] - 1236:18, 1236:20
limited [3] - 1244:7, 1244:10, 1305:2
limiting [2] - 1227:7, 1229:8
line [2] - 1274:25, 1275:1
linear [1] - 1274:23
lined [1] - 1307:8
link [1] - 1303:9
linking [1] - 1302:14
list [3] - 1244:5, 1316:4, 1316:6
listed [1] - 1304:1
listen [1] - 1313:19
lived [2] - 1303:24, 1305:2

living [2] - 1241:16, 1299:24
Llama [3] - 1238:22, 1238:24, 1239:6
load [2] - 1302:16, 1303:5
locate [1] - 1239:7
locked [2] - 1253:12, 1254:17
locker [1] - 1264:13
logged [1] - 1264:2
logic [1] - 1296:24
look [16] - 1228:22, 1234:2, 1238:10, 1240:15, 1242:15, 1243:25, 1244:24, 1249:1, 1263:13, 1270:3, 1270:10, 1272:20, 1274:11, 1280:25, 1295:6, 1311:7
looked [5] - 1242:23, 1246:7, 1253:12, 1284:19, 1291:11
looking [12] - 1240:15, 1243:21, 1246:11, 1246:21, 1247:14, 1248:4, 1249:6, 1259:8, 1259:9, 1275:4, 1295:4, 1304:19
looks [6] - 1247:13, 1247:19, 1248:13, 1249:4, 1261:24, 1264:17
loud [1] - 1230:19
love [1] - 1301:24
Loveland [25] - 1225:7, 1242:19, 1246:8, 1247:18, 1248:2, 1248:24, 1249:7, 1249:10, 1254:4, 1298:23, 1299:1, 1299:12, 1300:9, 1304:10, 1304:19, 1304:22, 1304:24, 1305:4, 1305:5, 1305:21, 1306:6, 1306:9, 1306:11, 1307:1, 1323:2
Loveland's [4] - 1242:24, 1243:17, 1250:25, 1253:15
low [1] - 1272:9
lower [1] - 1303:17
lowest [4] - 1272:6, 1273:12, 1278:10, 1279:11
lunch [1] - 1314:16,

1314:24
Lynn [5] - 1283:11, 1283:13, 1283:15, 1283:20, 1284:15

## M

mail [1] - 1264:1
main [1] - 1266:18
manner [1] - 1301:2
marijuana [1] - 1283:2
Mario [1] - 1316:9
mark [2] - 1261:24, 1300:11
marked [2] - 1247:5, 1277:22
marks [1] - 1238:25
Martinez [1] - 1316:9
Mass [1] - 1287:10
mass [5] - 1273:20, 1273:21, 1274:4, 1287:9, 1287:10
matches [1] - 1320:19
matter [8] - 1225:11, 1265:5, 1270:7, 1284:8, 1298:3, 1306:15, 1306:16, 1313:25
matters [1] - 1320:19
MDMA [1] - 1257:11
mean [6] - 1229:16, 1252:2, 1252:19, 1259:11, 1278:10, 1286:19
meaning [2] - 1252:17, 1284:5
means [4] - 1247:21, 1252:6, 1252:20, 1266:21
measure [3] - 1270:22, 1275:5, 1279:4
measurement [1] - 1279:3
meet [1] - 1231:3
member [1] - 1257:5
members [5] - 1226:6, 1227:6, 1227:14, 1232:4, 1233:25
memory [1] - 1228:8
mention [2] - 1232:12, 1310:16
mentioned [3] - 1234:14, 1271:2, 1313:24
merge [1] - 1235:18
message [1] - 1228:24
meter [1] - 1287:8
meth [12] - 1257:11, 1270:1, 1271:16,

1287:16, 1290:7, 1290:12, 1290:25, 1302:23, 1303:3, 1304:6, 1309:25, 1311:15
methamphetamine [66] - 1249:14, 1251:5, 1259:1, 1259:4, 1259:9, 1259:13, 1259:17, 1259:20, 1260:2, 1260:6, 1260:11, 1260:15, 1261:9, 1261:17, 1262:10, 1262:20, 1262:24, 1263:10, 1264:24, 1268:14, 1268:17, 1268:24, 1269:1, 1269:3, 1269:5, 1269:7, 1269:16, 1269:19, 1269:22, 1270:24, 1271:1, 1271:10, 1271:14, 1273:4, 1273:10, 1273:16, 1275:3, 1275:6, 1275:17, 1276:1, 1276:10, 1277:16, 1278:2, 1278:3, 1278:12, 1279:12, 1279:21, 1279:24, 1279:25, 1283:1, 1298:24, 1299:2, 1299:12, 1299:16, 1299:18, 1300:10, 1300:21, 1300:22, 1303:10, 1303:14, 1303:18, 1303:23, 1303:25, 1305:6, 1322:18, 1322:19
methods [1] - 1277:13
Mexican [2] - 1310:9, 1310:17
Mexico [6] - 1242:1, 1242:3, 1302:5, 1310:1, 1310:10, 1311:11
Michael [5] - 1225:6, 1300:15, 1303:16, 1304:5
micrograms [1] - 1273:8
microphone [2] - 1230:17, 1317:10
middle [1] - 1241:17
might [10] - 1289:6, 1290:13, 1291:16, 1293:14, 1294:21, 1297:11, 1310:10, 1312:24, 1322:17

**milligrams** [1] - 1271:5

**milliliter** [1] - 1273:8

**mind** [2] - 1312:6, 1313:25

**minus** [12] - 1276:20, 1277:5, 1278:8, 1279:5, 1280:1, 1280:6, 1280:10, 1281:10, 1281:13, 1281:18, 1281:20, 1282:2

**minute** [7] - 1251:20, 1252:1, 1252:4, 1252:7, 1252:16, 1252:20, 1252:23

**minutes** [7] - 1236:1, 1247:20, 1252:21, 1307:2, 1307:4, 1308:11, 1314:11

**mischief** [2] - 1237:13, 1320:22

**missed** [2] - 1243:14, 1244:6

**misspoke** [1] - 1254:9

**mistake** [1] - 1286:3

**mistakes** [1] - 1309:6

**mistrial** [1] - 1310:19

**misunderstanding** [1] - 1289:10

**misunderstood** [2] - 1289:22, 1292:3

**mix** [1] - 1290:1

**mixed** [2] - 1271:8, 1287:17

**mixture** [1] - 1268:16

**Model** [1] - 1318:8

**model** [3] - 1229:10, 1231:5, 1317:15

**modification** [2] - 1229:11, 1237:8

**modifications** [1] - 1233:15

**modified** [1] - 1316:3

**moment** [2] - 1294:14, 1312:11

**momentarily** [1] - 1237:15

**Monday** [2] - 1313:6, 1322:8

**money** [10] - 1299:23, 1309:9, 1309:16, 1310:1, 1310:3, 1310:10, 1311:2, 1311:6, 1311:8, 1311:10

**monitor** [2] - 1246:14, 1250:21

**month** [3] - 1249:3, 1260:1, 1282:23

**moreover** [1] - 1320:25

**morning** [13] - 1225:8, 1242:13, 1242:14, 1307:18, 1308:6, 1313:6, 1313:7, 1313:10, 1313:15, 1314:1, 1314:25, 1322:8, 1323:7

**Morris** [8] - 1225:6, 1300:15, 1300:24, 1301:4, 1303:16, 1303:17, 1304:5, 1306:4

**most** [4] - 1287:25, 1305:17, 1305:18, 1306:9

**mostly** [2] - 1288:3, 1301:11

**motion** [7] - 1235:16, 1298:15, 1300:15, 1304:9, 1306:3, 1308:25, 1319:2

**motions** [1] - 1306:21

**Mountain** [1] - 1247:2

**move** [5] - 1280:13, 1291:9, 1298:20, 1301:10, 1314:17

**MR** [45] - 1228:9, 1230:3, 1230:10, 1236:3, 1236:5, 1236:8, 1251:9, 1251:12, 1252:9, 1252:11, 1253:1, 1254:25, 1255:2, 1282:14, 1282:17, 1286:7, 1286:11, 1289:13, 1289:20, 1290:23, 1291:9, 1291:13, 1293:4, 1294:10, 1297:18, 1297:20, 1300:14, 1301:9, 1307:2, 1307:4, 1307:10, 1307:13, 1307:20, 1307:21, 1308:21, 1308:24, 1309:8, 1311:5, 1311:22, 1311:25, 1317:25, 1318:25, 1319:10, 1323:3, 1323:4

**MS** [78] - 1230:7, 1230:12, 1230:15, 1230:18, 1232:14, 1232:25, 1233:4, 1238:4, 1238:9, 1239:21, 1242:8, 1242:12, 1244:17, 1244:23, 1245:1, 1245:4, 1245:6,

1245:8, 1245:10, 1246:15, 1246:19, 1246:20, 1250:18, 1250:23, 1251:7, 1253:5, 1253:18, 1253:23, 1254:23, 1255:6, 1255:14, 1256:3, 1256:5, 1265:10, 1265:12, 1273:19, 1280:12, 1280:19, 1280:23, 1281:4, 1281:7, 1282:9, 1282:12, 1289:9, 1290:17, 1291:7, 1293:8, 1294:12, 1294:20, 1294:23, 1295:2, 1295:3, 1297:13, 1297:16, 1297:24, 1298:17, 1298:19, 1302:11, 1305:12, 1305:14, 1305:17, 1307:1, 1307:24, 1308:8, 1308:18, 1309:19, 1310:12, 1310:20, 1310:23, 1311:1, 1316:16, 1316:19, 1317:6, 1317:11, 1317:19, 1317:22, 1322:25, 1323:2

**MSM** [1] - 1250:3

**mulled** [1] - 1318:14

**multiple** [3] - 1318:9, 1318:16, 1321:17

**multiply** [2] - 1273:13, 1275:7

**must** [5] - 1225:19, 1233:8, 1233:21, 1234:4, 1298:9

## N

**name** [9] - 1243:18, 1255:12, 1255:23, 1255:24, 1255:25, 1257:7, 1282:19, 1283:11, 1316:5

**names** [2] - 1243:3, 1316:8

**necessary** [1] - 1321:9

**need** [12] - 1234:15, 1239:11, 1239:13, 1239:16, 1255:7, 1260:14, 1293:24, 1298:2, 1306:15, 1306:21, 1306:24, 1307:5

**negates** [2] - 1228:15, 1305:25

**networks** [1] - 1318:21

**never** [6] - 1231:21, 1232:7, 1299:8, 1299:9, 1299:18, 1310:20

**new** [5] - 1233:20, 1237:9, 1257:22, 1315:17, 1315:20

**news** [1] - 1313:20

**next** [6] - 1255:9, 1255:13, 1255:14, 1297:23, 1308:2, 1312:14

**nicely** [1] - 1235:10

**night** [2] - 1225:10, 1235:12

**nightmare** [1] - 1235:2

**nine** [3] - 1246:17, 1247:11, 1269:2

**nineteen** [1] - 1247:13

**Ninth** [3] - 1231:5, 1231:15, 1321:11

**nobody** [1] - 1299:14

**none** [5] - 1248:20, 1254:25, 1255:2, 1282:12

**nonmeth** [1] - 1271:10

**normally** [6] - 1226:16, 1226:24, 1259:14, 1260:10, 1271:20, 1312:25

**note** [9] - 1234:17, 1237:6, 1237:19, 1243:16, 1285:20, 1308:15, 1315:5, 1315:13, 1318:12

**noted** [6] - 1230:25, 1301:16, 1311:19, 1318:13, 1318:23, 1321:18

**notes** [3] - 1270:5, 1276:5, 1276:8

**nothing** [5] - 1295:15, 1295:16, 1297:18, 1307:1, 1323:2

**novel** [5] - 1225:15, 1228:6, 1228:16, 1228:21, 1236:6

**November** [2] - 1299:3, 1304:18

**number** [18] - 1239:5, 1240:7, 1240:11, 1240:25, 1241:7, 1242:24, 1243:7, 1243:17, 1248:18, 1254:20, 1272:6, 1276:7, 1279:6, 1279:7, 1285:10, 1286:1, 1304:23,

1305:2

**numbered** [1] - 1315:9

**numbers** [11] - 1238:17, 1242:19, 1245:13, 1253:25, 1254:3, 1254:8, 1254:10, 1254:11, 1254:14, 1274:13

**numerous** [1] - 1304:21

## O

**oath** [1] - 1237:23

**object** [6] - 1289:9, 1317:6, 1317:11, 1317:7, 1318:10, 1319:6

**objection** [11] - 1231:11, 1289:14, 1290:17, 1294:10, 1310:19, 1311:19, 1317:3, 1318:22, 1319:14, 1320:12

**objections** [10] - 1231:17, 1231:20, 1309:8, 1309:20, 1317:18, 1317:22, 1317:24, 1319:10, 1319:13, 1322:6

**obligation** [4] - 1229:25, 1232:21, 1232:23, 1234:12

**obligations** [1] - 1228:20

**obviously** [2] - 1274:21, 1301:23

**occasion** [1] - 1234:19

**occur** [1] - 1320:23

**occurred** [2] - 1286:3, 1294:22

**occurs** [1] - 1312:25

**offense** [2] - 1316:20, 1318:6

**offenses** [2] - 1316:12

**offer** [2] - 1291:8, 1321:9

**offered** [2] - 1227:6, 1232:4

**Officer** [3] - 1235:24, 1237:21, 1255:5

**officer** [2] - 1263:22, 1316:15

**often** [2] - 1259:23, 1263:9

**Olson** [1] - 1302:25

**omitted** [1] - 1318:11

**once** [13] - 1231:1, 1236:17, 1239:13,

1262:5, 1262:14, 1263:11, 1263:14, 1263:20, 1264:2, 1265:2, 1269:15, 1269:21, 1273:2

**one** [60] - 1236:5, 1240:22, 1243:6, 1243:7, 1243:10, 1243:24, 1245:12, 1247:10, 1248:10, 1249:1, 1250:19, 1251:13, 1251:20, 1252:1, 1252:4, 1252:7, 1252:16, 1253:15, 1267:4, 1267:7, 1267:8, 1268:3, 1268:6, 1268:20, 1269:13, 1271:9, 1272:18, 1274:19, 1274:20, 1275:13, 1276:2, 1276:9, 1277:18, 1278:1, 1280:5, 1280:9, 1281:5, 1281:9, 1281:12, 1281:17, 1281:20, 1282:1, 1283:10, 1284:5, 1285:18, 1286:12, 1286:14, 1287:12, 1287:13, 1287:15, 1287:22, 1290:6, 1291:21, 1291:24, 1292:8, 1292:23, 1295:4, 1299:9, 1299:13

**ones** [8] - 1251:23, 1270:6, 1270:17, 1274:11, 1275:16, 1292:10, 1292:17

**open** [5] - 1239:8, 1239:11, 1261:23, 1295:10, 1312:21

**opened** [2] - 1284:15, 1284:24

**operable** [1] - 1253:8

**operating** [1] - 1258:15

**opinion** [3] - 1291:4, 1291:8, 1295:16

**opinions** [3] - 1298:9, 1313:18, 1314:6

**opportunity** [7] - 1242:15, 1243:12, 1244:24, 1313:2, 1317:2, 1320:5, 1322:13

**organic** [1] - 1274:6

**organization** [1] - 1310:18

**original** [8] - 1272:22,

1273:14, 1276:9, 1278:15, 1284:20, 1295:14, 1296:1, 1301:17

**originally** [1] - 1284:25

**otherwise** [1] - 1289:19

**ounce** [3] - 1251:5, 1282:3, 1300:3

**ounces** [5] - 1282:5, 1299:2, 1300:4, 1300:5, 1305:8

**outgoing** [1] - 1243:14

**outside** [3] - 1235:4, 1267:18, 1313:21

**outward** [1] - 1318:19

**overnight** [3] - 1264:1, 1264:12, 1283:18

**overrule** [1] - 1311:19

**overruled** [2] - 1231:20, 1289:14

**own** [2] - 1312:6, 1315:23

## P

**p.m** [3] - 1245:23, 1246:23, 1323:8

**package** [1] - 1273:4

**packages** [2] - 1286:12, 1294:8

**packaging** [5] - 1239:9, 1239:12, 1262:2, 1268:10, 1295:6

**page** [1] - 1238:15

**paragraph** [7] - 1225:19, 1225:24, 1233:12, 1233:19, 1315:18, 1315:19, 1318:3

**parameters** [1] - 1229:25

**paraphernalia** [1] - 1299:19

**part** [9] - 1259:18, 1274:4, 1274:7, 1286:13, 1287:8, 1287:22, 1287:25, 1303:7, 1303:11

**partial** [2] - 1292:11, 1292:19

**participation** [2] - 1225:23, 1234:6

**particular** [18] - 1256:22, 1267:7, 1274:14, 1276:2, 1276:6, 1276:9, 1278:1, 1281:9,

1284:5, 1285:25, 1287:12, 1287:13, 1287:15, 1289:3, 1290:6, 1291:24, 1292:1, 1322:22

**particularly** [2] - 1229:2, 1245:21

**parties** [2] - 1229:13, 1316:1

**parts** [2] - 1291:16, 1292:17

**pass** [1] - 1296:21

**passcode** [2] - 1253:11, 1254:17

**past** [1] - 1228:7

**Patric** [4] - 1303:20, 1316:9, 1316:16, 1316:19

**pay** [1] - 1299:16

**paying** [1] - 1311:15

**people** [6] - 1242:1, 1252:4, 1257:10, 1263:6, 1310:1, 1311:11

**per** [2] - 1240:6, 1273:8

**percent** [13] - 1273:13, 1274:20, 1274:21, 1275:5, 1275:6, 1276:14, 1276:20, 1277:1, 1277:3, 1278:21, 1289:16

**percentage** [1] - 1273:14

**perfect** [1] - 1250:17

**perfectly** [1] - 1252:4

**perhaps** [4] - 1225:14, 1242:1, 1306:20, 1318:17

**period** [1] - 1246:6

**person** [6] - 1226:6, 1232:3, 1263:22, 1293:16, 1293:18, 1293:24

**personal** [6] - 1285:7, 1300:2, 1300:6, 1305:9, 1305:25, 1306:14

**personally** [3] - 1283:19, 1303:20, 1314:13

**persuaded** [1] - 1227:23

**pesticide** [1] - 1259:8

**phone** [30] - 1242:16, 1243:1, 1243:13, 1243:14, 1243:20, 1243:22, 1243:23, 1244:7, 1244:9, 1245:15, 1245:19,

1245:20, 1246:6, 1246:7, 1246:9, 1247:3, 1247:14, 1247:18, 1247:23, 1248:1, 1248:4, 1248:6, 1248:12, 1248:23, 1249:3, 1251:17, 1253:15, 1254:4, 1304:17, 1304:22

**phones** [9] - 1244:2, 1245:16, 1253:7, 1253:10, 1253:11, 1253:15, 1254:14, 1254:15, 1254:16

**physical** [1] - 1302:1

**physically** [1] - 1302:1

**pick** [2] - 1303:5, 1320:23

**picked** [1] - 1302:16

**piece** [13] - 1264:4, 1267:8, 1287:12, 1287:13, 1287:15, 1287:21, 1288:14, 1289:2, 1289:6, 1290:4, 1290:11, 1290:25, 1291:15

**pieces** [1] - 1288:2

**pile** [1] - 1296:23

**pistol** [2] - 1238:22, 1239:6

**place** [4] - 1246:10, 1246:23, 1248:21, 1259:21

**placed** [1] - 1244:9

**plain** [1] - 1321:14

**plan** [1] - 1314:15

**planned** [1] - 1312:4

**plans** [1] - 1313:2

**plastic** [3] - 1267:4, 1267:13, 1272:22

**plea** [3] - 1316:1, 1319:15, 1319:19

**plotted** [1] - 1274:23

**plus** [12] - 1276:20, 1277:4, 1278:8, 1279:5, 1280:1, 1280:6, 1280:9, 1281:10, 1281:13, 1281:17, 1281:20, 1282:2

**pocket** [1] - 1249:23

**point** [9] - 1227:22, 1236:5, 1237:8, 1274:17, 1285:11, 1291:20, 1309:22, 1310:14, 1321:21

**pointed** [1] - 1320:1

**pointedly** [1] - 1231:21

**Police** [3] - 1256:7, 1257:17, 1257:20

**police** [2] - 1247:24, 1316:15

**policy** [1] - 1240:6

**porch** [1] - 1241:15

**portion** [1] - 1289:2

**position** [5] - 1231:14, 1256:13, 1256:22, 1257:16, 1318:2

**positive** [2] - 1260:14, 1260:19

**possess** [2] - 1298:23, 1303:11

**possession** [5] - 1249:14, 1250:2, 1299:18, 1299:23, 1300:19

**possibility** [1] - 1292:15

**possible** [10] - 1262:13, 1271:9, 1286:22, 1288:25, 1289:17, 1289:18, 1292:25, 1293:1, 1295:1, 1312:8

**possibly** [4] - 1289:21, 1292:3, 1311:9, 1311:17

**posttrial** [1] - 1306:21

**potential** [1] - 1228:15

**potentially** [1] - 1322:21

**pound** [2] - 1282:6, 1311:15

**pounds** [2] - 1282:7, 1302:18

**powder** [10] - 1261:25, 1262:7, 1270:12, 1270:16, 1270:20, 1270:21, 1272:24, 1287:4, 1292:2, 1297:5

**practice** [3] - 1235:18, 1282:24, 1321:2

**preadmission** [1] - 1229:3

**precedent** [1] - 1226:15

**precisely** [2] - 1234:3, 1312:4

**precision** [1] - 1276:24

**preliminary** [5] - 1226:1, 1226:3, 1232:2, 1233:23, 1321:24

**preparation** [1] - 1264:13

**preponderance** [8] -

1226:1, 1226:13, 1226:19, 1227:2, 1227:12, 1232:6, 1234:24, 1235:11
**preproof** [1] - 1229:7
**presence** [3] - 1235:4, 1256:20, 1260:15
**present** [5] - 1235:5, 1237:18, 1237:20, 1308:14, 1308:16
**presenter** [1] - 1246:13
**presume** [1] - 1283:23
**pretty** [4] - 1244:19, 1263:4, 1282:23, 1291:5
**previously** [1] - 1238:6
**primarily** [3] - 1256:19, 1273:7, 1287:22
**principles** [1] - 1259:7
**printout** [1] - 1273:7
**probable** [1] - 1293:2
**problem** [4] - 1237:5, 1237:13, 1311:12, 1322:20
**problems** [1] - 1322:14
**procedure** [7] - 1258:15, 1261:19, 1262:25, 1275:13, 1275:19, 1294:2, 1308:25
**procedures** [3] - 1261:1, 1261:5, 1271:21
**proceed** [1] - 1306:25
**process** [3] - 1260:8, 1260:9, 1269:18
**processes** [1] - 1269:9
**professional** [1] - 1257:6
**profit** [1] - 1237:2
**promise** [1] - 1315:21
**pronounce** [1] - 1282:19
**proof** [1] - 1300:18
**properly** [1] - 1320:19
**proposed** [3] - 1315:11, 1317:3, 1318:3
**prosecution** [1] - 1317:17
**prosecutor** [1] - 1309:12
**protocols** [1] - 1294:24
**prove** [1] - 1235:11

**proven** [1] - 1234:23
**provide** [4] - 1229:8, 1229:23, 1233:7, 1318:8
**provided** [10] - 1232:15, 1300:18, 1300:21, 1300:22, 1315:6, 1315:8, 1315:15, 1315:23, 1319:5, 1319:19
**province** [1] - 1294:16
**purchased** [1] - 1238:18
**pure** [4] - 1275:25, 1279:12, 1288:22, 1322:19
**purity** [16] - 1259:14, 1261:17, 1262:24, 1269:19, 1269:23, 1270:24, 1271:14, 1271:23, 1276:8, 1277:12, 1279:20, 1279:23, 1287:7, 1287:18, 1288:17, 1296:13
**purpose** [6] - 1225:18, 1231:4, 1236:18, 1260:12, 1270:25, 1310:23
**pursuant** [1] - 1319:19
**put** [15] - 1240:22, 1246:12, 1250:18, 1262:16, 1264:4, 1264:6, 1266:21, 1267:7, 1270:14, 1272:15, 1272:24, 1307:6, 1313:24, 1317:2, 1320:24
**putting** [1] - 1314:21

## Q

**quality** [1] - 1258:10
**quantification** [4] - 1259:4, 1259:11, 1263:13, 1263:24
**quantified** [1] - 1263:9
**quantify** [2] - 1261:17, 1276:4
**quantitate** [2] - 1261:10, 1261:13
**quantitated** [4] - 1259:7, 1259:10, 1261:10, 1276:5
**quantitation** [2] - 1263:3, 1274:9
**quantitative** [1] - 1276:23
**quantities** [1] - 1322:16

**quarter** [6] - 1263:11, 1263:15, 1296:19, 1296:24, 1297:2, 1300:3
**quarter-inch** [1] - 1296:19
**quartering** [1] - 1296:23
**questions** [9] - 1251:7, 1251:9, 1253:2, 1253:18, 1253:20, 1282:9, 1297:13, 1297:20, 1322:15
**quite** [3] - 1228:10, 1229:14, 1249:18

## R

**Rachel** [1] - 1303:20
**raided** [1] - 1302:3
**ran** [3] - 1243:25, 1245:16, 1267:6
**rare** [1] - 1262:4
**rather** [2] - 1227:3, 1237:13
**read** [6] - 1239:25, 1240:8, 1240:18, 1241:1, 1315:20, 1316:3
**reading** [1] - 1225:13
**reads** [1] - 1251:19
**ready** [3] - 1264:9, 1285:21, 1306:25
**realized** [1] - 1235:1
**really** [12] - 1225:16, 1227:23, 1234:15, 1239:9, 1251:13, 1259:5, 1265:5, 1270:7, 1294:15, 1318:15, 1318:16, 1321:22
**realm** [1] - 1284:4
**reason** [13] - 1228:22, 1262:3, 1264:12, 1271:22, 1271:25, 1287:14, 1287:20, 1288:19, 1314:2, 1314:8, 1318:23, 1320:10, 1320:22
**reasonable** [3] - 1232:23, 1300:12, 1306:11
**reasons** [5] - 1236:18, 1239:14, 1266:20, 1300:17, 1302:6
**rebuttal** [1] - 1307:15
**receive** [6] - 1261:20, 1263:17, 1263:21, 1264:2, 1266:17,

1286:14
**received** [9] - 1229:15, 1264:23, 1265:21, 1266:2, 1267:15, 1284:19, 1286:13, 1299:9
**receives** [2] - 1263:19, 1263:20
**receiving** [3] - 1299:2, 1303:25, 1306:13
**recent** [2] - 1317:6, 1317:13
**recess** [8] - 1237:14, 1298:11, 1308:10, 1308:12, 1313:12, 1314:10, 1314:22, 1315:1
**Recess** [3] - 1237:17, 1308:13, 1315:2
**recessed** [1] - 1323:8
**recessing** [1] - 1313:5
**recipient** [1] - 1228:23
**recognize** [1] - 1293:22
**recognized** [3] - 1261:1, 1263:1, 1269:10
**record** [14] - 1234:22, 1237:19, 1250:20, 1253:16, 1255:24, 1258:14, 1308:15, 1315:5, 1315:6, 1315:16, 1316:21, 1317:2, 1319:1, 1321:21
**recorded** [1] - 1245:18
**records** [7] - 1246:8, 1247:3, 1248:23, 1251:17, 1254:4, 1311:7, 1311:12
**recover** [1] - 1254:15
**recovered** [2] - 1238:22, 1253:13
**RECROSS** [1] - 1253:22
**RECROSS-EXAMINATION** [1] - 1253:22
**redirect** [1] - 1293:6
**REDIRECT** [2] - 1253:4, 1293:7
**refer** [2] - 1231:21, 1232:10
**reference** [5] - 1228:24, 1229:8, 1236:13, 1285:11, 1313:23
**referred** [1] - 1260:24
**referring** [3] - 1232:11, 1280:18,

1309:5
**reflect** [1] - 1225:9
**reflection** [1] - 1225:13
**regard** [7] - 1309:6, 1319:3, 1319:13, 1319:25, 1320:12, 1321:17, 1321:20
**regarding** [2] - 1259:4, 1309:1
**regardless** [1] - 1284:11
**regards** [4] - 1283:4, 1285:2, 1285:6, 1318:4
**regular** [1] - 1231:15
**relationship** [1] - 1225:22
**relatively** [1] - 1272:4
**relevancy** [4] - 1309:1, 1309:9, 1309:11, 1309:22
**relevant** [2] - 1227:1, 1229:2
**reliable** [2] - 1261:2, 1263:1
**relied** [1] - 1321:12
**rely** [1] - 1236:21
**remain** [1] - 1314:10
**remember** [3] - 1253:7, 1274:24, 1309:19
**remind** [1] - 1237:22
**render** [1] - 1239:22
**reopen** [1] - 1238:1
**repeat** [1] - 1254:5
**rephrase** [2] - 1290:21, 1294:17
**replicates** [1] - 1276:24
**report** [6] - 1243:25, 1244:18, 1245:14, 1264:19, 1276:25, 1285:22
**reported** [1] - 1279:7
**reporting** [1] - 1285:25
**reports** [1] - 1245:16
**representative** [1] - 1292:22
**reproducible** [1] - 1274:12
**request** [14] - 1225:15, 1227:18, 1228:2, 1228:7, 1228:12, 1228:15, 1228:17, 1228:22, 1230:22, 1232:18, 1232:19, 1235:21, 1237:7, 1319:1

**requested** [6] -
1227:15, 1228:5,
1262:3, 1318:9,
1318:14, 1319:5
**requesting** [1] -
1281:2
**require** [1] - 1227:8
**required** [5] - 1225:25,
1226:13, 1232:1,
1237:12, 1318:5
**requirement** [3] -
1233:20, 1318:5,
1322:1
**reseal** [1] - 1239:13
**resealed** [1] - 1284:17
**research** [1] - 1313:21
**reserve** [2] - 1306:5,
1306:17
**respect** [12] - 1240:19,
1257:16, 1265:2,
1272:12, 1275:15,
1275:20, 1275:22,
1277:11, 1280:2,
1302:12, 1303:16,
1304:10
**response** [9] -
1230:11, 1262:21,
1274:2, 1274:15,
1274:16, 1274:22,
1275:1, 1275:3,
1302:10
**rest** [6] - 1288:3,
1292:12, 1292:14,
1308:19, 1308:22,
1323:6
**restate** [1] - 1291:10
**rested** [1] - 1309:3
**restriction** [2] -
1229:16, 1229:20
**rests** [2] - 1297:25,
1312:1
**result** [1] - 1260:19
**results** [2] - 1263:4,
1263:14
**resume** [2] - 1237:24,
1313:15
**retake** [1] - 1237:21
**retire** [2] - 1298:5,
1312:9
**return** [2] - 1235:23,
1264:17
**reveals** [1] - 1316:22
**review** [7] - 1237:7,
1243:12, 1254:3,
1264:20, 1301:14,
1306:6, 1306:15
**reviewed** [4] -
1225:10, 1225:17,
1251:18, 1254:10
**reviewing** [1] -

1233:18
**rights** [1] - 1228:20
**role** [1] - 1283:23
**room** [8] - 1241:13,
1241:16, 1280:16,
1281:1, 1298:5,
1312:10, 1313:13,
1314:11
**rough** [1] - 1270:18
**roughly** [2] - 1276:14,
1300:4
**Ruiz** [2] - 1250:11,
1320:3
**Rule** [8] - 1225:17,
1231:10, 1233:12,
1233:19, 1235:7,
1235:16, 1300:16,
1304:9
**rule** [3] - 1226:21,
1230:23, 1232:13
**ruled** [2] - 1311:20,
1319:4
**ruling** [4] - 1233:2,
1306:5, 1306:17,
1306:22
**rulings** [1] - 1322:5
**run** [8] - 1237:11,
1242:3, 1260:18,
1260:21, 1262:18,
1265:5, 1273:6,
1297:6

# S

**S-I-N-C-E-R-B-E-A-U
-X** [1] - 1256:1
**safety** [1] - 1266:19
**sample** [15] - 1262:2,
1262:6, 1275:7,
1278:16, 1286:21,
1286:25, 1287:11,
1288:1, 1288:3,
1288:7, 1289:4,
1289:11, 1291:21,
1292:5, 1292:23
**samples** [24] -
1264:23, 1269:25,
1271:18, 1271:23,
1272:11, 1272:15,
1272:16, 1272:19,
1273:1, 1273:2,
1286:14, 1287:23,
1288:9, 1288:16,
1288:22, 1289:12,
1289:23, 1290:1,
1290:3, 1290:8,
1291:2, 1291:22,
1296:9, 1296:10
**Samsung** [4] -
1242:24, 1242:25,

1245:11, 1254:19
**Sanchez** [16] - 1225:6,
1248:6, 1248:16,
1249:8, 1301:16,
1302:2, 1302:12,
1302:17, 1302:20,
1303:3, 1303:7,
1304:12, 1304:24,
1306:4, 1309:10,
1318:17
**Sanchez's** [2] -
1248:18, 1299:10
**save** [1] - 1255:11
**saved** [2] - 1243:3
**saw** [3] - 1244:15,
1303:24, 1304:3
**scales** [2] - 1250:8,
1299:19
**science** [1] - 1256:24
**scientific** [1] -
1269:11
**scientist** [5] -
1257:24, 1258:3,
1258:5, 1258:7,
1261:3
**scissors** [1] - 1239:18
**scoops** [1] - 1262:16
**scope** [1] - 1225:22
**screen** [3] - 1250:19,
1252:13, 1296:20
**scroll** [1] - 1246:25
**seal** [8] - 1264:16,
1265:23, 1266:2,
1266:5, 1266:17,
1267:14, 1293:17,
1295:6
**sealed** [3] - 1261:22,
1284:24, 1295:18
**sealing** [1] - 1293:22
**seals** [6] - 1284:20,
1293:10, 1293:12,
1294:9, 1295:14,
1296:1
**searched** [3] -
1228:11, 1253:6,
1301:17
**second** [2] - 1238:14,
1315:19
**seconds** [3] -
1251:23, 1251:24,
1252:17
**section** [1] - 1291:20
**secure** [1] - 1264:6
**security** [1] - 1239:14
**see** [20] - 1225:11,
1233:14, 1233:15,
1239:9, 1245:13,
1247:1, 1248:8,
1248:12, 1249:2,
1249:8, 1252:7,

1252:13, 1252:16,
1265:8, 1271:22,
1282:2, 1283:8,
1312:7, 1320:5,
1323:6
**seem** [1] - 1229:2
**seized** [4] - 1302:23,
1302:24, 1302:25
**self** [1] - 1299:23
**self-support** [1] -
1299:23
**sell** [1] - 1299:15
**selling** [1] - 1303:25
**seminars** [1] -
1257:21
**send** [4] - 1264:21,
1307:16, 1308:5,
1314:15
**sending** [3] - 1307:12,
1309:25, 1311:10
**sense** [1] - 1310:15
**sent** [3] - 1293:25,
1294:4, 1310:10
**sentence** [2] - 1236:9,
1236:12
**September** [1] -
1248:24
**serial** [6] - 1238:17,
1239:5, 1240:7,
1240:11, 1240:25,
1241:7
**series** [1] - 1233:14
**sessions** [1] - 1315:11
**set** [3] - 1249:7,
1263:12, 1315:9
**setting** [1] - 1276:22
**settled** [1] - 1312:6
**seven** [1] - 1247:11
**seventeen** [1] -
1247:12
**several** [2] - 1251:18,
1251:19
**Severson** [1] -
1244:21
**shall** [4] - 1236:10,
1236:12, 1236:13,
1236:14
**share** [1] - 1283:3
**sheet** [1] - 1246:11
**sheets** [2] - 1246:12,
1252:7
**shipped** [1] - 1263:25
**shipping** [1] - 1285:3
**short** [1] - 1257:7
**show** [20] - 1238:17,
1239:1, 1240:14,
1243:6, 1244:5,
1244:18, 1250:15,
1272:19, 1275:17,
1280:14, 1280:24,

1281:5, 1289:4,
1303:7, 1304:5,
1304:21, 1310:5,
1311:1, 1311:6,
1311:8
**showing** [1] - 1300:9
**shown** [1] - 1304:16
**shows** [7] - 1273:25,
1274:1, 1293:13,
1293:18, 1295:10,
1295:17, 1303:15
**shy** [2] - 1300:4,
1300:11
**sic** [3] - 1273:18,
1304:9, 1322:8
**sic]** [1] - 1245:21
**side** [2] - 1241:21,
1272:9
**sidebar** [2] - 1232:9,
1309:4
**Sidebar** [2] - 1309:7,
1311:23
**sieve** [1] - 1296:19
**sign** [3] - 1264:16,
1264:20, 1285:21
**SIM** [1] - 1244:8
**similar** [1] - 1300:15
**simple** [1] - 1321:14
**simply** [10] - 1231:8,
1231:14, 1232:20,
1233:21, 1237:3,
1300:11, 1306:13,
1309:16, 1313:24,
1321:18
**Sincerbeaux** [9] -
1255:10, 1255:15,
1255:16, 1256:1,
1256:6, 1282:20,
1282:21, 1282:22,
1293:5
**SINCERBEAUX** [1] -
1255:20
**single** [2] - 1301:3,
1318:17
**site** [1] - 1313:23
**six** [1] - 1247:10
**sixteen** [2] - 1247:12,
1282:7
**sizes** [1] - 1296:24
**skeptical** [1] - 1320:15
**slide** [1] - 1239:4
**slightly** [1] - 1278:22
**small** [7] - 1262:12,
1262:15, 1270:6,
1270:13, 1271:4,
1275:6, 1291:22
**sold** [2] - 1299:12,
1304:7
**solely** [1] - 1236:21
**solid** [1] - 1283:1

**solution** [1] - 1273:9
**solve** [2] - 1237:5, 1237:13
**solvent** [1] - 1262:17
**someone** [4] - 1244:19, 1276:12, 1285:14, 1294:7
**sometime** [3] - 1312:14, 1313:10, 1314:24
**sometimes** [1] - 1247:3
**somewhat** [3] - 1228:16, 1234:25, 1314:19
**somewhere** [1] - 1275:1
**SOP** [1] - 1258:13
**SOPs** [1] - 1258:10
**sorry** [14] - 1230:15, 1233:4, 1242:23, 1246:2, 1251:14, 1254:6, 1275:24, 1277:19, 1280:3, 1307:3, 1307:24, 1308:8, 1316:18, 1317:11
**sort** [3] - 1294:16, 1305:25, 1312:17
**sound** [1] - 1230:19
**sounds** [2] - 1282:23, 1284:10
**source** [1] - 1284:3
**sources** [1] - 1313:22
**speaking** [2] - 1243:19, 1245:21
**Special** [1] - 1271:7
**specialists** [2] - 1264:7, 1264:18
**specialize** [1] - 1257:11
**specialized** [3] - 1257:15, 1259:3, 1259:5
**specialty** [1] - 1263:12
**specific** [5] - 1243:22, 1252:16, 1252:17, 1316:6, 1321:4
**spectrometer** [8] - 1260:24, 1273:18, 1273:20, 1273:21, 1274:4, 1287:9, 1287:10, 1287:11
**spectrum** [1] - 1287:8
**speculation** [3] - 1294:11, 1294:18, 1295:1
**spell** [1] - 1255:24
**spelled** [1] - 1256:1
**spot** [1] - 1307:7

**stage** [1] - 1286:4
**stand** [2] - 1235:24, 1237:22
**standard** [4] - 1258:15, 1274:18, 1277:2, 1322:2
**standards** [1] - 1262:20
**standpoint** [3] - 1286:19, 1301:25, 1308:25
**stands** [1] - 1257:8
**start** [2] - 1238:20, 1313:25
**started** [2] - 1234:18, 1257:19
**state** [7] - 1231:6, 1255:23, 1258:11, 1260:13, 1291:14, 1315:15, 1318:23
**State** [4] - 1256:7, 1257:2, 1257:17, 1257:20
**statement** [10] - 1225:19, 1226:6, 1226:8, 1226:9, 1227:5, 1228:25, 1229:4, 1231:22, 1234:4, 1236:10
**statements** [8] - 1229:14, 1229:16, 1229:17, 1231:2, 1231:13, 1231:18, 1234:21, 1236:21
**States** [3] - 1225:5, 1230:23, 1323:1
**stationed** [1] - 1256:8
**stay** [2] - 1230:16, 1313:1
**STENNETT** [1] - 1238:5
**Stennett** [5] - 1235:24, 1237:21, 1242:13, 1255:5, 1255:6
**step** [6] - 1230:14, 1237:15, 1255:3, 1255:17, 1265:2, 1297:22
**stick** [1] - 1320:16
**sticker** [1] - 1285:17
**still** [7] - 1233:5, 1237:22, 1291:19, 1294:9, 1298:6, 1312:15, 1312:20
**stop** [1] - 1252:5
**stored** [1] - 1244:10
**straight** [2] - 1274:25, 1291:6
**strike** [1] - 1291:9
**strikes** [2] - 1225:18,

1233:11
**study** [2] - 1276:21, 1284:3
**stuff** [2] - 1266:21, 1271:6
**subject** [1] - 1298:6
**submission** [1] - 1285:23
**submit** [1] - 1235:15
**submitted** [9] - 1260:5, 1261:14, 1261:18, 1264:22, 1276:6, 1298:10, 1312:14, 1312:21, 1312:25
**submitting** [1] - 1322:15
**subsample** [2] - 1262:12, 1271:4
**subsamples** [2] - 1270:19, 1297:6
**substance** [10] - 1259:1, 1260:10, 1260:16, 1260:22, 1261:9, 1267:22, 1268:16, 1270:12, 1275:17, 1293:25
**substances** [8] - 1256:16, 1256:20, 1257:19, 1258:9, 1259:19, 1260:5, 1263:10, 1268:13
**substantive** [4] - 1233:8, 1233:13, 1233:20, 1322:1
**successfully** [1] - 1234:14
**sufficient** [7] - 1226:10, 1229:1, 1229:18, 1236:24, 1301:2, 1303:7, 1304:8
**suggest** [1] - 1303:6
**suggesting** [1] - 1310:16
**suggestion** [2] - 1311:10, 1321:3
**suggestive** [1] - 1310:11
**supervise** [2] - 1258:17, 1258:18
**support** [4] - 1232:17, 1299:23, 1320:7, 1321:19
**supports** [1] - 1229:22
**supposed** [1] - 1258:12
**suspect** [1] - 1285:19
**suspected** [1] - 1260:22

**sustain** [3] - 1298:22, 1304:9, 1310:18
**switch** [1] - 1286:2
**sworn** [3] - 1238:6, 1255:17, 1255:21
**system** [1] - 1264:3

## T

**Tambunga** [7] - 1248:7, 1248:14, 1251:3, 1299:6, 1299:7, 1304:14, 1304:15
**Tambunga's** [1] - 1242:16
**tampered** [6] - 1261:22, 1266:23, 1293:14, 1294:8, 1295:11, 1295:17
**tampering** [2] - 1296:2, 1296:4
**Tanya** [1] - 1302:25
**tasked** [1] - 1284:4
**technical** [1] - 1258:7
**technically** [1] - 1258:20
**technicians** [1] - 1283:11
**telephone** [3] - 1245:11, 1253:25, 1254:20
**ten** [3] - 1247:11, 1263:15, 1307:4
**Ten** [1] - 1307:2
**tend** [1] - 1252:3
**terms** [2] - 1243:13, 1312:16
**test** [7] - 1263:12, 1269:20, 1286:13, 1286:22, 1287:7, 1290:15, 1292:17
**tested** [2] - 1287:22, 1303:14
**testified** [9] - 1238:7, 1255:22, 1283:24, 1288:19, 1299:7, 1301:23, 1304:11, 1304:16, 1305:18
**testimony** [7] - 1300:1, 1300:6, 1301:11, 1303:10, 1303:23, 1315:21, 1321:25
**testing** [6] - 1288:1, 1288:8, 1288:13, 1288:21, 1288:22, 1291:3
**tests** [2] - 1260:14, 1260:20

**text** [1] - 1315:14
**THE** [101] - 1225:4, 1225:8, 1230:2, 1230:4, 1230:8, 1230:11, 1230:14, 1230:16, 1231:19, 1232:22, 1233:1, 1233:6, 1236:4, 1236:7, 1236:16, 1237:19, 1239:13, 1239:16, 1239:18, 1239:20, 1242:10, 1244:21, 1244:25, 1245:3, 1246:12, 1246:17, 1250:20, 1250:22, 1251:8, 1251:10, 1252:10, 1253:3, 1253:20, 1254:24, 1255:1, 1255:3, 1255:12, 1255:16, 1255:23, 1255:25, 1256:2, 1280:17, 1280:21, 1281:2, 1282:11, 1282:13, 1282:15, 1286:9, 1289:14, 1289:16, 1290:21, 1291:10, 1293:6, 1294:14, 1294:21, 1294:24, 1297:15, 1297:17, 1297:19, 1297:22, 1298:1, 1298:15, 1298:18, 1300:13, 1301:7, 1302:9, 1305:11, 1305:13, 1305:15, 1306:2, 1307:3, 1307:6, 1307:11, 1307:14, 1307:23, 1308:1, 1308:10, 1308:15, 1308:20, 1308:23, 1309:4, 1309:18, 1310:7, 1310:14, 1310:22, 1310:25, 1311:4, 1311:18, 1311:24, 1312:2, 1315:5, 1316:18, 1316:24, 1317:9, 1317:18, 1317:20, 1317:23, 1318:12, 1319:8, 1319:11, 1323:5
**themselves** [3] - 1240:16, 1248:4, 1301:15
**therefore** [2] - 1244:9, 1322:2
**thinking** [1] - 1231:23
**third** [1] - 1251:3
**thirteen** [1] - 1247:11

**United States Courts, District of Idaho**

**three** [8] - 1247:10, 1251:15, 1257:21, 1258:20, 1258:22, 1298:25, 1302:17, 1304:11

**threshold** [1] - 1231:3

**throughout** [1] - 1313:17

**tie** [7] - 1300:24, 1309:13, 1309:15, 1309:20, 1310:8, 1310:17

**tie-in** [1] - 1310:17

**tied** [1] - 1300:25

**today** [3] - 1307:16, 1312:7, 1312:21

**together** [8] - 1235:19, 1267:8, 1272:4, 1287:17, 1309:13, 1309:21, 1314:21

**toll** [1] - 1246:7

**tolls** [2] - 1243:21, 1248:4

**took** [13] - 1246:22, 1248:21, 1265:3, 1272:16, 1272:25, 1286:25, 1287:23, 1288:2, 1289:12, 1289:23, 1289:25, 1291:22, 1292:22

**top** [2] - 1247:1, 1276:3

**total** [4] - 1267:9, 1275:8, 1287:2, 1288:12

**touched** [1] - 1284:16

**tracking** [1] - 1264:3

**Trailer** [1] - 1241:14

**trailer** [12] - 1238:23, 1241:12, 1241:18, 1249:25, 1253:6, 1253:10, 1254:12, 1301:17, 1302:3, 1302:18, 1302:24, 1309:24

**trained** [1] - 1295:10

**training** [6] - 1256:21, 1257:16, 1257:18, 1258:4, 1258:25, 1259:3

**transcript** [2] - 1306:6, 1316:23

**transferred** [2] - 1254:19, 1309:17

**transfers** [1] - 1309:9, 1311:9

**treat** [1] - 1235:19

**tremendous** [1] - 1301:24

**trends** [2] - 1257:12,

1257:22

**trial** [9] - 1225:7, 1231:18, 1233:22, 1235:2, 1235:20, 1313:3, 1313:15, 1313:17, 1320:23

**trigger** [1] - 1240:17

**truth** [2] - 1238:7, 1255:22

**try** [6] - 1228:18, 1246:24, 1265:7, 1289:22, 1306:7, 1312:6

**trying** [5] - 1228:23, 1262:7, 1262:8, 1285:24, 1288:20

**Tuesday** [10] - 1307:18, 1308:5, 1313:5, 1313:7, 1313:10, 1313:15, 1314:1, 1314:14, 1314:25, 1323:6

**turn** [1] - 1228:5

**turned** [2] - 1246:13, 1250:21

**turns** [1] - 1251:14

**twelve** [1] - 1247:11

**twice** [2] - 1260:18, 1304:17

**two** [36] - 1247:10, 1251:15, 1252:21, 1260:14, 1262:15, 1262:16, 1267:4, 1267:13, 1267:19, 1269:4, 1271:20, 1271:21, 1271:22, 1272:22, 1273:2, 1273:12, 1277:1, 1287:23, 1288:2, 1288:9, 1288:16, 1288:22, 1289:23, 1290:1, 1290:3, 1290:8, 1295:24, 1299:2, 1300:4, 1300:5, 1305:8, 1305:9, 1308:3, 1315:10

**type** [2] - 1229:10, 1264:19

## U

**U.S** [1] - 1242:2

**unable** [2] - 1253:12, 1253:13

**uncertainty** [7] - 1279:3, 1279:8, 1279:10, 1296:7, 1296:12, 1297:10, 1315:16

**under** [13] - 1225:21, 1225:22, 1225:24, 1230:22, 1231:20, 1237:23, 1298:21, 1300:16, 1313:16, 1314:8, 1318:10, 1320:3

**undercover** [1] - 1303:2

**underlying** [1] - 1318:6

**uniform** [3] - 1286:22, 1291:21, 1292:2

**uniformly** [1] - 1296:25

**Union** [1] - 1309:9

**unique** [1] - 1236:9

**United** [3] - 1225:5, 1230:23, 1323:1

**unknown** [1] - 1262:22, 1274:18

**unless** [3] - 1233:3, 1262:3, 1320:20

**untested** [1] - 1291:16

**unusual** [4] - 1249:16, 1249:19, 1249:20, 1249:22

**up** [45] - 1236:5, 1239:1, 1239:8, 1243:17, 1246:25, 1255:7, 1255:8, 1255:11, 1256:8, 1257:12, 1261:23, 1262:6, 1262:17, 1263:13, 1263:25, 1264:16, 1264:19, 1270:12, 1271:8, 1272:18, 1272:24, 1274:12, 1274:15, 1276:22, 1281:4, 1287:3, 1296:18, 1297:5, 1298:2, 1298:12, 1300:3, 1302:16, 1303:5, 1307:8, 1307:15, 1308:2, 1309:1, 1309:3, 1309:4, 1310:19, 1311:6, 1313:4, 1313:11, 1313:25, 1320:23

**user** [1] - 1305:21

**usual** [1] - 1302:19

## V

**vagueness** [1] - 1301:13

**validation** [1] - 1276:21

**validity** [1] - 1228:15

**variety** [1] - 1284:12

**varying** [1] - 1247:4

**vault** [2] - 1264:6, 1264:8

**verbatim** [1] - 1315:25

**verdict** [1] - 1315:10

**versa** [1] - 1271:11

**versus** [2] - 1225:5, 1284:5

**Vertner** [8] - 1302:21, 1302:22, 1302:25, 1303:1, 1303:19, 1303:22, 1304:6, 1316:9

**vial** [5] - 1270:15, 1270:20, 1272:24, 1272:25, 1282:2

**vials** [2] - 1262:16, 1272:17

**vice** [1] - 1271:10

**Victor** [4] - 1250:11, 1302:20, 1304:13, 1304:25

**view** [2] - 1309:23, 1321:5

**visit** [3] - 1305:1, 1313:23, 1314:11

**visually** [1] - 1261:24

**voluminous** [1] - 1244:19

**vs** [1] - 1230:23

## W

**wait** [1] - 1313:14

**walk** [1] - 1241:14

**wants** [1] - 1231:6

**wash** [1] - 1303:22

**weak** [1] - 1306:9

**weapon** [1] - 1239:4

**week** [5] - 1299:2, 1300:4, 1300:5, 1305:9, 1312:14

**weekend** [3] - 1306:7, 1308:6, 1313:5

**weigh** [5] - 1262:1, 1266:24, 1267:2, 1267:10, 1271:7

**weighed** [5] - 1266:25, 1267:24, 1268:3, 1268:6, 1268:12

**weight** [10] - 1262:1, 1262:5, 1267:22, 1273:14, 1275:10, 1276:9, 1276:10, 1278:15, 1322:18, 1322:19

**Western** [2] - 1309:9, 1311:13

**whole** [12] - 1238:7,

1255:21, 1273:4, 1288:14, 1289:1, 1289:5, 1290:25, 1291:15, 1291:25, 1292:5, 1310:23

**wise** [1] - 1302:2

**wish** [3] - 1227:18, 1228:10, 1230:5

**withdrawing** [1] - 1310:2

**Witness** [2] - 1239:3, 1272:21

**witness** [13] - 1237:22, 1244:18, 1244:20, 1244:22, 1255:9, 1255:14, 1255:18, 1256:2, 1265:11, 1290:20, 1297:23, 1315:23, 1319:18

**WITNESS** [5] - 1239:16, 1239:20, 1250:22, 1255:25, 1289:16

**witness's** [1] - 1294:18

**witnesses** [5] - 1304:11, 1304:13, 1305:12, 1305:17, 1316:8

**witnesses'** [1] - 1315:20

**women** [1] - 1311:13

**wondered** [1] - 1280:24

**wondering** [1] - 1289:7

**word** [1] - 1261:11

**words** [1] - 1271:12

**works** [2] - 1235:9, 1265:8

**wrap** [2] - 1307:15, 1308:2

**write** [1] - 1258:9

**writing** [1] - 1293:23

**written** [1] - 1315:14

## Y

**year** [1] - 1258:5

**years** [5] - 1256:12, 1257:21, 1260:3, 1263:16, 1276:22

**yourselves** [1] - 1298:8

## Z

**zero** [2] - 1247:19, 1247:20